FILED _____ LODGED
_____ RECEIVED _____ COPY

MAR 1 1 2005

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ P DEPUTY

1   THE PHOENIX LAW GROUP OF
    FELDMAN BROWN WALA HALL & AGENA, PLC
2   8765 East Bell Road, Suite 110
3   Scottsdale, Arizona 85260
    (480) 444-3500
4   Ashley Adams Feldman (#013732)

5   PHILLIPS & COHEN, LLP
6   2000 Massachusetts Avenue, N.W.
    Washington, D.C. 20036
7   (202) 833-4567
    Mary Louise Cohen (D.C. Bar #298299)
8   Peter Chatfield (D.C. Bar #06270)
9   Colette G. Matzzie (D.C. Bar #451230)

10  Attorneys for Qui Tam Plaintiffs

11

12          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ARIZONA

13

14  United States of America, Ex Rel. Jerre Frazier

15                                    Case No. **CV'05 0766 PHX LOA**

16              Plaintiffs,

17  v.                              **COMPLAINT FOR VIOLATION OF
                                     FEDERAL FALSE CLAIMS ACT, 31
18  Iasis Healthcare Corporation,    U.S.C. § 3729 et seq.**

19              Defendant.

20                                    **JURY TRIAL DEMANDED**

21

22              <u>**FILED IN CAMERA AND UNDER SEAL**</u>

23

24      Plaintiffs and *qui tam* relators Jerre Frazier and          through their attorneys

25  Phillips & Cohen LLP and The Phoenix Law Group of Feldman Brown Wala Hall & Agena PLC

26  for their Complaint against IASIS Healthcare Corporation, allege as follows:

27

28

I.   **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made by the defendant and/or its agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729 et seq., ("the FCA" or "the Act").

2.      This *qui tam* case is brought against defendant IASIS Healthcare Corporation ("IASIS") for knowingly defrauding the federal Government in connection with the Medicare, Medicaid and other federal health care programs. IASIS is the owner and operator of fifteen medium-sized acute care hospitals and one behavioral health hospital in five states:  Utah, Arizona, Florida, Texas and Nevada.  As alleged below, since at least 1999, defendant has engaged in a scheme to pay improper compensation to physicians to induce them illegally to refer patients, including Medicare and Medicaid patients, exclusively or nearly exclusively to hospitals owned by defendant.  As used in this complaint "defendant" refers to IASIS or one or more of its wholly owned hospitals, ownership interest in surgery centers, home health care agencies, and its Medicaid managed health plan.

3.      The compensation offered to physicians by defendant as an inducement for referrals included (1) compensation paid to physicians, either as salaries or consulting services fees, that was greater than fair market value and payments to physicians in excess of contract terms; (2) sham medical directorship contracts including falsified time records and excessive compensation; (3) below market rent for office and lab space; (4) lease payments for laboratories owned by a physician at prices above fair market value; (5) payments to physicians without written agreements to support the payments; (6) provision of free services to physicians; (7) forgiveness of indebtedness owed by physicians to IASIS; and (8) retention payments to physicians.  The financial relationships between physicians and defendant implicate the Stark Statute, 42 U.S.C. § 1395nn, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and various state laws and ethical canons of the medical profession.

4.      The physicians to whom defendant provided illegal remuneration and kickbacks, and with whom defendant entered into illegal financial relationships, referred large volumes of

1  patients, including Medicare, Medicaid, and other beneficiaries of government health care

2  programs, to defendant in violation of federal law.  Defendant then submitted false or fraudulent

3  claims based on these referrals to the United States to obtain millions of dollars in Medicare,

4  Medicaid, and over government health care programs for reimbursement that it was not legally

5  entitled to receive.  Under the False Claims Act, 31 U.S.C. § 3729(a)(1), such claims were false

6  and/or fraudulent because defendant had no entitlement to payment for such unlawfully obtained

7  referrals.

8        5.     To conceal their unlawful conduct and avoid refunding payments made on the

9  false claims, the hospitals owned by defendant also falsely certified, in violation of the False

10  Claims Act, 31 U.S.C. § 3729(a) (7), that the services identified in their annual cost reports were

11  provided in compliance with federal law, including the prohibitions against kickbacks, illegal

12  remuneration to physicians, and improper financial relationships with physicians.  The false

13  certifications, made with each annual cost report submitted to the government, were part of

14  defendant's unlawful scheme to defraud Medicare and other government healthcare programs.

15        6.     The FCA was originally enacted in 1863, and was substantially amended in 1986

16  by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  Congress enacted the

17  1986 amendments to enhance and modernize the Government's tools for recovering losses

18  sustained by frauds against it after finding that federal program fraud was pervasive.  The

19  amendments were intended to create incentives for individuals with knowledge of Government

20  frauds to disclose the information without fear of reprisals or Government inaction, and to

21  encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

22        7.     The Act provides that any person who presents, or causes to be presented, false or

23  fraudulent claims for payment or approval to the United States Government, or knowingly

24  makes, uses, or causes to be made or used false records and statements to induce the Government

25  to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up

26  to $11,000 for each such claim, plus three times the amount of the damages sustained by the

27  federal Government.

28

8.     The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time).  Based on these provisions, *qui tam* plaintiffs and relators Jerre Frazier and                              seek through this action to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein.

9.     Although the precise amount of the loss to the federal and state government cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the defendant under the facts alleged in this Complaint amounts to millions of dollars.

**II.     PARTIES**

10.    Plaintiff/relator Jerre Frazier is a resident of Houston, Texas.  From November 1999 until April 2003, Relator Frazier served as Vice President of Ethics and Business Practices and Chief Compliance Officer for defendant.   From April 2003-April 2004, Relator  Frazier had a consulting agreement with defendant to provide similar compliance services.

11.

12.    Defendant IASIS is headquartered in Franklin, Tennessee.  It owns and operates the following hospitals:  Mesa General Hospital in Mesa, Arizona; St. Luke's Behavioral Hospital in Phoenix, Arizona; St. Luke's Medical Center in Phoenix, Arizona; Tempe St. Luke's Hospital in Tempe Arizona; Memorial Hospital of Tampa in Tampa, Florida; Palms of Pasadena Hospital in St. Petersburg, Florida; Town and Country Hospital in Tampa, Florida; North Vista Hospital in North Las Vegas, Nevada; Mid-Jefferson Hospital in Nederland, Texas; Odessa Regional Hospital in Odessa, Texas; Park Place Memorial Hospital in Port Arthur, Texas;

1  Southwest General Hospital in San Antonio, Texas; Davis Hospital and Medical Center in

2  Layton, Utah; Jordan Valley Hospital in West Jordan, Utah; Pioneer Valley Hospital in West

3  Valley Utah and Salt Lake Regional Medical Center in Salt Lake City, Utah.  IASIS also has

4  ownership interest in three ambulatory surgery centers and owns and operates a Medicaid

5  managed health plan in Phoenix called Health Choice.

6        13.    Many of these IASIS hospitals were formerly owned by Tenet and were

7  purchased by IASIS when it was formed in 1999.   In June 2004, IASIS was purchased by an

8  investor group led by Texas Pacific Group.

9  **III.**    **JURISDICTION AND VENUE**

10        14.    This Court has jurisdiction over the subject matter of this action pursuant to both

11  28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on

12  this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. §

13  3730(e), there has been no statutorily relevant public disclosure of the "allegations or

14  transactions" in this Complaint.

15        15.    This Court has personal jurisdiction over the defendant pursuant to 31 U.S.C. §

16  3732(a) because that section authorizes nationwide service of process and because the defendant

17  has at least minimum contacts with the United States.  Moreover, the defendants can be found in,

18  reside in or transact or have transacted business in the District of Arizona.

19        16.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because defendant

20  transacts business in the District of Arizona.

21  **IV.**    **BACKGROUND**

22  **A.**    **Applicable Law**

23      **i.**    **The Stark Statute**

24        17.    A section of the Social Security Act, 42 U.S.C. § 1395nn (commonly known as

25  the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services)

26  from submitting Medicare claims for payment based on patient referrals from physicians having

27  an improper "financial relationship" (as defined in the statute) with the hospital.  The regulations

28  implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare

1    service "performed under a prohibited referral must refund all collected amounts on a timely

2    basis." 42 C.F.R. § 411.353.

3        18.    The Stark Statute establishes that the providers should not submit claims for items

4    or services referred by physicians who have improper financial relationships with the providers

5    of the items or services. In enacting the statute, Congress found that improper financial

6    relationships between physicians and entities to which they refer patients can compromise the

7    physician's professional judgment as to whether an item or service is medically necessary, safe,

8    effective, and of good quality. Congress relied on various academic studies consistently showing

9    that physicians who had financial relationships with medical service providers used more of

10   those providers' services than similarly situated physicians who did not have such relationships.

11   The statute was designated specifically to reduce the loss suffered by the Medicare Program due

12   to such increased questionable utilization of services.

13       19.    Congress enacted the Stark Statute in two parts, commonly known as Stark I and

14   Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory

15   services made on or after January 1, 1992 by physicians with a prohibited financial relationship

16   with the clinical lab provider. See Omnibus Budget Reconciliation Act of 1989, Pub. Law 101-

17   239, § 6204.

18       20.    In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for ten

19   additional designated health services. See Omnibus Budget Reconciliation Act of 1993, Pub.

20   Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

21       21.    As of January 1, 1995, Stark II applied to patient referrals by physicians with a

22   prohibited financial relationship for the following ten additional "designated health services"; (1)

23   inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4)

24   radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and

25   supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics

26   and prosthetic devices and supplies: (9)outpatient prescription drugs; and (10) home health

27   services. See 42 U.S.C. § 395nn(h)(6).

28       22.    In pertinent part, the Stark Statute provides:

1    (a)    Prohibition of certain referrals

2    (1) In general Except as provided in subsection (b) of this section, if a physician (or an

3    immediate family member of such physician) has a financial relationship with an entity specified

4    in paragraph (2),then:

5    A) the physician may not make a referral to the entity for the furnishing of designated

6    health services for which payment otherwise may be made under this subchapter; and

7    B) the entity may not present or cause to be presented a claim under this subchapter or

8    bill to any individual, third party payor or other entity for designated health services furnished

9    pursuant to a referral prohibited under subparagraph (A). 42 U.S.C. § 1395nn(a)(1).

10    23.    The Stark Statute broadly defines prohibited financial relationships to include

11    any "compensation" paid directly or indirectly to a referring physician.  The statute's exceptions

12    then identify specific transactions that will not trigger its referral and billing prohibitions.

13    24.    An employment relationship may be considered proper under the Stark Statute,

14    but only if the amount of the remuneration under the employment is consistent with the fair

15    market value of the services, and is not determined in a manner that takes into account (directly

16    or indirectly) the volume or value of any referrals by the referring physician.

17    25.    Compensation paid to a referring physician serving as a consultant to a hospital

18    may fall within an exception to the statute but only if the contract specifies the services covered,

19    covers all the services to be provided by the physician, and the aggregate of such services is

20    reasonable and necessary for the legitimate business purposes of the hospital and is consistent

21    with fair market value for services actually rendered, not taking into account the volume or value

22    of the referrals or other business generated between the parties.  42 U.S.C. § 1395nn(e)(3).

23    Thus, compensation paid to a physician (directly or indirectly) under a medical directorship that

24    exceeds fair market value, or for which no actual services were required, triggers the referral and

25    payment prohibitions of Stark II with respect to designated health services referred by that

26    physician.

27    26.    Similarly, office space leased to a referring physician may be considered proper

28    under the Stark Statute, but only if the rent over the term of the lease is consistent with fair

1   market value and is not determined in a way that takes into account the volume or value of

2   referrals or other business generated between the parties. 42 U.S.C. § 1395nn(e)(1)(A). Thus,

3   rents paid (directly or indirectly) by a physician to a hospital that are below fair market value

4   trigger the referral and payment prohibitions of Stark II with respect to designated health services

5   ordered, referred or arranged for by that physician. Likewise, payments made to a referring

6   physician for lease of equipment owned by the hospital may be considered proper under Stark,

7   but only if the amount paid by the hospital for lease of the equipment is consistent with fair

8   market value and is not determined in a way that takes into account the volume or value of

9   referrals or other business generated between the parties. 42 U.S.C. § 1395nn(e)(1)(A).

10          27.     Violations of Stark may subject the physician and the billing entity to exclusion

11  from participation in federal health care programs and various financial penalties, including (a) a

12  civil money penalty of $15,000 for each service included in a claim for which the entity knew or

13  should have known the payment should not be made under section 1395nn(g)(1); and (b) an

14  assessment of three times the amount claimed for a service rendered pursuant to a referral the

15  entity knows or should have known was prohibited. See 42 U.S.C. §§ 1395nn(g)(3), 1320a-

16  7a(a).

17          28.     In sum, Stark prohibits hospitals from billing Medicare for certain designated

18  services referred by a physician with whom the hospital has a financial relationship of any type

19  not falling within specific statutory exemptions. 42 U.S.C. § 1395nn. The statute specifically

20  prohibits hospitals from billing for such services. In-patient and out-patient hospital services are

21  among the designated health services to which the Stark II referral and billing prohibitions apply.

22          **ii.     The Medicare and Medicaid Anti-Kickback Statute**

23          29.     The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback statute), 42

24  U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977. The Anti Kickback

25  Statute arose out of Congressional concern that payoffs to those who can influence health care

26  decisions will result in goods and services being provided that are medically inappropriate,

27  unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the

28  integrity of federal health care programs from these difficult to detect harms, Congress enacted a

1  prohibition against the payment of kickbacks in any form, regardless of whether the particular

2  kickback actually gives rise to over utilization or poor quality of care.

3      30.     The Anti-Kickback statute prohibits any person or entity from making or

4  accepting payment to induce or reward any person for referring, recommending or arranging for

5  the purchase of any item for which payment may be made under a federally-funded health care

6  program. 42 U.S.C. § 1320a-7b(b). The Statute not only prohibits outright bribes and rebate

7  schemes, but also prohibits offering inducements or rewards that has as one of its purposes

8  inducement of a physician to refer patients for services that will be reimbursed by a federal

9  health care program.  The Statute ascribes liability to both sides of an impermissible kickback

10 relationship.

11     31.     The Anti-Kickback Statute contains statutory exceptions that exempt certain

12 transactions from its prohibitions.  These exceptions include regulatory safe harbors for space

13 rental, equipment rental, and personal services and management contracts as long as certain

14 standards are met.  The space and equipment rental safe harbors apply to payments made to a

15 lessor for the use of the premises or equipment as long as "the lease is intended to provide the

16 lessee with access for periodic intervals of time" with schedules, intervals and costs expressly

17 stated in the lease, the rental charge is Aconsistent with fair market value in  arms-length

18 transactions and is not determined in a manner that takes into account the volume or value of any

19 referrals or business otherwise generated between the parties .... 42 C.F.R. §§ 1001.952(b),(c).

20 Thus, where payments purportedly made to lease real property or equipment do not comply with

21 the conditions and are made with the intent to reward referrals, the Anti-Kickback Statute has

22 been violated.

23     32.     The personal services or management contracts safe harbor applies to payments to

24 an agent as long as Athe agency agreement is intended to provide the services of the agent on a

25 periodic, sporadic or part-time basis with schedules, intervals and costs expressly stated in the

26 contract, the compensation Ais consistent with fair-market value in arms-length transactions and

27 is not determined in a manner that takes into account the volume or value of any referrals or

28 business otherwise generated between the parties. Id. at § 1001.952(d).  When compensation is

1   paid for personal or management services that are not provided and the compensation is made

2   with the intent to induce referrals, there is a violation of the Anti-Kickback Statute.

3        33.     Violation of the Anti-Kickback statute subjects the violator to exclusion from

4   participation in federal health care programs, civil monetary penalties, and imprisonment of up to

5   five years per violation.  42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

6        34.     Compliance with the Anti-Kickback law is a precondition to participation as a

7   health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal

8   Employee Health Benefit Program, and other federal health care programs.

9        35.     Either pursuant to provider agreements, claims forms, or other appropriate

10   manner, hospitals, pharmacists and physicians who participate in a federal health care program

11   generally must certify that they have complied with the applicable federal rules and regulations,

12   including the Anti-Kickback law.

13        36.     Any party convicted under the Anti-Kickback statute _must_ be excluded (_i.e._, not

14   allowed to bill for services rendered) from federal health care programs for a term of at least five

15   years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds

16   administratively that a provider has violated the statute, the Secretary may exclude that provider

17   from the federal health care programs for a discretionary period (in which event the Secretary

18   must direct the relevant State agency (ies) to exclude that provider from the State health

19   program), and may consider imposing administrative sanctions of $50,000 per kickback

20   violation.  42 U.S.C. § 1320a-7(b).

21        37.     The enactment of these various provisions and amendments demonstrates

22   Congress's commitment to the fundamental principle that federal health care programs will not

23   tolerate the payment of kickbacks.  Thus, compliance with the Stark and Anti-Kickback statutes

24   is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare

25   and other federal health care programs.

26

27

28

**B.    The Medicare and Medicaid Programs**

    **i.    Medicare**

38.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program.  Medicare is a federally-funded health insurance program primarily benefiting the elderly. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  See 42 U.S.C. § 426 et seq.  Part A of the Medicare Program, the Basic Plan of Hospital Insurance, authorizes payment for institutional care, including inpatient hospital services and post-hospital nursing facility care.  See 42 U.S.C. §§ 1395c-1395i-4.

39.    Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare pays providers only for services that it considers are "reasonable and necessary for the diagnosis or treatment of illness or injury...." Social Security Act § 1862(a)(1)(A).  Providers who wish to participate in the Medicare program must ensure, among other things, that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a).

40.    The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

41.    To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies are responsible for processing and paying claims and auditing cost reports.

42.    Under Medicare Part A, CMS makes payments retrospectively to hospitals for inpatient services.  Medicare enters into provider agreements with hospitals to establish the hospital's eligibility to participate in the Medicare program.  However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.  Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

43.     As detailed below, defendant submitted claims for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

44.     On discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.   Hospitals submit patient-specific claims for interim payments on a Form CMS UB-92.

45.     As a prerequisite to payment for Medicare, CMS requires hospitals to submit annually a Form CMS-2552  (previously Form HCFA-2552), more commonly known as the Hospital Cost Report.  Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

46.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

47.     In September 1994, Medicare revised the certification provision of the Hospital Cost Report to state:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

48.     In or about 1996, the Hospital Cost Report form was revised again to state:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine, and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

49.     Once the Stark Statute became effective, providers certified on the CMS Form 2552 that the services provided in the cost report were billed in compliance with the Stark Statute.

50.     A hospital is required to disclose all known errors and omissions in its claim for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports.

> Whosoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such payment or benefit is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

51.     Under Medicare Part B, "Medicare carriers" are responsible for accepting and paying claims for certain reimbursements under Medicare Part B.

52.     Under Part B, the physician typically submits a bill using Form CMS-1500.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient."

53.     In addition, each provider must sign a provider agreement as a condition of participation that agrees to comply with all Medicare requirements including the fraud and abuse provisions.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.  By submitting a claim for Medicare reimbursement, the provider certifies that the submitted claim is eligible for Medicare reimbursement and that the provider is in compliance with all Medicare requirements.

### ii.    MEDICAID AND TRICARE/CHAMPUS

54.     Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program.  Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor.  Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary").  After the

1  Secretary approves the plan submitted by the State, the state is entitled each quarter to be
2  reimbursed for a percentage of its expenditures made in providing specific types of "medical
3  assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal
4  financial participation" ("FFP").

5       55.    Each state's Medicaid program must cover hospital services, 42 U.S.C. §
6  1396a(a)(10(A), 42 U.S.C. § 1396d(a)(1-)(2), and uses a cost reporting method similar to that
7  used under Medicare.

8       56.    Each physician that participates in the Medicaid program must sign a Medicaid
9  provider agreement with his or her state. Although there are variations in the agreements among
10 the states, all states require the prospective Medicaid provider to agree that he/she will comply
11 with all Medicaid requirements, including the fraud and abuse provisions.

12      57.    TRICARE/CHAMPUS, administered by the United States Department of
13 Defense, is a health care program for individuals and dependents affiliated with the armed forces.
14 The Federal Employee Health Benefit Program, administered by the United States Office of
15 Personnel Management, provides health insurance for federal employees, retirees, and survivors.
16 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

17      58.    Compliance with the Stark and the Anti Kickback statutes is also a condition for
18 participation in the TRICARE/CHAMPUS and FEHB programs. Accordingly, claims for
19 reimbursement for inpatient or outpatient services under these programs that were the result of
20 referrals tainted by kickbacks or violations of Stark, are false claims and are not entitled to
21 reimbursement.

22      59.    To summarize, pursuant to the terms of the Medicare Provider Agreement
23 defendant certified that the claims it submitted were eligible for Medicare and Medicaid payment
24 and that the providers had complied with the statutes and regulations relating to Medicare and
25 Medicaid.

26      60.    Because claims that derive from referrals that were tainted by kickbacks or that
27 violate the Stark laws were not eligible for reimbursement, submission of such a claim for
28 reimbursement constitutes a false or fraudulent claim under the federal False Claims Act, 31

1    U.S.C. § 3729.  And, those who knowingly cause such false or fraudulent claims to be filed, as

2    IASIS has done here, are liable under the federal False Claims Act, 31 U.S.C. § 3729.

3        61.    Defendant knew that claims that derived from referrals that were tainted by

4    kickbacks or that violate the Stark laws are not eligible for federal or state reimbursement.

5    Notwithstanding this knowledge, IASIS undertook its fraudulent scheme of inducing referrals

6    from physicians through improper financial relationships and then submitting claims for

7    reimbursements for services provided as a consequence of referrals tainted by illegal kickbacks

8    or other improper financial compensation.  Every claim for reimbursement derived from a

9    referral that was tainted by an illegal kickback or other unlawful compensation is a false or

10   fraudulent claim for payment under 31 U.S.C. § 3729.

11   **V.    ALLEGATIONS**

12       62.    IASIS was formed in 1999.  The original founder, Ken Perry, invested a small

13   amount of money and then sought investment from Clayton McWorter who had been an

14   executive at Columbia/HCA.  Clayton McWorter invested two million dollars initially.  The

15   hospitals purchased to form IASIS had previously been part of the Tenet and Paracelsus chains.

16   Most of these hospitals had originally been owned by HCA and then sold to Health Trust.  From

17   Health Trust, some of hospitals were sold to Orenda and then to Tenet and then to IASIS.  The

18   other hospitals were sold by Health Trust to Paracelsus and then to IASIS.

19       63.    David White, a former Group President for Columbia/HCA, was hired as CEO.

20   White had been with Columbia/HCA during the Government's FCA investigation of Columbia.

21   After the Eleventh Circuit overruled the convictions of Bob Whiteside (who had reported to

22   White) and Jay Jarrell in the Columbia HCA case, White began voicing his views that healthcare

23   laws were unfair and too complicated to be enforced by the courts.   David White also

24   characterized the government's efforts to enforce health care laws as the "new McCarthyism."

25   As a result the corporate culture at IASIS, as directed by White, was one which encouraged its

26   executives to eschew regulatory compliance and instead to focus on maximizing revenue.  The

27   top management control group at IASIS is more focused on short term gain and profit than on

28   long term growth or compliance.  Management decisions are highly centralized and made by a

1   very small control group in the central office.  Extreme pressure and inappropriate incentives are

2   brought to bear on employees to discourage open discussion about compliance issues and to

3   control employees from taking actions to remedy non-compliant conduct by the company.  By

4   way of example, employees who identified regulatory compliance problems.

5               either were reassigned from their position or threatened with replacement and

6   were told they were not "team players." 64.   One of the keys to maximizing revenues is to build

7   and retain a base of physicians who will refer their patients to IASIS facilities in return for

8   lucrative financial arrangements.

9         65.    As a result of this corporate decision, defendant made a conscious  decision to

10   enter into numerous physician recruiting agreements, labeled as consultant services agreements

11   and medical directorship agreements.  These agreements are intended to produce patient referrals

12   to IASIS hospitals.  These agreements, several of which are described in detail below, pay

13   doctors substantial sums of money for "consulting" or "medical director" services when in fact

14   that price paid by defendant is substantially in excess of fair market value for the services

15   actually proved by these referring doctors.

16         66.    In addition, defendant provides lavish entertainment and other benefits to doctors

17   who refer patients to IASIS hospitals.  For example, defendant maintains luxury boxes and

18   season tickets for major professional sporting events in its markets.  IASIS makes tickets to these

19   events available without regard to compliance with either the Stark or the Anti-Kickback laws.

20   Doctors are given tickets to events where no representative of defendant is present and no

21   business related discussion occurs.  The doctors who refer the most business to defendant, are the

22   most frequent recipients of these "benefits."

23         67.    A number of specific examples of the sort of physician relationships approved by

24   defendant in violation of the Stark and Anti-Kickback laws are described below.

25   **A.     Dr. Richard Heuser**

26         68.    Dr. Richard R. Heuser is a high profile cardiologist who was recruited away from

27   another Phoenix hospital by St. Luke's Medical Center in late 1999.  To entice Dr. Heuser,

28   defendant agreed to pay fees totaling $461,000 annually to Dr. Heuser under three separate

medical director/consulting contracts. The first agreement was a directorship contract for "Interventional Cardiology Services." This contract, effective as of December 1, 1999 paid Dr. Heuser $284,750 per year based on an hourly rate of $187.50 for 90 hours per month plus an expense allowance of $42,250 and a Publication and Presentation Allowance of $40,000. The second agreement was a directorship contract for the Heart Cath and Lab. That agreement, which was effective as of June 1, 2000, paid Dr. Heuser $74,250 a year for 33 hours a month, again at $187.50 per hour. The final agreement, which was effective as of February 3, 2000 paid Dr. Heuser $102,000 per year at a rate of $500 per hour for 17 hours per month of consulting on "Cardiology Equipment and Supply Purchasing."

69.     In total, defendant paid Dr. Heuser $461,000 per year for services allegedly totaling 140 hours per month. In actuality, Dr. Heuser provided practically no services to defendant and certainly substantially less than 140 hours of service each month: at the same time he was committed to spend 140 hours per month, or approximately *35 hours a week* providing director or consulting service, Dr. Heuser was also running a busy medical practice and providing consulting services to at least seven other companies. Even though Dr. Heuser provided practically no services to defendant he would complete time records indicating that he was providing 140 hours of service per month.

70.     In addition to this large direct annual payment, St. Luke's Medical Center also paid $45,000 for half of the salary and benefits for one of Dr. Heuser's employees who provided nursing and administrative support to Dr. Heuser's practice and practically no services for IASIS. Other physicians received similar arrangements where they received free nursing and administrative support from IASIS in exchange for referring patients to IASIS hospitals

71.     While he was associated with St. Luke's Medical Center, Dr. Heuser referred patients to IASIS which resulted in several million in annual revenue. In 2003, Dr Heuser was recruited away from St. Luke's to another hospital in the Phoenix area.

**B.      Dr. Robert Siegel**

72.      Dr. Robert Siegel is a cardiologist who was recruited by IASIS Mesa Hospital from another area hospital in 2003 to develop a cardiac program for Mesa Hospital (including referring patients to the hospital's heart program).

73.      To do so, Dr. Siegel demanded that the hospital lease his heart cath equipment from him at a rate favorable to Dr. Siegel.

74.      Before completing the contract, certain IASIS officials obtained an independent appraisal of the cath lab's fair market rental value.  That appraisal valued the lab rental value significantly below the lease price that Dr. Siegel demanded as part of his agreement to work with Mesa Hospital.

75.      Despite this appraisal, IASIS CEO David White insisted that the lease agreement be finalized at the higher price demanded by Dr. Siegel.  As a result, Dr. Siegel obtained a substantial monetary benefit, and the defendant secured substantial referrals from Dr. Siegel.

76.      Many of the referrals made by Dr. Siegel to Mesa Hospital are for patients to have unnecessary procedures performed at Mesa Hospital.  Therefore, at Dr. Siegel's direction, a number of unnecessary procedures were performed at Mesa Hospital reaping millions of dollars in reimbursement for Dr. Siegel and Mesa Hospital from federal health care programs.  Many of these unnecessary procedures would also result in unnecessary surgeries being performed by Dr. Segal at Mesa Hospital reaping millions more in reimbursement and putting patients at significant risk.

77.      Dr. Siegel had a similar financial relationship with IASIS at St. Luke's Hospital where he was provided free office space for his cath equipment.  At St. Luke's Dr Siegel performed a number of unnecessary procedures including putting a number of patients on balloon pumps so that Dr. Siegel could bill an additional $1000 per patient per day for maintenance of the balloon pump.  These unnecessary procedures also resulted in millions in reimbursement for St. Luke's.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.      Discounted sub-leases at Mesa Hospital

78.     Defendant also encouraged physicians to refer patients to Mesa Hospital by offering physicians sub-leases at a rate substantially below the rates that the Hospital itself was paying for the lease.

79.     For example, from June 1, 1998 to May 31, 2003, defendant leased space for $28.41 a square foot and then sub-leased the space to Dr. Kohring for $12.41 a square foot. Because Dr. Kohring sub-leases 3996 square feet, the hospital subsidized Dr. Kohring's rent by $64,000 per year over the five year period for a total rent subsidy of nearly $320,000.

80.     Similarly, from July 1, 1999, to June 30, 2004, defendant sub-leased 2,088 square feet of space to Dr. Mark Lettelier for $12.41 a square foot. Because defendant paid $28.41 per square foot for this space, Defendant subsidized Dr. Lettelier by $34,000 per year or more than $170,000 over the five years.

81.     Dr. Ralph Herro also received a similar rental subsidy of $16 per square foot for a 1,080 square foot space. As a result, his annual rental subsidy from defendant totaled $17,280 per year.

### D.      Dr. James Polluck

82.     Dr. James Polluck is a surgeon who specializes in the Barnett Continent Intestinal Reservoir Procedure. In order to induce Dr. Polluck to refer the substantial number of patients he sees to Palms of Pasadena Hospital, the hospital pays him $100,000 per year as a "Medical Director" for the hospital's ostomy surgery program.

83.     Although Dr. Polluck submits time sheets which purport to support these payments, Dr. Polluck actually provides few directorship services. Indeed, time sheets "documenting" the services provided by Dr. Polluck are submitted even during the two months each year that the doctor is on his boat in the Caribbean. Defendant is aware that Polluck is out of country for months at a time, and yet continues to accept these time sheets as support for continuing his directorship fees.

84.     In 2003, Dr. Polluck's malpractice insurance costs increased. Polluck informed the defendant that unless the hospital agreed to pay these costs he would move his practice and

1   patients to another hospital.  As a result, defendant entered into a $250,000 Retention Agreement

2   with Polluck.

3       85.    In return for these substantial payments, Polluck refers approximately $20 million

4   in surgical business to defendant each year.

5       **E.    Dr. John Barrett**

6       86.    Dr. John Barrett is an Orthopedic surgeon who is responsible for approximately

7   $22 million in annual revenue to defendant at its Palms of Pasadena Hospital.

8       87.    From at least 1999 through 2004, defendant paid Barrett $5,000 monthly as a

9   medical directorship fee, and Barrett submitted monthly time sheets to support this fee.  These

10   reports however were submitted and payment was made each month, despite the fact that Barrett

11   is out of the country and on vacation for three months each year.

12       88.    In addition, to these payments, in order to retain referrals from Dr. Barrett,

13   defendant provided other free services to Dr. Barrett for his patients.  These free services

14   included transportation to and from the hospital for surgery and rehabilitation, and a free night's

15   stay at the hospital the night before surgery.

16       **F.    Dr. Williams**

17       89.    Dr. Williams managed the Emergency Room at Park Place Medical Center and

18   Mid Jefferson Hospital when these hospitals were acquired by IASIS from Tenet.  At that time

19   Dr. Williams had a $450,000 note payable to Tenet.  This note was assigned to IASIS.

20       90.    Dr. Williams wife, Cynthia Williams, is also a physician and is the second highest

21   admitter at Park Place Medical Center.  Because of this, defendant permitted Dr. Williams to

22   suspend payment on this note.

23       **G.    Granger Clinic Physician Group**

24       91.    The Granger Clinic Physician Group produced approximately 60% of the revenue

25   for Pioneer Valley Hospital at the time that defendant IASIS acquired Pioneer Valley Hospital.

26   When Tenet owned the hospital, the Group wanted to finance and build its own office building.

27   The Group demanded that the hospital lease a substantial amount (approximately 40,000 square

28

1   feet) of this office space, and made it clear that if Parecelsus declined to do so, they would move

2   their business to a different hospital.

3       92.     When defendant purchased the hospital from Paracelsus, it assumed the lease,

4   although defendant had no need for the space.  By assuming the lease and continuing to pay rent

5   for space it did not use, defendant conveyed a significant benefit to the Granger Clinic Physician

6   Group in exchange for referrals.

7       **H.     Summary of Defendant's Unlawful Conduct**

8       93.     From the time it was created in 1999, IASIS initiated an aggressive strategy to

9   secure business by continuing contracts in place between Tenet and Paracelsus and their

10  referring physicians, and by expanding on this practice of offering lucrative financial

11  relationships to doctors who could and would refer large volumes of business to defendant.

12      94.     As a part of this strategy, Defendant awarded medical directorships and consultant

13  service agreements to many of those physicians at compensation levels far above fair market

14  value for services performed.  Subsequently, these physicians increased the number of patients,

15  including Medicare, Medicaid and other federally-insured patients that they referred to defendant

16  for outpatient services and inpatient stays.

17      95.     Defendant also leased space to physicians at below fair market value.

18  Subsequently, these physicians increased the number of patients, including Medicare, Medicaid

19  and other federally-insured patients that they referred to defendant for outpatient services and

20  inpatient stays.

21      96.     Defendant also provided physicians with free or below market administrative

22  support in their offices and marketing and promotional support for their practices.  Subsequently,

23  these physicians increased the number of patients, including Medicare, Medicaid and other

24  federally-insured patients, whom they referred to defendant for outpatient services and inpatient

25  stays.

26      97.     Defendant knowingly submitted to Medicare and Medicaid claims for

27  reimbursement and claims for interim payment on annual hospital cost reports covering Fiscal

28  Years 1999 - 2004 for the medical services provided as a result of these referrals although

1  defendant knew that the claims should not have been submitted under the applicable laws and
2  regulations.

3       98.    The annual hospital cost reports covering Fiscal Years 1999 - 2004
4  falsely certified that the medical services identified therein had been provided in compliance
5  with all applicable laws and regulations.

6       99.    As part of its consideration about which physicians to recruit, Relators have
7  reason to believe based on their own experience and observations, and on that basis alleges, that
8  defendant analyzed data for each physician or physician group to project estimated or projected
9  revenues that defendant would receive from referrals for inpatients and outpatients for designated
10 health services from the physicians once they became referral sources for IASIS.

11      100.   Beginning in 1999, defendant received millions of dollars from Medicare,
12 Medicaid and other federal health programs for referrals made by physicians with whom IASIS
13 had improper financial arrangements for outpatient and inpatient services.

14      101.   Under the Stark and Anti Kickback statutes, defendant was prohibited from
15 billing Medicare, Medicaid, or other federal health care programs for any claims resulting from
16 referrals where IASIS had improper financial relationships with the referring physicians.

## COUNT I

### False Claims Act

### 31 U.S.C. § 3729(a)(1)

20      102.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-
21 101.

22      103.   This is a claim for treble damages and penalties under the False Claims Act, 31
23 U.S.C. § 3729 *et seq.*

24      104.   Through the acts described above, defendant IASIS (since at least 1999) has
25 knowingly presented, or caused to be presented, false or fraudulent claims, to the United States
26 Government, in order to obtain reimbursement for services provided under Medicare, Medicare,
27 Tricare/Champus, and the Federal Employees Health Benefits Program.

28

1    105.   As a result of these false claims, the United States has been damaged and

2    continues to be damaged, in an amount yet to be determined.

3                                    **COUNT II**

4                                 **False Claims Act**

5                             **31 U.S.C. § 3729(a)(2)**

6    106.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-

7    100.

8    107.   This is a claim for treble damages and penalties under the False Claims Act, 31

9    U.S.C. § 3729 *et seq*.

10    108.   Through the acts described above, defendant IASIS (since at least 1999) has

11    knowingly made, used and caused to be made and used false records and statements to get false

12    or fraudulent claims paid in order to obtain reimbursement for services provided under

13    Medicare,Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

14    109.   As a result of these false claims, the United States has been damaged and

15    continues to be damaged, in an amount yet to be determined.

16                                   **COUNT III**

17                                 **False Claims Act**

18                             **31 U.S.C. § 3729(a)(3)**

19    110.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-

20    101.

21    111.   This is a claim for treble damages and penalties under the False Claims Act, 31

22    U.S.C. § 3729 *et seq*.

23    112.   Through the acts described above, defendant IASIS (since at least1999) entered

24    into agreements to defraud the United States by submitting false and fraudulent claims for

25    reimbursement from the Medicare, Medicaid, Tricare/Champus, and the Federal Employees

26    Health Benefits Program.

27    113.   As a result of these false claims and this conspiracy, the United States has been

28    damaged and continues to be damaged, in an amount yet to be determined.

## COUNT IV

### False Claims Act

### 31 U.S.C. § 3729(a)(7)

114.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1B101.

115.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

116.    Through the acts described above, defendant IASIS (since at least 1999) has knowingly failed to reimburse the Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program for moneys wrongfully received.

117.    As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

### PRAYER

WHEREFORE, plaintiffs pray for judgment against defendant as follows:

1.    that Defendant ceases and desists from violating 31 U.S.C. § 3729 <u>et</u> <u>seq.</u>;

2.    that this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.    that plaintiffs be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;4.        that plaintiffs be awarded all costs of this action, including attorneys' fees and expenses; and

6.    that the United States and plaintiffs recover such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand a trial by jury.

DATED this 10th day of _____, 2005.


THE PHOENIX LAW GROUP OF
FELDMAN BROWN WALA HALL & AGENA, PLC
8765 East Bell Road, Suite 110
Scottsdale, Arizona 85260

By:_____
    Ashley Adams/Feldman

PHILLIPS & COHEN, LLP
2000 Massachusetts Avenue, N.W.
Washington, D.C.  20036
Mary Louise Cohen
Peter Chatfield
Colette G. Matzzie

Attorneys for Qui Tam Plaintiffs

ORIGINAL filed this 11th day of _____, 2005.