ASHLEY D. ADAMS PLC (#013732)
8245 North 85th Way
Scottsdale, AZ 85258
(480) 219-1366

PHILLIPS & COHEN, LLP
2000 Massachusetts Avenue, N.W.
Washington, D.C.  20036
(202) 833-4567
Mary Louise Cohen (D.C. Bar #298299)
Colette G. Matzzie (D.C. Bar #451230)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America ex rel. Jerre Frazier,<br><br>Plaintiff,<br><br>V.<br><br>IASIS Healthcare Corporation, David White, and<br><br>Sandra McRee,<br><br>Defendants. | Case No. <u>CV-05-0766-PHX/LOA</u><br><br>**THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 <u>et seq.</u>**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff and *qui tam* relator Jerre Frazier (Frazier) through his attorneys Phillips & Cohen LLP and Ashley D. Adams PLC for his Complaint against IASIS Healthcare Corporation, David White, and Sandra McRee, alleges as follows:

## I.    INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made by the defendant and/or its agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729 <u>et</u> <u>seq.</u>, ("the FCA" or "the Act").

2.      This *qui tam* case is brought against defendant IASIS Healthcare Corporation ("IASIS") and its former Chief Executive Officer David White ("White") and former Chief Operating Officer Sandra McRee ("McRee") for knowingly defrauding the federal Government in connection with the Medicare, Medicaid and other federal health care programs.  IASIS is headquartered in Franklin, Tennessee and owns and operates seventeen medium-sized acute care hospitals and one behavioral health hospital in seven states:  Utah, Arizona, Florida, Texas, Nevada, Colorado and Louisiana.

3.      Since its inception, IASIS's business plan has focused in developing small or poor performing hospitals and establishing intensive programs in a few areas of high utilization including cardiology, obstetrics, orthopedic surgery, and bariatric surgery.  IASIS sought to achieve very optimistic short term financial goals by recruiting physicians likely to perform high numbers of lucrative procedures and providing those physicians with various forms of financial compensation in exchange for performing procedures at IASIS hospitals.

4.      In a presentation made to Bank of America Securities, UBS Warburg, Lehman Brothers, and JP Morgan when IASIS was attempting to do an Initial Public Officering (IPO) for IASIS in 2002/2003, IASIS presented itself as uniquely qualified among the for-profit hospital chains to "monitor, review and understand product line margins and net revenues at each hospital" by performing a monthly product line analysis (cardiology, orthopedics, bariatric, etc.) at each hospital, evaluate margin and net revenue by service line, case, physician and payor."

5.      IASIS also touted that it had a unique "opportunity to expand profitable lines of business and improve business mix" and an "ability to capitalize on price and volume trends through expansion of certain services."  IASIS repeatedly emphasized its potential for driving high margins and increasing volumes with lowered expenses through intense operational scrutiny specifically by its top three managers, David White, Sandra McRee and Derek Morkel.

6.      As alleged below, since at least 1999, defendants have knowingly engaged in a number of different illegal schemes to submit false claims for reimbursement from Medicare, Medicaid and other federal health care programs.

7.      IASIS has implemented an illegal scheme to pay improper compensation to physicians to induce them illegally to refer patients, including Medicare and Medicaid patients, exclusively or nearly exclusively to hospitals owned by defendant.

8.      As used in this complaint, "IASIS" refers to or one or more of its wholly owned hospitals, ownership interest in surgery centers, home health care agencies, and its Medicaid managed health plan.

9.      The compensation offered to physicians by defendants as an inducement for referrals included (1) compensation paid to physicians, either as salaries or consulting services fees, that was greater than fair market value and payments to physicians in excess of contract terms; (2) sham medical directorship contracts including falsified time records and excessive compensation; (3) below market rent for office and lab space; (4) lease payments for catheter labs or other diagnostic equipment owned or controlled by a physician at prices above fair market value; (5) failure to seek reimbursement from physicians for use of hospital based labs for services performed for private pay clients; (5) payments to physicians without written agreements to support the payments; (6) provision of free services to physicians; (7) forgiveness of indebtedness owed by physicians to IASIS,  (8) retention payments to physicians; and (9) agreements to purchase supplies and equipment from physicians at above fair market value.  The financial relationships between physicians and defendant implicate the Stark Statute, 42 U.S.C. § 1395nn, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and various state laws and ethical canons of the medical profession.

10.     The physicians to whom defendants provided illegal remuneration and kickbacks, and with whom defendants entered into illegal financial relationships, referred large volumes of patients, including Medicare, Medicaid, and other beneficiaries of government health care programs, to IASIS hospitals in violation of federal law.  Some of these physicians were individually responsible for referrals of significant portions of the revenues for each of the hospitals identified in this action.

11.     Many of the physicians referred patients for hospital admissions or procedures as outpatients at IASIS hospitals with a higher rate of more intensive and frequent procedures even with short lengths of stay compared to others with similar diagnoses.

12.     Defendants recruited physicians who understood that they would be referring a guaranteed volume and value of business, including Medicare and Medicaid business, (referrals of patients for admissions, procedures and other ancillary services) as prohibited by the Stark law.

13.     For example, as discussed herein, IASIS managers recruited Dr. Siegel and Advanced Cardiac Specialists (ACS) to Mesa General Hospital because he would refer "400 hearts per year" for cardiac surgery to Mesa.  IASIS managers knew that that Dr. Siegel referred patients likely to be federally-insured.  Dr. Siegel spoke openly that he preferred to treat a less-sophisticated and poorer patients – "Medicaid trailer trash" as he referred to them – rather than those patients from Scottsdale or with means who might "ask too many questions."

14.     White and McRee were so determined to cut the deal to bring Dr. Siegel to Mesa General Hospital that they forced the third party valuation expert hired by IASIS to prepare a fair market value analysis which masked the above-fair-market-value benefit conferred on Dr. Siegel and ACS.  White personally ordered then-CEO of Mesa General, Pam Maher, and IASIS General Counsel, Frank Coyle, to complete the deal with Dr. Siegel and ACS in an all-night session that finally ended with a deal signed in the middle of the night.

15.     Similarly, McRee and then-CEO of Odessa Regional Hospital, Mike Potter, recruited Dr. Srivastava in Odessa, Texas to "jump start" a cardiology program at Odessa Regional Hospital by inducing him through a large consulting contract to refer large numbers of patients, including federally insured patients, for cardiac surgery at Odessa, a maternity hospital converted into a cardiac surgery center very quickly.

16.     So too, top IASIS managers were aware that they must retain Drs. Barrett and Pollack at Palms of Pasadena in Florida.  White stated to IASIS managers in Florida that because Dr. Barrett's group produces $4-$5 million "bottom line revenue" for Palms of Pasadena, that the

4

hospital could not survive without that practice referring its patients to it.  Dr. Pollack also added $4-$5 million in revenue to Palms of Pasadena's bottom line revenues.  These physicians had significant leverage to dictate the terms of their compensation to IASIS because IASIS managers were willing to do whatever was required to pump up revenues at the poorly performing hospitals they had acquired.

17.     Many of the referrals generated substantial revenue both for the physicians and for the IASIS hospitals and allowed the hospitals to establish reputations for performing high numbers of specialty procedures including interventional cardiology procedures and orthopedic or bariatric surgery.

18.     Early in his tenure,  Frazier attended a "Leadership Conference" in June 2001, where Mike French made the observation that at the time IASIS was only doing approximately seventy open heart procedures which was not enough for quality purposes and that they did not have enough surgery volume at either Mesa General or St Luke's Tempe to support full time anesthesiology services and as a result it was difficult to increase surgery volumes at those hospitals.  Present at the Leadership Conference meeting in addition to French and Frazier were White, Richard Algood, Alan Chapman, and McRee, among others.

19.     By the time Frazier had left IASIS in 2004, IASIS had brought ACS, an interventional cardiology practice, to Mesa General that delivered 400 heart surgeries per year and Dr. Srivastava to Odessa Regional Hospital generating 80 surgeries in the first three months of surgical operation.

20.     Claims submitted by defendants, or caused to be submitted by defendants, for patients referred by physicians with improper financial relationships are false or fraudulent claims.  Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(C), (G), such claims were false and/or fraudulent because defendant had no entitlement to payment for such unlawfully obtained referrals.

21.     As a means of generating additional revenue to compensate physicians, defendants also permitted physicians to perform unnecessary medical procedures including

unnecessary interventional cardiology procedures without adequate peer review or utilization review. In turn, the physician received compensation from the revenue generated for the hospital through these procedures and the physician had an additional incentive to perform additional unnecessary procedures.

22. Defendants acquiesced in the provision of these unnecessary medical procedures, including unnecessary interventional cardiology procedures or even experimental procedures like experimental carotid stenting at St Luke's Medical Center by Dr. Heuser and at Park Place Medical Center by Dr. Stephan Keisz, because it generated profits for IASIS, even though unnecessary medical procedures may jeopardize the health and well being of patients and even though defendants had clear indicators that the procedures were excessive, unnecessary and potentially dangerous.

23. Specifically, Dr. Siegel at Mesa General Hospital in Mesa, Arizona and St. Luke's Hospital in Phoenix, Arizona and Drs. Rao and Keisz at Mid-Jefferson Hospital in Texas have performed a large number of medically unnecessary interventional cardiology procedures. While at Odessa Regional Hospital, Dr. Srivastava performed medically unnecessary heart surgeries based heavily on referrals from an interventional cardiologist, Dr. Gatasali, who himself performed numerous unnecessary interventional cardiology procedures (estimated to be as much 20% by IASIS managers).

24. Claims submitted for procedures that are not medically necessary are false claims within the meaning of the federal False Claims Act. Claims that are the result of referrals made by physicians with whom the hospital has prohibited financial relationships are also false claims within the meaning of the federal False Claims Act.

25. To conceal their unlawful conduct and avoid refunding payments made on the false claims, Iasis hospitals, working through their facility, market and corporate CFOs and sometimes CEOs, falsely certified, in violation of the False Claims Act, 31 U.S.C. § 3729(a) (7), that the services identified in their annual cost reports were provided in compliance with federal

law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians.

26.     The false certifications, made with each annual Medicare cost report submitted to the government, were part of defendants' unlawful scheme to defraud Medicare and other government healthcare programs.  False claims, and false cost reports, were also submitted to the Medicaid programs in Arizona, Florida, Texas and Utah.

27.     Even without the false certification of compliance with federal healthcare laws, the claims were false because they were not eligible for reimbursement by federal programs. The Stark law forbids payment for a claim submitted by a provider when referred by a physician with whom the hospital physician has an improper financial relationship.

28.     IASIS also failed to repay Medicare and other federal healthcare programs for overpayments it had received and of which it was aware repayment was owed.

29.     The FCA was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153 and in 2009.  Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.  The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Governments behalf.

30.     The Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

31.     The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery.  The Act requires

that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time).  Based on these provisions, *qui tam* plaintiff and relator Jerre Frazier seeks through this action to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein.

32.     Although the precise amount of the loss to the federal and state government cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the defendants under the facts alleged in this Complaint amounts to millions of dollars.  During the five year period from 1999-2004 during which Frazier was associated with IASIS, net patient revenue was in excess of $4.8 billion and net patient revenue from Medicare and other government sources was $1.9 billion.

## II.     PARTIES

33.     Plaintiff/relator Jerre Frazier is a resident of Houston, Texas.  From November 1999 until April 2003, Frazier served as Vice President of Ethics and Business Practices and Chief Compliance Officer for defendant.  From April 2003-April 2004, Frazier had a consulting agreement with defendant to provide similar compliance services.

34.     Frazier was hired at the founding of IASIS Healthcare to create a Compliance Department.  He was hired by then-CEO Wayne Gower.  At the time, the founders of IASIS agreed that IASIS should have an independent internal audit, external audit, and compliance department.  When White became CEO of IASIS, Relator also had numerous discussions with him about making IASIS compliant.  Both Gower and White professed that they wanted to make IASIS a compliant company initially.

35.     Frazier reported directly to the CEO and to the Board of Directors' Compliance Committee.  Each IASIS hospital also had compliance officers who would report directly to the hospital CEO and to Frazier.  The Compliance Officer function was completely separate from and not subordinate to the IASIS Legal Department and Frazier made it a condition of accepting the job as compliance officer that it would be completely independent from the Legal Department.

36.     As Chief Compliance Officer of IASIS, Frazier's role was to monitor and coordinate policies, procedures and practices among its divisions and hospitals and to coordinate the process for addressing compliance concerns.  In the course of Frazier's job he routinely spoke with dozens of hospital CEOs, CFOs, nurses, technicians and division/market managers both on the telephone and through frequent site visits many of whom sought me out to discuss their concerns about compliance and physician relationship issues.

37.     IASIS employees also spoke with Frazier about their concerns about improper pressures being exerted by White and McRee and by Derek Morkel on market and hospital managers to "make the numbers," about their concerns about lack of quality and/or overutilization and medical necessity for procedures, about concerns with upcoding, improper inpatient admissions, overbilling through laboratory and radiology services, excessive admissions through the Emergency Room, improper treatment for wounds, and the like.

38.     Other employees spoke to Frazier about their concerns about inappropriate conduct by IASIS senior managers including hard drinking and gambling by managers including McRee, sexual harassment by managers like Jim McKinney and White, improper use of the corporate jet by Defendant White, and abusive practices toward employees.

39.     This complaint pleads allegations about nine specific physician relationships. Additional compliance concerns exist at IASIS hospitals and result in the submission of false and fraudulent claims for payment to federal programs by IASIS hospitals.

40.     Frazier repeatedly raised his concerns about improper conduct at IASIS, including conduct that could be harmful to patients.  Frazier raised initial concerns – including about unnecessary interventional cardiology procedures being performed in Texas – as early as 2001.

41.     An initial meeting of the IASIS Board of Directors Compliance Committee was held in 2000 in Nashville, Tennessee.  The second meeting was held on August 27, 2001 incident to the Board of Directors meeting in Phoenix.  Frazier raised a number of compliance concerns at that meeting including the annual management turnover rate in the facilities which was near

100% and the risk exposure for ongoing Stark violations, medically unnecessary procedures and billing violations (billing violations alone being worth $20 million).

42.     McWhorter agreed with some of the concerns articulated by Relator and expressed his support for bringing IASIS into compliance.  McWhorter noted that Columbia HCA's settlement with the government could have been in the $10-$20 billion range rather than the $2 billion they paid if the government had pursued all issues.  McWhorter brought up some of these issues at the September 2001 Board of Directors meeting but White disagreed with him and a few days later McWhorter resigned from the Board and from the Compliance Committee. The vacancies on the Board Compliance Committee were not filled and that Committee ceased to function.

43.     Frazier spoke with White and McRee and other IASIS managers about compliance concerns on many occasions.  At various times, White ordered Frazier to never raise any questions in any meetings, to never comment about any of his concerns in any meetings and to never talk to Clayton McWhorter or anyone from Joseph, Littlejohn and Levy (JL&L), the investment bank that had been the initial investors in IASIS.

44.     From 2000 until his departure in 2003, Frazier consistently identified fraudulent activities within IASIS, reported them to the Corporate CEO, the Corporate Compliance Committee, the division and facility operations managers, the internal auditors, and the external auditors.

45.     Frazier repeatedly attempted to implement corrective actions including audits of physician relationships, audits of radiology and laboratory billing practices, medical necessity and utilization audits.  He advocated for auditors, like Bill Stephens, to be hired to conduct audits reporting directly to CEO White.  He also advocated for clinical reviewers, like Bill Hammock, to be hired to review patient files for medical necessity.  He worked closely with some employees at IASIS who cared deeply about running a compliant company including like Richard Algood, Art Bell, David Verinder, Dolores Horvath, Sammy Cantrell, Roy Matthews,

Alan Chapman, and Lelan Daines, but were unable to operate compliantly because of corporate management decisions.

46.     Retaliation was a common method used by White and McRee to undermine compliance.  White and McRee use retaliation as a management tool to ensure control of employees.  A few examples of retaliation: Debbie Bellamy was fired by McRee when she reviewed her billing reviews; McRee fired the Internal Coding Auditors when she was presented with their Internal Coding Audits; White relieved Bill Stephens and the Internal Audit Department of its responsibilities for performing compliance audits after Stephens completed the audits of Lab and Radiology billing and physician relationship audit; McRee replaced Alan Chapman with Derek Morkel when Chapman told employees they would not continue to "make the numbers" by improperly reporting patient credit balances as income or taking other actions to "cook the books;" Linda Kirks, the well-respected CFO of Southwest General Hospital, was forced to resign after resisting corporate directives to bill transfers as dismissals and to amortize bad debt write offs improperly.

47.     By 2002-2003, it became clear to Frazier, and to other IASIS managers and employees who spoke with him about their concerns about illegal and improper conduct, that IASIS managers, Board Members and investors had no intention of taking corrective action.

48.     IASIS managers including White and McRee forbade Frazier from being involved with serious issues of compliance concern including physician relationships and refused to provide the money needed to investigate lack of medical necessity for procedures performed at IASIS hospitals.  Eventually, Frazier was forced to resign because this situation had become untenable.

49.     IASIS is headquartered in Franklin, Tennessee.  It owns and operates the following hospitals:  St. Luke's Behavioral Hospital in Phoenix, Arizona; St. Luke's Medical Center in Phoenix, Arizona; Tempe St. Luke's Hospital in Tempe Arizona; Mountain Vista Medical Center in Mesa, Arizona; Memorial Hospital of Tampa in Tampa, Florida; Palms of Pasadena Hospital in St. Petersburg, Florida; Town and Country Hospital in Tampa, Florida;

North Vista Hospital in North Las Vegas, Nevada; Odessa Regional Hospital in Odessa, Texas; The Medical Center of Southeast Texas in Port Arthur, Texas; Southwest General Hospital in San Antonio, Texas; Wadley Regional Medical Center in Texarkana, Texas, Davis Hospital and Medical Center in Layton, Utah; Jordan Valley Hospital in West Jordan, Utah; Pioneer Valley Hospital in West Valley, Utah; Salt Lake Regional Medical Center in Salt Lake City, Utah; Pikes Peak Regional Hospital in Woodland Park, Colorado, and Glenwood Regional Medical Center in West Monroe, Louisiana.  IASIS also has ownership interest in three ambulatory surgery centers and owns and operates a Medicaid managed health plan in Phoenix called Health Choice.  IASIS has previously operated Park Place Medical Center and Mid-Jefferson Hospital in Beaumont/Port Arthur, Texas and Mesa General Hospital in Mesa, Arizona.

50.     Many of these IASIS hospitals were purchased from the Tenet and Paracelsus hospital chains.  Most of the hospitals had originally been owned by HCA and then sold to Health Trust.  From Health Trust, some hospitals were sold to Orenda and to Tenet and then IASIS.  Others were sold by Health Trust to Paracelsus and then IASIS.

51.     Defendant David White is the former Chief Executive Officer of IASIS Healthcare.  He resides near Nashville, Tennessee.  David White is a former Group President for Columbia HCA, heading what was known as the Atlantic Group during the government's investigation of Columbia. In 2003, the United States announced the payment of $1.7 billion in penalties and damages by Columbia/HCA to conclude the largest health care fraud investigation ever undertaken by the United States.

52.     When White became CEO in 2000 of IASIS, he professed that he would run a legal and compliant company.  However, after the 11th Circuit overruled the convictions of Bob Whiteside and Jay Jarrell in the Columbia HCA case, White took the position that health care fraud laws are unfair and too complex to be enforced by the courts.  He characterized the federal government's efforts to enforce the health care fraud laws as the new "McCarthyism."

53.     White directed and participated in many of the activities described herein including the payments to Dr. Siegel and the land purchase from Dr. Rao. White knowingly and

recklessly turned a blind eye to compliance problems within IASIS as well as reports that patients were undergoing procedures without proper medical necessity.

54.     Defendant Sandra McRee is the former Chief Operating Officer of IASIS.  Prior to IASIS, McRee also worked for Columbia HCA as a direct report to White.   She resides on a farm near Nashville, Tennessee and Alabama.  McRee, like White, delivered a very strong message to all IASIS employees "to make the numbers" no matter what and that otherwise one would lose one's job.  McRee was responsible for many of the violations of law set forth herein including negotiations in the Florida market over payments to Drs. Pollack and Barrett, negotiations in the Texas market over the land purchased from Drs. Rao and Williams, and the deal arranged with Dr. Siegel and Advanced Cardiac Specialists in Arizona.

55.     In June 2004, a private equity firm, the Texas Pacific Group (TPG), made a major capital investment in IASIS of $1.4 billion ownership interest.  David Bonderman is a principal with Texas Pacific Group.  Jonathan Cosman directs TPG's health care ventures.

## III.     JURISDICTION AND VENUE

56.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

57.     This Court has personal jurisdiction over the defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the defendant has at least minimum contacts with the United States.  Moreover, the defendants can be found in, resides in or transacts or have transacted business in the District of Arizona.

58.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because defendant transacts business in the District of Arizona.

**IV.     BACKGROUND**

    **A.     <u>The Medicare and Medicaid Programs</u>**

        **i.     Medicare**

59.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program.  Medicare is a federally-funded health insurance program primarily benefiting the elderly.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  <u>See</u> 42 U.S.C. § 426 et seq. Part A of the Medicare Program authorizes payment for institutional care, including inpatient hospital services and post-hospital nursing facility care.  <u>See</u> 42 U.S.C. §§ 1395c-1395i-4.

60.     Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider.  Medicare pays providers only for services that it considers are "reasonable and necessary for the diagnosis or treatment of illness or injury. . . ."  Social Security Act § 1862(a)(1)(A).  Providers who wish to participate in the Medicare program must ensure, among other things, that their services are provided "economically and only when, and to the extent, medically necessary."  42 U.S.C. § 1320c-5(a).

61.     The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

62.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries."  42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies are responsible for processing and paying claims and auditing cost reports.

        **ii.     Medicaid and TRICARE/CHAMPUS**

63.     Medicaid was also created in 1965 under Title XIX of the Social Security Act.  Funding for Medicaid is shared between the Federal Government and those states participating in the program.  Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services

to the poor.  Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary").  After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan.  42 U.S.C. § 1396b(a)(1).  This reimbursement is called "federal financial participation" ("FFP").

64.    Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396(a)(10(A), 42 U.S.C. § 1396d(a)(1-)(2), and uses a cost reporting method similar to that used under Medicare.

65.    Each physician that participates in the Medicaid program must sign a Medicaid provider agreement with his or her state.  Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all Medicaid requirements, including the fraud and abuse provisions.

66.    TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

67.    Medicare, Medicaid and the other federal health care program require as a condition of coverage that services be reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A).

68.    Providers must provide economical medical services and, then, provide such services only where medically necessary.  42 U.S.C. § 1320c-(a)(1).

69.    Providers must provide evidence that the service is medically necessary as appropriate. 42 U.S.C. § 1320c-5(a)(3).

70.     Providers must ensure that services provided are not substantially in excess of the needs of such patients.  42 U.S.C. § 1320a-7(b)(6)&(8).

### iii.     The Stark Statute

71.     A section of the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having an improper "financial relationship" (as defined in the statute) with the hospital.  The regulation implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353.

72.     The Stark Statute establishes that the providers should not submit claims for item or services referred by physicians who have improper financial relationships with the providers of the items or services.  In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.  Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships. The statute was designated specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

73.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider.  See Omnibus Budget Reconciliation Act of 1989, Pub. Law 101¬239, § 6204.

74.     In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for ten

additional designated health services.  See Omnibus Budget Reconciliation Act of 1993, Pub.

Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

75.     As of January 1, 1995, Stark II applied to patient referrals by physicians with a

prohibited financial relationship for the following ten additional "designated health services";

(1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy;

(4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and

supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics

and prosthetic devices and supplies:  (9) outpatient prescription drugs; and (10) home health

services.  See 42 U.S.C. § 395nn(h)(6).

76.     In pertinent part, the Stark Statute provides:

(a)     Prohibition of certain referrals

(1)     In general Except as provided in subsection (b) of this section, if a
physician (or an immediate family member of such physician) has
a financial relationship with an entity specified in
paragraph (2),then:

A)      the physician may not make a referral to the entity for the
furnishing of designated health services for which payment
otherwise may be made under this subchapter; and

B)      the entity may not present or cause to be presented a claim
under this subchapter or bill to any individual, third party payor or
other entity for designated health services furnished pursuant to a
referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

77.     The Stark Statute broadly defines prohibited financial relationships to include any

"compensation" paid directly or indirectly to a referring physician.  The statute's exceptions then

identify specific transactions that will not trigger its referral and billing prohibitions.

78.     An employment relationship may be considered proper under the Stark Statute,

but only if the amount of the remuneration under the employment is consistent with the fair

79.     Compensation paid to a referring physician serving as a consultant to a hospital may fall within an exception to the statute but only if the contract specifies the services covered, covers all the services to be provided by the physician, and the aggregate of such services is reasonable and necessary for the legitimate business purposes of the hospital and is consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties.  42 U.S.C. § 1395nn(e)(3).  Thus, compensation paid to a physician (directly or indirectly) under a medical directorship that exceeds fair market value, or for which no actual services were required, triggers the referral and payment prohibitions of Stark II with respect to designated health services referred by that physician.

80.     Similarly, office space leased to a referring physician may be considered proper under the Stark Statute, but only if the rent over the term of the lease is consistent with fair market value and is not determined in a way that takes into account the volume or value of referrals or other business generated between the parties.  42 U.S.C. § 1395nn(e)(1)(A).  Thus, rents paid (directly or indirectly) by a physician to a hospital that are below fair market value trigger the referral and payment prohibitions of Stark II with respect to designated health service ordered, referred or arranged for by that physician.  Likewise, payments made to a referring physician for lease of equipment owned by the hospital may be considered proper under Stark, but only if the amount paid by the hospital for lease of the equipment is consistent with fair market value and is not determined in a way that takes into account the volume or value of referrals or other business generated between the parties.  42 U.S.C. § 1395nn(e)(1)(A).  For all transactions with a physician, a hospital must obtain fair market value payments from the physicians for the space, personnel and other items and services furnished to the physician.

81.     Additional issues may arise under Stark when a physician uses a hospital clinic. Under Medicare, the hospital submits a claim for the hospital technical component charge for use of its clinic and the physician submits claims for professional fees.

82.     If the physician uses the hospital based clinic, the physician should receive a reduced payment on their bill for professional services – the "site of service" differential.  To submit proper claims, the physician must indicate on the face of the bill that the site of service was a hospital outpatient setting.

83.     In addition, the hospital must collect a portion of any reimbursement the physician receives from private insurers when using the hospital based clinic. Typically, private insurers do not reimburse the hospital but reimburse the physician as though the services had been provided in the physician's office.

84.     Accordingly, the hospital must collect a portion of any fees paid by private insurer to physicians for services provided in the hospital clinic.  Failure to recoup such payments is furnishing value in-kind to the physician, which constitutes a "financial relationship" within the meaning of the Stark law.

85.     Violations of Stark may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known the payment should not be made under section 1395nn(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited.  See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

86.     In sum, Stark prohibits hospitals from billing Medicare for certain designated services referred by a physician with whom the hospital has a financial relationship of any type not falling within specific statutory exemptions.  42 U.S.C. § 1395nn.  The statute specifically prohibits hospitals from billing for such services.  In-patient and out-patient hospital services are among the designated health services to which the Stark II referral and billing prohibitions apply.

### iv.   The Medicare and Medicaid Anti-Kickback Statute

87.     The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977.  The Anti Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to over utilization or poor quality of care.

88.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  The Statute not only prohibits outright bribes and rebate schemes, but also prohibits offering inducements or rewards that has as one of its purposes inducement of a physician to refer patients for services that will be reimbursed by a federal health care program.  The Statute ascribes liability to both sides of an impermissible kickback relationship.

89.     The Anti-Kickback Statute contains statutory exceptions that exempt certain transactions from its prohibitions.  These exceptions include regulatory safe harbors for space rental, equipment rental, and personal services and management contracts as long as certain standards are met.  The space and equipment rental safe harbors apply to payments made to a lessor for the use of the premises or equipment as long as "the lease is intended to provide the lessee with access for periodic intervals of time" with schedules, intervals and costs expressly stated in the lease, the rental charge is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties. . . . 42 C.F.R. §§ 1001.952(b), (c).  Thus, where payments purportedly made to lease real property or equipment do not comply with

the conditions and are made with the intent to reward referrals, the Anti-Kickback Statute has been violated.

90.     The personal services or management contracts safe harbor applies to payments to an agent as long as the agency agreement is intended to provide the services of the agent on a periodic, sporadic or part-time basis with schedules, intervals and costs expressly stated in the contract, the compensation is consistent with fair-market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties.  Id.  at § 1001.952(d).  When compensation is paid for personal or management services that are not provided and the compensation is made with the intent to induce referrals, there is a violation of the Anti-Kickback Statute.

91.     Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

92.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMP VA, Federal Employee Health Benefit Program, and other federal health care programs.

93.     Either pursuant to provider agreements, claims forms, or other appropriate manner, hospitals, pharmacists and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law.

94.     Any party convicted under the Anti-Kickback statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health

program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

95.     The enactment of these various provisions and amendments demonstrates Congress's commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the Stark and Anti-Kickback statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare and other federal health care programs.

96.     On discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form CMS UB-92.

97.     As a prerequisite to payment for Medicare, CMS requires hospitals to submit annually a Form CMS-2552 (previously Form HCFA-2552), more commonly known as the Hospital Cost Report.  Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.  An example of a Medicare cost report for St Luke's Medical Center is attached as an exhibit to this Complaint.

98.     A hospital may not participate in the Medicare program unless it files an annual cost report.  42 U.S.C. 1395g, 42 CFR 413.20(b).  Each year's cost report covers all of the interim requests for reimbursement, such as the UB-92 forms submitted by participating hospitals for claims.  The purpose of the cost report is to allow a platform for all of the claims submitting during the year to be audited and examined.

99.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

100.    In September 1994, Medicare revised the certification provision of the Hospital Cost Report to state:

I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

101.    In or about 1996, the Hospital Cost Report form was revised again to state:

Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine, and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

102.    The actual certification language states:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by {name of facility, ID of facility) for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in the cost report were provided in compliance with such laws and regulations.

103.    The certification is followed by a line for the signature of the facility officer, title and date.

104.    Once the Stark Statute became effective, providers certified on the CMS Form 2552 that the services provided in the cost report were billed in compliance with the Stark Statute.

105.    A hospital is required to disclose all known errors and omissions in its claim for Medicare reimbursement (including its cost reports) to its fiscal intermediary.  42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports.

> Whosoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such payment or benefit is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

106.    Final Medicare hospital payment is conditioned upon the cost report certification being submitted to a Medicare fiscal intermediary.

107.    Under Medicare Part B, "Medicare carriers" are responsible for accepting and paying claims for certain reimbursements under Medicare Part B.

108.    Under Part B, the physician typically submits a bill using Form CMS-1500.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient."

109.    In addition, each provider must sign a provider agreement as a condition of participation that agrees to comply with all Medicare requirements including the fraud and abuse provisions.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.  By submitting a claim for Medicare reimbursement, the provider certifies that the submitted claim is eligible for Medicare reimbursement and that the provider is in compliance with all Medicare requirements

110.    Compliance with the Stark and the Anti Kickback statutes is also a condition for participation in the TRICARE/CHAMPUS and FEHB programs.  Accordingly, claims for reimbursement for inpatient or outpatient services under these programs that were the result of referrals tainted by kickbacks or violations of Stark, are false claims and are not entitled to reimbursement.

111.     To summarize, pursuant to the terms of the Medicare Cost Report and then Medicare Provider Agreement, defendants certified that claims submitted were eligible for Medicare and Medicaid payment and that the providers had complied with the statutes and regulations relating to Medicare and Medicaid.

112.     Claims that derive from referrals that were tainted by kickbacks or that violate the Stark laws were not eligible for reimbursement.  Submission of such a claim for reimbursement constitutes a false or fraudulent claim under the federal False Claims Act, 31 U.S.C. § 3729.

113.     Claims for services rendered that were not medically necessary or performed in such a way as to deliberately increase costs and reimbursement were not eligible for reimbursement.  Submission of such claims constitutes a false or fraudulent claim under the federal False Claims Act, 31 U.S.C. § 3729.

114.     Defendants knew that claims that derived from referrals that were tainted by kickbacks and that violate the Stark laws are not eligible for federal or state reimbursement.

115.     Notwithstanding this knowledge, Defendants undertook their fraudulent scheme of inducing referrals from physicians through improper financial relationships and then submitting claims for reimbursements for services provided as a consequence of referrals tainted by illegal kickbacks or other improper financial compensation.

## V.     ALLEGATIONS

116.     IASIS was formed in 1999.  The original founder, Ken Perry, invested a small amount of money and then sought investment from Clayton McWorter who had been an executive at Columbia/HCA.  Clayton McWorter invested two million dollars initially.

117.     The corporate culture at IASIS, as directed by White and McRee, encourages its executives to eschew regulatory compliance and instead to focus on maximizing revenue.

118.     The top management control group at IASIS is focused on short term gain and profit and not on long term growth or compliance.  Management decisions are highly centralized and made by a very small control group in the central office.  Extreme pressure and inappropriate incentives are brought to bear on employees to discourage open discussion about compliance

issues and to control employees from taking actions to remedy non-compliant conduct by the company.

119.    By way of example, employees who identified regulatory compliance problems either have been reassigned from their position or threatened with replacement or told they were not "team players."  The rates of turnover at the facility and market level for managers can be in excess of 50%-80%.  Many managers leave when they realize the inappropriate pressures being exerted to make profits and cut costs or because they are forced to leave by IASIS corporate managers for failure to "make the numbers."

120.    One of the keys for IASIS to maximize revenues has been to build and retain a base of physicians who referred their patients to IASIS facilities in return for lucrative financial arrangements.  Also, driving higher volumes of patients was, and is, critical to IASIS's success. From White and McRee down through the hierarchy of market presidents, hospital administrators including Chief Operating Officers and Chief Financial Officers, the message was clear to focus on patient volume and generating revenue often with unrealistic expectations for high revenues.  Employees who could not generate high enough revenues and profits on a monthly basis were routinely terminated.

121.    As a result of these corporate decisions, defendants made a conscious decision to enter into numerous arrangements with physicians including physician recruiting agreements, labeled as consultant services agreements and medical directorship agreements.  These agreements are intended to produce patient referrals to IASIS hospitals including referral of Medicare and Medicaid patients.

122.    These agreements, several of which are described in detail below, pay doctors substantial sums of money for "consulting" or "medical director" services when in fact the price paid by defendants is substantially in excess of fair market value for the services actually proved by these referring doctors.

123.    In addition, defendants provide lavish entertainment and other benefits to doctors who refer patients to IASIS hospitals.  For example, IASIS maintains luxury boxes and season tickets for major professional sporting events in its markets.

124.    IASIS makes tickets to these events available without regard to compliance with either the Stark or the Anti-Kickback laws.  Doctors are given tickets to events where no representative of defendant is present and no business related discussion occurs.  Physicians who refer the most business to Iasis hospitals, are the most frequent recipients of these "benefits."

125.    IASIS carefully tracks physician referrals on a week by week and even day by day basis including what referrals were made to a hospital for procedures and ancillary services and what Diagnosis Related Groups (DRGs) were used by the hospital for admission of the physician's referred patients.  These tracking reports also include payor codes so that defendants were well aware which physicians were referring patients insured under government health programs including Medicare and Medicaid.

126.    IASIS routinely purchased data from the Data Advantage Corp tracking the "inpatient performance" by physician.  The DRG reports analyze performance indicators for physicians referring to IASIS hospitals and could be customized to obtain a wide variety of information on patient referrals from physicians by name including typically the number of cases, the charges or costs per case, the average length of stay per patient, the mortality rate associated with that physician in that facility and the readmission rate for the physician in that facility.

127.    Comparison groups for each physician are derived by Data Advantage from Medicare data and the physician is compared to a comparison group normalized to reflect the physician's patient mix including the severity level of illness.

128.    Although the ostensible purpose of the data provided by the Data Advantage Group is to allow for performance indicators to guide outcome and quality improvement, IASIS's main purpose in reviewing physician-specific data was to determine the volume and value of referral business to be derived from entering into financial arrangements with a

particular physician including procedures, admission coding, length of stay, and readmissions, and payor for that physician's referred patients.

129.     Drawing on various data sources, each month the CFO at each IASIS hospital prepared a Monthly Operating Report that pulled together data on the top 25 referring physicians for the hospital and the top 25 DRGs.  That Report is a whole package of information on financials for the hospital, a detailed budget document to assess performance of each physician, each service line, and each hospital.  For any service line or provider, the report allows IASIS managers to review the profitability of that service line as compared to a projected monthly budget.

130.     By the tenth day of the month that report is posted on a computer network that could be viewed by IASIS managers at the hospital, market, and corporate level including White and McRee.  The report was a very significant management tool.  It was used to evaluate profitability of service lines including revenue from referrals (for example, ancillary revenues, admissions and surgeries originating from outpatient procedures like cath procedures).  Meeting budget projections was also a critical tool for evaluating whether or not to keep hospital CEOs and CFOs.  The information, in turn, also would be used to prepare financial reports monthly for the IASIS investors about performance.

131.     The Monthly Operating Report was a package of electronic tracking reports.  It allowed hospital and senior executives to "drill down" on any given service line, any given physician, any DRG and evaluate profitability and costs.  This package of material was produced from the internal hospital database systems SBase, Hyperion, and Reveal.  The full package of reports would contain information and statistics such as (1) referrals, (2) DRGs, (3) admissions, (4) number of procedures, and (5) gross revenue compared to budget for the top 25 referring physicians at a hospital (which would include Siegel and the other ACS physicians).  The package would also include something called the "Monthly Operations President's Report," which would contain an analysis of the reports contained in the package.

132.    The reports from these systems were posted on IASIS's internal computer system and were prepared on a hospital-by-hospital basis.  The package, although available electronically, was also printed out in full, and given to managers at a monthly meeting in 3-ring binder notebooks.  Present at these meetings each month would be the Market President, the CEO and CFO of the hospital, the Chief Nurse, the Business Office Director, the Managed Care representative, and often McRee or Derek Morkel.  At the end of these meetings, the CFO for the hospital would collect all of the binders.

133.    By 2004, IASIS had implemented an additional reporting package, a Microsoft system called Business Intelligence Software, which provided even greater detail.  This software allows hospital executives to review billing information department by department, physician by physician, etc. and track for any lost dollar of revenue.

134.    A number of specific examples of the sort of physician relationships approved by defendant in violation of the Stark and Anti-Kickback laws are described below.  There are many additional arrangements with physicians that violate the Stark and Anti-Kickback laws.

**A.     Submission Of False or Fraudulent Claims To Federal Health Programs by IASIS's St Luke Medical Center For Services Provided To Patients Referred To St Luke's by Dr. Richard Heuser**

135.    Dr. Richard R. Heuser is a high profile cardiologist who was recruited to Luke's Medical Center in late 1999.  To entice Dr. Heuser, IASIS agreed to pay fees totaling up to $459,750 annually to Dr. Heuser under three separate medical director and consulting contracts. Bobbi Kale originally identified Heuser as a physician for IASIS to recruit.  Also, key to negotiating these contracts was IASIS' hiring of Robert Luther as CEO of St. Luke's Medical Center.  Luther was a personal friend of Dr. Heuser's.   Relator attended a dinner meeting with Wayne Gower, Carol Beauchamp, and Bob Luther in 1999 where Dr. Heuser's recruitment was discussed.  Top managers at IASIS recruited Luther to IASIS to secure his referral stream, including referral of patients insured by Medicare and Medicaid, to St Luke's Hospital.

136.    Other key former employees who were in a position to have knowledge of the relationship between Dr. Heuser and IASIS hospitals include Maridell Sladerbeck, the former CEO/COO of St Luke's, Linda Hischke, former Arizona Market President, Wayne Gower, former Arizona Market President during the time Dr. Heuser was recruited, and George Horner, former St Luke's Chief Financial Officer (CFO) during the time that Heuser was recruited.

137.    IASIS top managers were aware that IASIS was entering into contractual relationships with Dr. Heuser that Dr. Heuser could not reasonably fulfill.  The primary purpose of these contractual arrangements was to secure referral of patients by Dr. Heuser to St Luke's and away from competing hospitals including Phoenix Heart Hospital.  The purpose of these relationships was not, primarily, to secure consulting services from Dr. Heuser.

138.    Successive IASIS managers signed the three contracts.  CEO Maridell Sladerbeck signed the original 1999 Directorship Agreement but was reluctant to do so.  Mike Georgeluis signed the IASIS Corporate Consulting Service Agreement with Dr. Heuser for IASIS.  Mr. Georgeluis was reluctant to sign the Agreement and had serious concerns about the legality of the contract.  Georgeluis left IASIS in 2001.  CEO Arthur Layne signed the Directorship Agreement for Heart Cath/Lab Services.

139.    The first agreement between Dr. Heuser and St Luke's was a directorship contract for "Interventional Cardiology Services."  This contract, effective as of December 1, 1999 paid Dr. Heuser $202,500 per year for 90 hours per month ($185.70 per hour).  The 1999 Agreement also allowed for an expense allowance of $42,250 and reimbursement of up to $40,000 annually for travel- and publication-related expenses.

140.    The second agreement between Dr. Heuser and St Luke's was a directorship contract for the Heart Cath and Lab.  That agreement, which was effective as of June 1, 2000, paid Dr. Heuser $75,000 a year for 33 hours a month ($187.50/hour).

141.    The final agreement between Dr. Heuser and St Luke's, which was effective as of February 3, 2000 paid Dr. Heuser $100,000 per year for 17 hours per month of consulting on "Cardiology Equipment and Supply Purchasing" ($500/hour).

30

142.    In total, IASIS agreed to pay, and did pay Dr. Heuser up to $459,750 per year for services allegedly totaling 140 hours per month.  Records of these payments show that Iasis paid Dr. Heuser into 2004

143.    In actuality, Dr. Heuser provided practically no services to St Luke's and certainly substantially less than 140 hours of service each month.

144.    At the same time Dr. Heuser was committed to spend 140 hours per month, or approximately 35 *hours a week* providing director or consulting service, Dr. Heuser was also running a busy medical practice and providing consulting services to at least seven other companies.

145.    Even though Dr. Heuser provided practically no services to defendant IASIS or St Luke's he would complete "Consulting Activity Logs" indicating that he was providing the hours of service required each month under the agreements.  One "Consulting Activity Log" from April 30, 2001 lists meeting with many of the same device manufacturers (Medtronics, Guidant, Cordia) with whom Dr. Heuser had independent agreements but no hours reflecting the tasks identified in his consulting contracts.  White often expressed to Frazier that one would not want a physician involved in managing hospital programs and that the purpose of directorship contracts was not for the physician to be involved in hospital business but simply to refer their patients to the hospital.

146.    Dr. Heuser's time records will demonstrate that he maintained a very busy cardiology practice seeing many patients for office visits and procedures during the day and that he also frequently traveled and lectured.

147.    Dr. Heuser's time records will also demonstrate that he took frequent vacations during periods for which he was paid by IASIS under the consultancy arrangements.

148.    In addition to these large direct annual payments to Dr. Heuser, IASIS's St. Luke's Medical Center also paid $45,000 for half of the salary and benefits for one of Dr. Heuser's employees who provided nursing and administrative support to Dr. Heuser's practice and practically no services for IASIS.

149.    While he was receiving payments from St. Luke's Medical Center under the three sham consulting agreements set forth above, Dr. Heuser referred patients to IASIS, including patients covered by Medicare and other federal programs.

150.    While IASIS was paying Dr. Heuser under the three sham consulting agreements, IASIS's St Luke Medical Center submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Heuser, including patients insured under Medicare, and which resulted in millions in annual revenue to St Luke's.

151.    While IASIS was paying Dr. Heuser under the three sham consulting agreements, IASIS's St Luke Medical Center submitted annual cost reports to the Medicare program, certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.

152.    IASIS managers, including the CFOs who signed the annual Medicare cost reports, knew the certification of compliance with the Stark law and the Anti Kickback Act was not true and, nonetheless, submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Heuser during the period of his illegal financial relationships, including patients insured under Medicare, and which resulted in millions in annual revenue to St Luke's.

153.    The following individuals were responsible for reviewing and signing cost reports for St Luke's Medical Center during the relevant time period that Dr. Heuser was referring patients to St Luke's and receiving cash under the consulting agreements: hospital CFOs and market CFOs including by example, but not limited to, CFO George Horner, CFO Dan Powell, and CFO Greg Wojtal.  In addition, some cost reports might have been signed at the corporate level by Donna Whitmer and Doug Wolfe who worked with the corporate reimbursement manager Don Hemphill.  These individuals were aware of the Stark violations at St Luke's and other IASIS hospitals and the risks of signing the certification on the hospital cost report.

154.    Each year, from 1999-2004, IASIS submitted a cost report to Medicare and to Medicaid for St Luke's Medical Center in violation of law because it knew that the certification

that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

155.    Each year, from 1999-2004, the United States made final payment upon the filing of the annual Medicare cost report.

156.    The United States would not pay claims presented by IASIS for services rendered to patients referred by Dr. Heuser if it has been aware of and understood that Dr. Heuser's relationship with IASIS and St Luke's violated the Stark Law and the Anti Kickback Act.

157.    In 2003, Dr. Heuser was recruited away from St. Luke's to another hospital in the Phoenix area.  According to documents from St Luke's, IASIS appears to have continued to make payments to Dr. Heuser under his consulting arrangements until mid 2004.

158.    IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at St Luke's, for 1999-2004 during which time IASIS (1) had an illegal financial relationship with Dr. Heuser, (2) Dr. Heuser referred patients to St Luke's for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Dr. Heuser to federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered to Dr. Heuser's federally insured patients.

159.    Such statements are false statements material to a false claims and such claims are false or fraudulent claims within the meaning of the federal False Claims Act.

**B.     Submission False Claims by IASIS For Services Performed on Federally-Insured Patients at Mesa General Hospital and St. Luke's Medical Center Referred by Dr. Robert Siegel and Physicians at Advanced Cardiac Specialist**

160.    IASIS recruited Dr. Robert Siegel, a cardiologist, and his physician group Advanced Cardiac Specialists ("ACS") in 2002 to develop an interventional cardiology program for Mesa General Hospital in Mesa, Arizona (including referring patients to the hospital's heart surgery program) and to join St Luke's Medical Center where he had previously been denied staff privileges by the medical staff in the 1990s.  Before this, Mesa General operated primarily as an osteopathic hospital and was not effectively equipped to handle cardiac cases.

161.    To generate the patient referrals for admissions and heart surgeries to Mesa
General, ACS and IASIS negotiated agreements in 2002, 2003, 2004 and 2005.  Under these
agreements, ACS owned the license to the cath lab and assessed a fee from Mesa for each
cardiac catheter procedure performed by ACS based on a negotiated fee schedule.  Under this
arrangement, the hospital was essentially leasing the catheter lab from ACS and paying a fee to
ACS for the value of the reimbursement it received from billing Medicare for the technical
component fee for each service performed by ACS in the cath lab.

162.    ACS also submitted invoices to Mesa for services provided on patients with
private insurance even though, typically, hospitals cannot bill under most private insurance
contracts and all reimbursement is directed by the private insurer to the physician or physician
group.

163.    Before completing the contract, IASIS and ACS agreed to obtain a third party
appraisal of the fair market value for the cath lab services.  That appraisal valued the fee
schedule significantly below the rates that ACS demanded as part of its agreement to work with
Mesa General Hospital.

164.    Despite this appraisal, White insisted that the agreement be finalized at the higher
price demanded by ACS, providing the physician group with a substantial financial benefit.

165.    White and McRee worked together to force through the deal.  McRee ruthlessly
beat the third party appraiser down to a sales price below fair market value.  Meanwhile, White
directed IASIS General Counsel Frank Coyle and the then-CEO for Mesa General, Pam Maher,
that they could not leave the office until they had finalized a deal on the terms directed by white.
The transaction was finalized at 2:00-3:00 am in the morning.

166.    As a result, under the terms of the lease agreement, starting in 2002, IASIS,
through Mesa, paid ACS greater than fair market rates for cardiac catheterization procedures,
including those requiring the insertion of stents, which were some of the most common
procedures ACS performed.

167.    The deal was very favorable to ACS and Dr. Siegel because they had a place to locate their cath lab business after Vanguard had not renewed their contract, they would not be subject to peer review at IASIS hospitals and they had very favorable terms under the lease agreement to induce referrals.

168.    The marginal value of the cath lab lease to Dr. Siegel may be even greater than that set forth in the express terms because physicians from Advanced Cardiac Specialists have a practice of acquiring medical devices including stents below fair market value by purchasing them on the black market including purchases on EBay and other means.

169.    IASIS earned significantly lower profit margins on cath patients from ACS than those from other cardiologists, a kickback.

170.    IASIS managers including White and McRee were well aware that the margins were below those earned by the hospital on other physician but tolerated these lower margins for the hospital because (1) Dr. Siegel and other physicians in his practice including e.g., Dr. Charles Jost, Dr. Mark Eckhauser, Dr, Garg, and Dr. Rahul Molhotra, referred, and performed services on very high volume of patients from all around Arizona to Mesa General including a very high number of Medicare and Medicaid patients, (2) Dr. Siegel and other physicians in his practice including e.g., Dr. Charles Jost, Dr. Mark Eckhauser, Dr. Garg, and Dr. Rahul Molhotra performed services at a high intensity and beyond medical necessity in many cases including unbundling of stent procedures by inserting stents over many months, aggressive use of pacemakers and other implantable devices, aggressive use of stents, and exceedingly high numbers for use of intraortic balloon pump, and, (2) as promised, Dr. Siegel and other physicians in his practice including e.g., Dr. Charles Jost, Dr. Mark Eckhauser, Dr. Garg, and Dr. Rahul Molhotra referred patients to Mesa General for 400 open heart surgeries (coronary artery bypass grafts).  McRee was quite explicit in saying that she did not care about the lost margin on the cath procedures to ACS because what she wanted was the money from the open heart surgeries. .

171.    In violation of requirements for participation in the Medicaid and Medicare programs, IASIS permitted Dr. Siegel to perform procedures using the leased catheter labs

without utilization or peer review by the hospital as required under Medicare Conditions of Participation even though the hospital owned the license for the catheter lab.

172.    For Dr. Siegel, the opportunity to perform interventional cardiology procedures at a hospital catheter lab without review of the procedures for medical necessity and appropriateness of care by the hospital staff or physician peers was a substantial inducement to refer patients, including federally insured patients, to Mesa General.

173.    As a result, Dr. Siegel operated a practice out of two IASIS hospitals, Mesa General and St. Luke's, where he could continue to perform interventional cardiology procedures at extremely high rates of utilization without supervision of peers or hospital administrators.

174.    In turn, the hospital benefited from Dr. Siegel's high rates of admission and readmission and permitted Dr. Siegel to reap benefits of performing a high incidence and high number of cardiology procedures without utilization review or peer review.

175.    Upon reasonable investigation, Dr. Siegel and his practice ACS have performed medically unnecessary interventional cardiology procedures at Iasis hospitals.

176.    Indicia of over utilization is to be found in numerous financial documents that IASIS managers obtained and analyzed which showed that Dr. Siegel and ACS re-admitted patients to the hospital up to four times more frequently than the national average.

177.    Readmissions to the hospital generated additional revenue for the hospital and suggested a serious concern with the quality of care provided to patients.

178.    Dr. Siegel and other ACS physicians would also admit patients for short lengths of stay including a high number of one day stays.  High rates of one-day stays under Diagnosis Related Groups coded for much longer hospital stays are an area that the Office of Inspector General for the Department of Health and Human Services has identified as a potential high risk area for fraud, waste and abuse in health care.

179.    ACS's contractual relationships appear to provide additional compensation to ACS as it appears that Mesa paid ACS for performing procedures for private pay patients even

though Mesa would not typically be able to receive reimbursement from private insurers for services performed by physicians in hospital based clinics.

180.    ACS also imposed no controls on ACS's billing of Medicare for its professional fees and did not require ACS to code its claims submitted to Medicare to reflect the reduced payment for services provided in a hospital based clinic where the physician group is not paying its own overhead.

181.    ACS had a similar financial relationship with IASIS at St. Luke's Hospital where the group was provided space for its catheter lab at a below-market lease rate.  Like at Mesa General, ACS's fee schedule for cath lab services at St. Luke's was above fair market value  St. Luke's tolerated this loss on margin in exchange for the significant number of referrals from ACS to the hospital for admissions, procedures and ancillary services.

182.    IASIS also entered into below-market lease arrangements for the physical space ACS required and failed to support its leases with fair market valuations in violation of Stark law requirements.

183.    IASIS took the position that Dr. Robert Siegel and ACS can do whatever it wants in the leased cath lab at Mesa General and that it did not conduct peer review or utilization review of what occurs in the cath lab at Mesa.

184.    In fact, in one notorious incident where one of the ACS physicians purchased and implanted a stolen pacemaker off of Ebay resulting in an investigation by the Arizona Medical Board, Mesa filed papers with the Arizona Medical Board stating that it had no legal responsibility for what goes on in the cath lab at Mesa.

185.    Patients understood themselves to be in a wing of Mesa General (and were not aware that IASIS took the position that it is not responsible for the cath lab) and that they were admitted to the ICU from the Mesa cath lab after procedures and then transferred to open heart surgeries at Mesa.

186.     The cath lab area where ACS and Dr. Siegel worked at Mesa General was poorly maintained, overcrowded, and insanitary and personnel including those engaged in cath procedures did not appear to be properly dressed (wearing motorcycle gang garb) or qualified.

187.     Patients had to argue that they want second opinions before they are permitted to leave the hospital after cath procedures when recommendations had been made for immediate bypass surgery or implantation of a cardiac device by Dr. Siegel or one of his colleagues.

188.     During the time period that IASIS operated Mesa General – and submitted claims to health insurers including federal health programs like Medicare, Medicaid and Tricare – the volume of open heart bypass surgeries at Mesa reached approximately 400 heart surgeries a year, a number which far exceeds what one would expect from a small suburban/rural osteopathic hospital.

189.     ACS also was recruited by IASIS back to St. Luke's hospital in Phoenix over objections of medical staff which had previously restricted Dr. Siegel's privileges at St. Luke's. Physicians, managers and staff reported concerns to top IASIS managers including, for example Chief Nursing Officer Cathy Story and Market President Dolores Horvath about unnecessary medical procedures, an inordinately high number of placement of intraortic balloon pumps with one day stays, and unbundling of stent procedures to maximize reimbursement for both Dr. Siegel and the hospital.

190.     IASIS managers, including White and McRee were acutely aware that ACS performed a high rate of intensive procedures and had high rates of readmissions and high rates of one day stays for ACS patients.  IASIS closely tracked referrals from ACS, including by payor code, and has calibrated its compensation agreements to allow ACS to earn a significantly higher margin on procedures its physicians perform at IASIS hospitals by comparison with other non ACS physicians.

191.     IASIS agreed to forego nearly half of its margin on heart cath procedures at Mesa General for ACS physicians (by comparison to non ACS physicians) in exchange for the high

numbers of referrals for open heart surgeries to a small team of cardiac surgeons working at Mesa.

192.    Additional indicia of overutilization and medically unnecessary procedures were the frequent use of Dr. Siegel and other patients of "intraortic balloon pumps" well known by medical staff and IASIS managers.  IASIS managers who would have been aware of the overutilization by ACS at IASIS hospitals and lack of peer review at the Arizona market level include Pam Maher, Greg Wojtal, Dolores Horvath, John Gallagher, Cathy Stevens, Joy Bennett, Mary Shaw, Rose Edwards and at the corporate level would include Kathy Story as well as White and McRee.

193.    According to published studies, use of the intraortic balloon pump should be in the range of 5-8% for most cardiologists but witnesses noted that Dr. Siegel appeared to use balloon pumps on approximately fifty percent of his patients.  Use of the balloon pump meant that the patient had to be hospitalized and could not leave the hospital without explantation.

194.    The use of the intraortic balloon pump presents high risk to patients.

195.    Medicare data shows frequent use of the ICD-9 code 219 for cardiogenic shock for Siegel and for other physicians in his group at the time including Dr. Jost.

196.    The rate of implantation of Intra-Aortic Balloon Pumps ("IABPs" or "balloon pumps") at Mesa General between 2004 and 2007 is staggering.  More balloon pumps were implanted by Siegel and ACS at Mesa General than any other hospital in Arizona for 2004, 2005, 2006, and 2007.

197.    Mesa General Hospital is not a heart hospital or a teaching facility, yet the volume of balloon pumps implanted exceeds those of the larger, more specialized facilities.

198.    Comparing the rate of placements of balloon pumps for those in a **Nationwide Ranking** of hospitals with 150 or less beds, including heart hospitals, Siegel/ACS and Mesa place in the following rankings.

**YEAR   RANK**

| 2003 | 14th (Phoenix Memorial, the hospital in which Siegel practiced for part of the year was ranked #1) |
| 2004 | 1st |
| 2005 | 1st |
| 2006 | 3rd |
| 2007 | 2nd |

This data uses ICD-9 procedure code 37.61 -- implantation of balloon pulsation device.

199.    IASIS also submitted claims where Dr. Siegel and the ACS physicians had "unbundled" stenting procedures.  ACS physicians would determine that they would be inserting stents on three vessels and would schedule patients to return to an IASIS hospital every two weeks to do each vessel separately.  This could cause great harm to patients but provides additional revenue to both the physician group and the hospital.

200.    ACS employees treated patients in the same way as established by Dr. Siegel with Sherri Stanley as head nurse and Robert Cohen as DO.

201.    One physician who worked for Dr. Siegel and produced very high revenues for the practice described Siegel as "very dangerous and unethical" and that he deserves to lose his license.

202.    The high use of intraortic balloon pumps occurred at St Luke's for ACS's and Siegel's patients as well as at Mesa General.  Members of the medical staff were not permitted to gather data to assess the frequent use of the procedure by ACS or its outcomes.  All decisions were made by Dr. Siegel and they were kept outside of normal peer review process.

203.    At one point, Dr. Mark Kartub worked with Dr. Kaplan and Bob Luther (then-CEO of St Luke's) wanted to create a Chief Medical Officer position and wanted to get bylaws approved at St Luke's which would have ensured peer review and utilization review of Siegel and ACS's procedures.

204.    White and McRee refused to allow the medical staff to implement peer review and McRee managed to get Dr. Kartub excluded from the Board at St Luke's and to put in place a policy that all Board appointments must be approved by IASIS corporate managers in

Tennessee.  McRee also made sure that Dr. Kartub's contract for operating the pathology laboratory was terminated.

205.    One cardiac surgeon who was recruited to Mesa General by IASIS manager Jim McKinney to perform open heart bypass surgeries generated by Dr. Siegel's high number of surgery referrals noted that Dr. Siegel's practices were well known and that he would do stress tests on the patients in remote areas and then ship them by helicopter or otherwise into the cath lab at Mesa general.  The physicians from ACS would do very aggressive interventions and do as many as twenty five heart catheters in a twenty four hour period, a tremendous amount of volume and referred the "400 hearts a year" that Siegel had promised to White and McRee when they cut their deal to bring him to Mesa General

206.    Cardiac surgeons at Mesa General included Dr. Maxwell, Dr. Dreicer, Dr. J Hessel, Dr. Smollens, and Dr. Bowles.

207.    Known complications from putting a patient on a balloon pumps is the leg becoming ischemic and one may have to amputate the leg as happened for one of the patients referred to Mesa General by Dr. Eckhauser and seen at Mesa by Drs. Garg and Mulhotra, ACS employees.

208.    Additional indicia of reliability of these allegations derives from the following examples of unnecessary procedures, or procedures falling below any reasonable standard of care, performed on patients by ACS at Mesa General including the following:

209.    Patient A went to Dr. Siegel's practice for a routine physical and stress test before taking a vacation trip out of the country.  Patient A was told he had to do an angiogram at Mesa General.  Patient A went to Mesa and only signed consent for the diagnostic angiogram.  Patient A woke up as an in patient at Mesa and had been placed on an Intraortic Balloon Pump and was told he had an 80% blockage and must have coronary artery by pass and could not leave the hospital or they would die.  Patient A was told when they woke that the surgery was already scheduled.  Patient A described his understanding that they had been placed in Siegel's wing of

Mesa General.  The nurses also told Patient A's family that their family member had to be admitted and have surgery right away.

210.    Patient A was not allowed to leave Mesa for 48 hours.  Patient A did not see physicians during that time and the nurses were very vague with Patient A and said the doctors were busy.  After 2 days of extreme distress, Patient A asked a nurse, "would you get a second opinion" and she said "probably."  The Mesa General surgeon came in and said you cannot leave here safely and that "we reviewed it again" and there is an 80% blockage.  The Mesa general Surgeon said "I am surprised that you have made it this long."

211.    Patient A insisted they be allowed to get a second opinion and that the pump be removed so that they could obtain a second option.  Patient A took their records to three separate cardiologists including a very well respected cardiologist in Phoenix.  All three cardiologists confirmed Patient A had a minor lesion, much smaller than what would justify stenting let alone surgery, and could be treated with aspirin and Lipitor.  One of these cardiologists also performed a subsequent angiogram and told Patient A that they did not need a valve replacement or any other surgery.  They told them they had a very small blockage and that maybe in 10 years Patient A would need surgery.  The other cardiologists told Patient A "let's just call it an over interpretation" but also said that hard to say how one could suggest an 80% blockage was on the film.  The person who did a subsequent echocardiogram for Patient A told him that the reports that are written do not correspond to what can be seen on the tests and also commented to Patient A about the poor character of those who had interpreted the test at Mesa.

212.    Patient A did not require surgery but was told by Dr. Siegel while a patient at Mesa General (while owned and operated by IASIS) that if Patient A did not have surgery within 48 hours Patient A would die.  Patient A was placed on an invasive device (heart pump) and hospitalized without medical necessity.

213.    Patient A also described a very unprofessional environment at Mesa General with staff in street clothes, tattoos, ball caps on backwards, sweatshirts, and motorcycles in hallway.  The nurses at Mesa pressured Patient A and their family saying that Siegel was a better

cardiologist than anyone at the Arizona Heart Hospital and when Patient A asked about stenting or angioplasty, saying that the disease was too extensive and won't help.

214.    Mesa General submitted a claim for the hospitalization and the angiogram and heart pump procedure to Patient A's private insurance.  Although Patient A is not a beneficiary of a federal health program, his experience was not unique to him.  Many beneficiaries within the federal health program experienced similar procedures without medical necessity and pressure to perform unnecessary open heart bypass surgery at Mesa General.

215.    Patient B died from sepsis after coronary bypass surgery at Mesa.  Dr. Siegel had been Patient B's cardiologist.  The conditions at Mesa General were very inadequate and not clean and Patient B was not treated properly there.  Patient B was hospitalized for nine days at Mesa and was never given a bath during that time or really any assistance.

216.    Patient B went for a visit with Dr. Siegel and even though his cholesterol was low and he was energetic and feeling well and walking 3-4 miles per day, was told by Dr. Siegel that they would have to have a quadruple bypass at Mesa General immediately.  In June 2003, Patient B was given a stress test and told that they had failed and that they were "not going to make it."

217.    Patient B was told he had to have an angiogram at Mesa General.  Patient B was taken into the cath lab and ten minutes later, Dr. Siegel came out and told Patient B's family that Patient B was a "heart attack waiting to happen" and that he had to have open heart surgery right away.  Patient B was taken into open heart surgery and declined over course of stay in hospital.

218.    Patient B died after the bypass after not being given proper post operative care.  Dr. Siegel never met with Patient B after the operation.  The Mesa surgeon, Dr. Dreicer, called Patient B's family saying he "wanted to clear Mesa's name" from the incident.

219.    Patient B's family described horrific conditions at Mesa where homeless people were sleeping in the hallways and everything looked old and dirty.  Patient B went in to Mesa looking vibrant and healthy and died post operatively from sepsis at Banner Baywood.  Patient B's family was told by the physicians at Banner Baywood that Patient B should not have had to die from sepsis if Mesa had handled his care properly.

220.    Patient B's family learned that there are other former patients at Mesa who have had similar experiences at the hands of ACS physicians and Dr. Siegel.

221.    IASIS submitted claims to Medicare for the treatment of Patient B including his surgery and hospitalization after his death.

222.    Patient B was referred to Mesa General by ACS during the period during which ACS had an illegal financial relationship with Mesa.

223.    Patient B received procedures in excess of medical necessity and care below any reasonable standard appropriate for a Medicare beneficiary.

224.    Claims for Patient B submitted to the Medicare program are false claims.

225.    Patient C was referred by ACS physicians Boswell and Siegel after a stress test at age 85.  Patient C had been in excellent health but after the angiogram, the ACS physicians, including Siegel, painted a dire picture of Patient C's health and told Patient C they must have open heart surgery with Dr. Fang at Mesa General.

226.    Patient C understands, in retrospect, that the open heart surgery was unnecessary and caused a decline in his health and status.

227.    Patient C was also subjected to the abusive unbundling practices described above. Patient C was scheduled for insertion of two cardiac stent at Mesa General at two different times. Patient C complained to the chief nurse at Mesa and received a sarcastic apology from Dr. Siegel.  Patient C did not understand why they were putting in stents one at a time and would call him to schedule the next stent.  Patient C is aware of another Mesa patient who, similarly, had five stents put in by Dr. Siegel and all had been "unbundled" at Mesa.

228.    IASIS submitted claims to Medicare for the treatment of Patient C for both open heart surgery and hospitalization and stent procedures.

229.    Patient C was referred to Mesa General by ACS during the period during which ACS had an illegal financial relationship with Mesa.

230.    Patient C received procedures in excess of medical necessity and care below any reasonable standard appropriate for a Medicare beneficiary.

231.    Claims submitted by IASIS for Patient C are false claims.

232.    Patient D lost a leg after insertion of an unnecessary intraortic balloon pump at St. Luke's Medical Center by Dr. Garg, a physician employee of ACS.

233.    Patient D had peripheral vascular disease and was flown into St Luke's from a small town in Arizona by ACS.  Dr. Mulhotra suggested Patient D had a blockage in left anterior descending and put Patient D on an intraortic balloon pump.  Patient D lost his left leg to ischemia after implantation of the balloon pump.

234.    Patient D's records demonstrate that there was no medical necessity for insertion of the balloon pump and that the way these procedures were staged was all about "making a buck" for hospital and physicians according to expert cardiologists who reviewed the case. There was no medical justification for putting Patient D on a balloon pump and it compromised Patient D to have a catheter in the leg for purpose of stenting renal artery.

235.    IASIS submitted claims for the treatment of Patient D for both open heart surgery and stents.

236.    Patient D was referred to St Luke's by ACS during the period during which ACS had an illegal financial relationship with Mesa.

237.    Patient D received procedures in excess of medical necessity and care below any reasonable standard.

238.    Patient E was sent to Mesa General to have rehabilitation after spinal surgery and narrowly avoided having a pacemaker implanted in them by ACS physicians at Mesa General.

239.    Patient E is retired military and on both Tricare and Medicare.

240.    While hospitalized at Mesa for rehabilitation from spinal surgery, Patient E was approached by an internist from ACS named Dr. Mohammed Arful Islam at ACS's Apache Junction location.  Patient E refused the pacemaker as they had never had any heart rhythm problems and Dr. Islam was only an internist.  Patient E was put under pressure to have the device implanted and had to yell and threaten to get out of Mesa and loudly demand that they wanted a second opinion.  Patient E was eventually released from Mesa

241.    Patient E later saw Dr. Breed at Banner Heart who informed that Patient E was correct and that he did not need a pacemaker.  Patient E was heavily drugged while at Mesa on several painkillers plus Morphine and that they were going to be moved to the cardiac unit where they reported it looked like a "third world country." Dr. Breed told Patient E they did not need a pacemaker implanted and that all he had ever needed was to have the amount of Coumadin he was being given at Mesa to be reduced.

242.    IASIS submitted claims to Medicare and Tricare for the treatment of Patient E.

243.    Patient E received procedures in excess of medical necessity and care below any reasonable standard appropriate for a Medicare or Tricare beneficiary.

244.    Claims submitted by IASIS for Patient E are false claims.

245.    Patient F was admitted to Mesa with a gastric bleed and while there was told by an ACS physician that they had to have a carotid artery stent.  It turned out that Patient F did not have a blockage sufficient to justify a carotid stent.  After stenting they were told by one physician to take Plavix but by other that they could not take any blood thinners.  Patient F formed a clot at the stent location and had a stroke and died.  Patient F's death was attributable to the unnecessary insertion of the carotid stent.

246.    IASIS submitted claims to Medicare for the treatment of Patient F.

247.    Patient F received procedures in excess of medical necessity and care below any reasonable standard appropriate for a Medicare beneficiary.

248.    Claims submitted by IASIS for Patient F are false claims.

249.    Patient G had an unnecessary septal occlusion device implanted into him by Dr. Siegel at age 43.

250.    IASIS submitted claims to private insurance for the treatment of Patient G.

251.    Patient G received procedures in excess of medical necessity and care below any reasonable standard.

252.    All of these examples, along with the data and other reasonable investigation, provide reliable indicia that unnecessary medical procedures were performed at Mesa General

and St Luke's by Dr. Siegel and ACS physicians.  Defendants were aware of these procedures and submitted claims for these procedures to government health programs.

253.    Dr Siegel could bill an additional $1000 per patient per day for maintenance of the balloon pump.

254.    Certain members of the medical staff including Dr. Kartub and Dr. Gina Conflitti and certain IASIS managers including Dolores Horvath, Cathy Stevens, Joy Bennett and Mary Shaw sought to put procedures in place based on standards from the American College of Cardiology to monitor the medical necessity of the procedures performed by Dr. Siegel at St Luke's and Mesa.  These IASIS managers and physicians were unable to put procedures in place to monitor medical necessity because of opposition from IASIS corporate managers including White and McRee and Dr. Siegel to such monitoring procedures being in place.

255.    White and McRee supported Dr. Siegel's position that no such quality controls should be put in place because Dr. Siegel was bringing in critical revenue for St. Luke's and Mesa General

256.    While Dr. Siegel and ACS had the financial arrangements with Mesa General and St. Luke's Medical Center described above, Dr. Siegel and other ACS physicians referred patients to IASIS, including patients covered by Medicare and other federal programs.

257.    While Dr. Siegel and ACS had the financial arrangements with Mesa General and St. Luke's Medical Center described above, IASIS submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Siegel and other ACS physicians, including patients insured under Medicare, and which resulted in millions in annual revenue to St Luke's and Mesa General.

258.    While Dr. Siegel and ACS had the financial arrangements with Mesa General and St. Luke's Medical Center described above, IASIS, through St Luke's and Mesa General, submitted annual cost reports to the Medicare program, certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.

47

259. IASIS managers, including the CFOs who signed the annual Medicare cost reports, knew the certification of compliance with the Stark law and the Anti Kickback Act was not true and, nonetheless, submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Siegel and Advanced Cardiac Specialists during the period of his illegal financial relationship, including patients insured under Medicare, and which resulted in millions in annual revenue to St Luke's and Mesa General.

260. The following individuals were responsible for reviewing and signing cost reports for St Luke's Medical Center and Mesa General during the relevant time period that Dr. Siegel and Advanced Cardiac Specialists was referring patients to St Luke's and Mesa General and had favorable financial relationships with IASIS: facility CFOs and market CFOs including, but not limited to, Greg Wojtal, George Horner and John Gallagher.  In addition, some cost reports might have been signed at the corporate level by Donna Whitmer and Doug Wolfe who worked with the corporate reimbursement manager Don Hemphill.  All of these individuals were aware of the Stark violations at St Luke's and other IASIS hospitals and the risks of signing the certification on the hospital cost report.

261. Each year, from 2002-2004, IASIS submitted a cost report to Medicare and to Medicaid for St Luke's Medical Center and Mesa General Hospital in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

262. Each year, from 2002-2004, the United States made final payment upon the filing of the annual Medicare cost report.

263. The United States would not pay claims presented by IASIS for services rendered to patients referred by Dr. Siegel and other ACS physicians if it has been aware of and understood that Dr. Siegel and ACS's relationship with IASIS and St Luke's violated the Stark Law and the Anti Kickback Act.

264. The United States would not pay claims presented by IASIS for services rendered to patients referred by Dr. Siegel and other ACS physicians where there was no medical

necessity for the service or the care was so lacking in quality as to be positively harmful to the patient if it has been aware of and understood that many claims lacked medical necessity or fell below any reasonable standard of care.

265.    IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at St Luke's and Mesa General, for 2002-2004 during which time IASIS (1) had an illegal financial relationship with Dr. Siegel and ACS, (2) Dr. Siegel and ACS referred patients to St Luke's and Mesa for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Dr. Siegel and Mesa to federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered to Dr. Siegel and other ACS physician's federally insured patients.

266.    Such statements are false statements material to a false claims and such claims are false or fraudulent claims within the meaning of the federal False Claims Act.

**C.** **Submission of False Claims by IASIS for Services Performed on Federally-Insured Patients at Park Place Medical Center, Mid Jefferson Hospital and the Southeast Medical Center of Texas Referred by Dr. Srinavasava Rao-Kothapalli and Dr. Radoslaw Stephan Keisz**

267.    Dr. Srinavasava Rao-Kothapalli is an interventional cardiologist with a principal place of business in Port Arthur, Texas.  Drs. Rao and Keisz perform or performed interventional cardiology procedures at IASIS hospitals in Texas including at Park Place Medical Center, Mid Jefferson Hospital and, later for Dr. Rao, Southeast Medical Center of Texas.  Dr. Rao is also the principal owner of office buildings and land near IASIS' hospital Southeast Medical Center of Texas and has had other financial transactions with IASIS including medical directorship agreements and sales/transfers of land.

268.    Dr. Radoslaw Stephan Keisz was recruited to IASIS from UT San Antonio by then-CEO of Park Place Medical Center Mike Miller.  Dr. Keisz had represented that he had research grants to perform carotid and vertebral stent procedures on elderly patients.  When IASIS managers looked into those representations it turned out he did not have any such research grants but IASIS managers were very eager to have him recruited to Park Place.

269.    At one point in approximately 2002, IASIS reimbursed Medicare several hundred thousand dollars in conjunction with claims made for payments for carotid artery and vertebral stents inserted in patients by Dr. Keisz before the procedure had FDA approval.  The allegations in this case are not based upon the carotid artery stent procedures that appear to have been reimbursed but similar misconduct that was not the subject of the repayment in 2002.

270.    Dr. Rao had a preexisting financial relationship with Tenet Healthcare Corporation prior to IASIS' acquisition of Park Place Medical Center.  In 2006, the United States announced that Tenet would pay over $900 million to resolve allegations of health care fraud including approximately $46 million to resolve claims about improper relationships with physicians. In addition, in 2003, the United States had announced that Tenet would pay approximately $54 million to resolve allegations that physicians at its Redding Medical Center had engaged in unnecessary interventional cardiology procedures and cardiac surgeries equivalent to those here.

271.    IASIS had several financial arrangements with Drs. Rao and Keisz. Significantly, IASIS paid Dr. Rao under a medical directorship contract.  Based on reasonable investigation, Dr. Rao did not perform the number of hours required for payment under the medical directorship.

272.    Defendants were aware that Dr. Rao did not perform these hours but that IASIS continued to pay Dr. Rao because of Dr. Rao's referrals of patients for cardiac catheterizations and other interventional cardiology procedures to IASIS hospitals.

273.    In September 2002, IASIS purchased land owned by Dr. Rao and Dr. Kirk Williams for the construction of the Greater Southeast Medical Center in Port Arthur. IASIS purchased this land for construction of its hospital at greater than fair market value price even though members of the medical staff opposed this purchase and advocated for purchase of land the local government had made available at a lower cost and with better access to transportation routes. IASIS chose the Rao/Williams land over land it could have had on much more favorable

50

terms including land being offered by the City of Nederland which would have been free, would have offered easy access and would have provided tax abatement for first the two-three years. There was one other site that would have cost significantly less as well.

274.    White and McRee were personally involved in the decision to purchase the land from Rao and Williams and did so over the objection of medical staff.  They travelled to Park Place to attend a meeting with medical staff and discuss the land purchase with them and with Mike Miller.  They decided to contract with Rao and Williams for the land over the objection of many physicians on medical staff.

275.    In addition to the improper land purchase, IASIS has additional financial arrangements with Dr. Rao.  In 2004, Drs. Rao and Williams bought 5 acres from IASIS for medical office building for $1.14 per square foot.  Dr. Rao continues to own the land and office buildings immediately adjacent to Southeast Medical Center of Texas, an IASIS hospital, and IASIS has tenancies in some of Dr. Rao's office buildings.

276.    In September 2005, Drs. Rao and Williams sold 7.028 acres to IASIS (or to Park Place Medical Center) for $8 per square foot ($2.4 million).  These non-fair-market-value exchanges were provided in order to encourage Dr. Rao's referral of patients for interventional cardiology procedures to IASIS hospitals.

277.    Managers at IASIS hospitals routinely used expense accounts to entertain physicians including on hunting trips, expensive dinners and professional sporting events.  For example, on July 24, 2001, then-CEO of Park Place Medical Center, Mike Miller, paid for dinner for physicians Drs. Rao and Keisz, on July 25, 2001, Mike Miller paid for dinner for Rao and Keisz, on July 27, 2001, Mike Miller paid $527.31 for dinner with Drs. Rao and Keisz and Craig Desmond, and on August 7, 2001 Mike Miller paid for dinner for Dr. Keisz, two other physicians referring to Park Place Medical Center, and Sandra McRee.

278.    The economic value of the land purchase and office space lease arrangements between IASIS and Dr. Rao is above fair market value in exchange for referral of patients for interventional cardiology procedures at IASIS hospitals.

279.    Drs. Rao and Keisz made referrals to IASIS hospitals for interventional cardiology procedures and heart surgeries.  These referrals included referral of patients covered under federal and state health care programs including Medicare and Medicaid.  A number of these referrals were for medically unnecessary cardiology procedures and heart surgeries performed at these Texas hospitals.

280.    Shortly after Frazier began work at IASIS in early 2000 he learned that there were concerns among IASIS hospital staff, including nursing staff and those administrators charged with compliance and risk management, that Dr. Rao was performing unnecessary interventional cardiology procedures.  Frazier relayed the concerns reported to him about unnecessary procedures to then CEO Wayne Gower and CFO John Crawford and told them he wanted to get clinical auditors to review the charts for Dr. Rao to see if there were, indeed, a large number of unnecessary cardiology procedures. At the time Gower told Frazier that he wanted to "slow play" the situation and though they would eventually have someone look at it he did not want to conduct a clinical review or audit which would risk losing the revenue that Dr. Rao was generating. Gower made it clear that he did not want to inquire into the utilization and medical necessity issues in Texas because of what might be discovered.

281.    Frazier was contacted by, among others, Mike Miller, who asked "are we going to get in trouble with all of these heart cath procedures being performed?"  Frazier visited the Texas facilities and spoke with Miller and with Risk Manager Debra Nicholson.  Dr. Rao's propensity for giving everyone without a "spring in their step" a heart cath procedure was widely discussed within the hospital.  Even Mike Miller had had a heart cath procedure being performed on him after telling Dr. Rao he was experiencing some mild chest pain which turned out to most likely be indigestion.

282.    Frazier requested that Bill Hammock, an internal auditor, be permitted to conduct such a clinical review (review of Dr. Rao's charts for medical necessity).  Bill Hammock and Art Bell may have done some limited clinical review of Dr. Rao's charts but they knew (or at least Bell knew) that McRee would not tolerate hearing that they needed to rein in Dr. Rao.  Frazier

was forbidden at that time by White from speaking to Dr. Rao (or any other high revenue doctor) so that he not upset them by asking too many questions.

283.    Some months later, when Frazier had Laura Reeds, an auditor with a clinical background, available to him, he sought once again the funds and authorization to conduct a clinical review of the charts for Dr. Rao and Dr. Keisz.

284.    Frazier was denied the opportunity to conduct such a review and he was forbidden from speaking with Dr. Rao (or any other high profile doctors) so that he not upset them by asking too many questions. Specifically, Frazier was instructed by White and McRee that they would look into the issue and take care of it themselves. Frazier would repeatedly ask McRee "how is it coming at Park Place" and be told that "I have taken care of it." But there were no signs that the number of procedures had slowed and to the best of Frazier's knowledge no review or audit was conducted.

285.    After significant protest from Frazier about Drs. Rao and Keisz engaging in unnecessary procedures at its facilities, IASIS conducted some review of the rate of "normal" heart catheterizations in response to concerns expressed to the compliance and risk management staff at IASIS and Park Place Medical.  These reviews were conducted by Laura Reeds, Corporate Manager for Coding and Billing.  This was not a clinical chart review.

286.    Frazier received a number of reports from personnel at Park Place Medical Center that Dr. Keisz was also performing unnecessary interventional cardiology procedures including experimental procedures for stenting of carotid arteries not approved by the Food and Drug Administration.

287.    Based on reasonable investigation, Frazier alleges that Drs. Rao and Keisz knowingly have performed medically unnecessary interventional cardiology procedures and submitted claims for those procedures to state and federal health care programs.

288.    These doctors have read normal diagnostic studies to suggest heart disease (or failed to perform any proper and adequate diagnostic tests) and then performed medically

unnecessary cardiac catheterizations even if the patient was asymptomatic. These physicians have also performed unnecessary bilateral heart catheterizations, a known area of risk for abuse.

289.    Dr. Rao schedules, and has scheduled, an extraordinary number of interventional cardiology procedures and sees himself to be in competition with other cardiologists to perform the most procedures.  This attitude leads Dr. Rao to order and perform interventions without due regard to medical necessity of the procedures.   Dr. Rao performed five hundred plus interventional procedures per year, exceeding the numbers one could expect for any interventional cardiologist working a reasonable schedule, even at an academic medical center.

290.    Dr. Rao often performed procedures on patients who had no blockages eligible for treatment and directed other cardiologists to "find something to treat."  Dr. Rao would also diagnose "unstable angina" as a justification for procedures even when the patient had no chest pain.

291.    Among other incidents, Dr. Rao once inserted seven stents in Patient H over a multi-month period.  Patient H subsequently learned that the stents were medically unnecessary under established criteria.  In addition, spacing the insertion of stents over a multi month period was contrary to established medical practice and medically unnecessary, thus violating requirements that medical services be performed economically and efficiently.  Patient H subsequently died from an occlusion in the right coronary artery, a known risk of stenting.

292.    Dr. Rao recommended to another patient who already had seven stents that he needed an additional stent.  Another local cardiologist advised the patient that he did not need any additional stents.

293.    Dr. Rao would schedule and perform an "extraordinary" number of interventional cardiology procedures.  He would schedule 25 patients in an afternoon to come in for tests, many would proceed to interventional cardiology procedures immediately. Any interventional procedure performed by Dr. Rao would typically lead to a 48 hour admission of the patient.

294.    It was difficult for Park Place's cath lab to keep up with the volume being done by Dr. Rao.  They were forced to acquire enormous volumes of cath lab equipment and there were

"shelves and shelves" of stents available for use to keep up with the volume Dr. Rao was doing. Dr. Rao would even perform heart caths "immediately" on patients from nursing homes who came into the hospital not clear headed and unable to describe their symptoms.

295.     Like Dr. Siegel in Arizona, Dr. Rao unbundled multiple procedures over the course of days or weeks in order to generate more revenue where there was no medical reason not to perform all the interventions at once.

296.     Dr. Keisz was equally excessive in his volume of procedures, averaging 8 to 12 interventional cardiology procedures per day.

297.     The cardiac surgeons at Park Place Medical Center refused, as a group, to back up Dr. Keisz because of their concerns about Dr. Keisz.  The cardiac surgeon group wrote to IASIS and Park Place and Mike Miller expressing their concern with Dr. Keisz' performing unnecessary procedures and performing procedures poorly.  Within weeks, IASIS recruited and put in place a different cardiac surgery group that was prepared to provide the back-up to Dr. Keisz without addressing any of the concerns with Dr. Keisz's procedures.

298.     Dr. Keisz also performed high volumes of procedures at Park Place Medical Center and Mid-Jefferson Hospital without due regard to medical necessity, including scheduling as many as twelve interventions on patients in one day.   Dr. Keisz had a reputation among cardiologists and cardiac surgeons he worked with for performing unnecessary and dangerous procedures.

299.     Among other incidents, Dr. Keisz performed an unnecessary carotid stent on a patent whose neurological symptoms were properly attributable to a brain tumor.

300.     Drs. Rao and Keisz were permitted to use cardiac catheter labs at IASIS's Texas hospitals to perform medically unnecessary procedures because the hospitals did not want to endanger the revenue stream provided by the defendants.  Dr. Rao solicited from IASIS officers, including Mike Miller, a promise that he would not be subject to peer review of medical necessity utilization review for cardiology procedures performed at IASIS hospitals. This lack of peer review was another form of compensation to Dr. Rao for his referrals.

301.     Among those Texas IASIS managers who were aware of the unnecessary medical procedures being performed at IASIS Texas hospitals (and concerned about them) were Craig Desmond, former CEO, Park Place; Debra Nicholson, Risk Manager, Park Place Medical; and Mike Miller, former CEO, Park Place Medical Center and Mid Jefferson Hospital.

302.     Iasis hospitals did not conduct adequate supervision of the medical necessity of interventional cardiology procedures performed by Drs. Rao and Keisz through peer review or utilization review methods required for participation in federal health care programs.

303.     While Drs. Rao and Keisz had the financial arrangements with IASIS Texas hospitals described above, Drs. Rao and Keisz referred patients to IASIS, including patients covered by Medicare and other federal programs.

304.     While Drs. Rao and Keisz had the financial arrangements with IASIS Texas hospitals described above, IASIS submitted claims to federal health programs for procedures and admissions of patients referred by Drs. Rao and Keisz, including patients insured under Medicare, and which resulted in millions in annual revenue to the IASIS Texas hospitals.

305.     While Dr. Rao and Keisz had the financial arrangements with IASIS Texas hospitals described above, IASIS, through Park Place Medical Center, Mid Jefferson Hospital and the Southeast Medical Center of Texas, submitted annual cost reports to the Medicare program, certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.

306.     IASIS managers, including the CFOs who signed the annual Medicare cost reports, knew the certification of compliance with the Stark law and the Anti Kickback Act was not true and, nonetheless, submitted claims to federal health programs for procedures and admissions of patients referred by Drs. Rao and Keisz during the period of his illegal financial relationships, including patients insured under Medicare, and which resulted in millions in annual revenue to the IASIS Texas hospitals.

307.     The following individuals were responsible for reviewing and signing cost reports for IASIS Texas hospitals during the relevant time period that Drs. Rao and Keisz was referring

patients to IASIS Texas hospitals and receiving substantial inducements for referrals including facility Chief Financial Officers and Chief Financial Officers for the Texas Market including, for example, Mike Taylor and Bernard Leger.  In addition, some cost reports might have been signed at the corporate level by Donna Whitmer and Doug Wolfe who worked with the corporate reimbursement manager Don Hemphill.  All of these individuals were aware of the Stark violations at St Luke's and other IASIS hospitals and the risks of signing the certification on the hospital cost report.

308.    Each year, from 1999-2004, IASIS submitted a cost report to Medicare and to Medicaid for Park Place Medical Center, Mid Jefferson Hospital and Southeast Medical Center of Texas in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

309.    Each year, from 1999-2004, the United States made final payment upon the filing of the annual Medicare cost report.

310.    The United States would not pay claims presented by IASIS for services rendered to patients referred by Drs. Rao and Keisz if it has been aware of and understood that Drs. Rao and Keisz's relationship with IASIS violated the Stark Law and the Anti Kickback Act.

311.    The United States would not pay claims presented by IASIS for services rendered to patients referred by Drs. Rao and Keisz where there was no medical necessity for the service, or the care was so lacking in quality as to be positively harmful to the patient, if it has been aware of and understood that many claims lacked medical necessity or fell below any reasonable standard of care.

312.    IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at Park Place, Mid Jefferson and Southeast Medical Center, for 1999-2004 during which time IASIS (1) had an illegal financial relationship with Dr. Rao, (2) Drs. Rao and Keisz referred patients to IASIS hospitals for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Dr. Rao to IASIS Texas hospitals to

federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered by Drs. Rao and Keisz's federally insured patients.

313.    Such statements are false statements material to a false claims and such claims are false or fraudulent claims within the meaning of the federal False Claims Act.

### D.    Submission of False Claims by IASIS for Services Performed on Federally-Insured Patients at Odessa Regional Hospital in Odessa, Texas by Dr. Sudhir Srivastava (Cardiac Surgeon)

314.    Dr. Sudhir Srivastava was recruited by IASIS to "jump start" a cardiovascular program at Odessa Regional Hospital.  Dr. Srivastava had a substantial consulting agreement with Odessa under which he was to perform services but did not provide services to the value of the payments made to him.  Former CEO Mike Potter and McRee were involved with negotiating the arrangement with Dr. Srivastava.

315.    Odessa had previously been a small maternity and children's hospital in Odessa, Texas. Top managers at IASIS, including White and McRee, decided to expand services to include high margin and high volume heart procedures so IASIS purchased a portable heart cath lab and the Da Vinci Robotic Surgical System to be used in the performance of totally endoscopic heart bypass procedures.

316.    Because Odessa Regional had been primarily a maternity hospital prior to the time it was acquired by IASIS, there was significant concern among staff about the absence of adequate support for a heart program at Odessa, such as heart qualified ICU capability, physician support staffing, equipment and infrastructure needs.  A heart cath lab was set up in a small temporary building adjacent to the hospital where instruments were washed in a sink and bloody water from the sink was drained through a water hose on to the grass outside the building.

317.    In a period of less than three months, Dr. Srivastava performed 85 surgical procedures.  The Quality Control Manager at Odessa Regional reported to Frazier concerns about medical necessity for the procedures, the frequency of patient returns to the operating room, and

poor clinical outcomes.  Former CEO of Odessa, Mike Potter, among others, has knowledge of these events.

318.    The hospital was ill-equipped and poorly staffed to handle the volume of cardiac surgeries that Dr. Srivastava brought to Odessa.  IASIS encouraged the reckless performance of open heart surgeries in a hospital facility ill equipped to handle heart patients post-surgery.

319.    Frazier advocated for a clinical chart review of these procedures.  Bill Hammock undertook a review of the case files.  He found clinical concerns in 25% of the cases he reviewed.

320.    Frazier continued to advocate for an outside review.  A small town doctor in Indiana chosen by McRee reviewed some of the charts and concluded that some of the charts did not meet the criteria for surgery.  Those findings were never reported or otherwise disclosed and no repayments were made by IASIS.

321.    A source for Dr. Srivastava's surgeries was Dr Gatasali, an interventional cardiologist, whose referrals made Odessa approximately $250,000 to $450,000 gross revenue per month.

322.    Dr. Gatasali had been excluded from Blue Cross/Blue Shield because of overutilization.  Iasis was aware of the overutilization and that approximately 40% of Gatasali's patients are insured by Medicare.  Dr. Gatasali referred heart surgeries to Dr. Srivastava and approximately 30-50% of referrals to Dr. Srivastava are from Dr. Gatasali.  One informed witness advised Frazier that based on a review of Dr. Gatasali's charts, approximately 20% of his procedures performed lacked medical necessity under accepted standards and 30% more were questionable with overpayments likely around $13 million.

323.    IASIS has not conducted adequate supervision of the medical necessity of cardiac surgeries performed by Dr. Srivastava through peer review or utilization review methods required for participation in federal health care programs.

324.    While Dr. Srivastava had a financial arrangement with Odessa Regional Hospital described above, Dr. Srivastava referred patients to IASIS, including patients covered by Medicare and other federal programs.

325.    While Dr. Srivastava had a financial arrangement with IASIS' Odessa Regional Hospital described above, IASIS submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Srivastava, including patients insured under Medicare, and which resulted in millions in annual revenue to Odessa Regional Hospital.

326.    While Dr. Srivastava had the financial arrangements with IASIS' Odessa Regional Hospital hospitals described above, IASIS, through Odessa Regional Hospital, submitted annual cost reports to the Medicare program, certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.

327.    IASIS managers, including the CFOs who signed the annual Medicare cost reports, knew the certification of compliance with the Stark law and the Anti Kickback Act was not true and, nonetheless, submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Srivastava during the period of his illegal financial relationship, including patients insured under Medicare, and which resulted in millions in annual revenue to the IASIS Texas hospitals.

328.    The following individuals were responsible for reviewing and signing cost reports for IASIS Texas hospitals during the relevant time period that Dr Srivastava was referring patients to Odessa Regional Hospital and receiving substantial inducements for referrals including facility Chief Financial Officers and Chief Financial Officers for the Texas Market including, for example, Mike Taylor and Bernard Leger.  In addition, some cost reports might have been signed at the corporate level by Donna Whitmer and Doug Wolfe who worked with the corporate reimbursement manager Don Hemphill.  All of these individuals were aware of the Stark violations at St Luke's and other IASIS hospitals and the risks of signing the certification on the hospital cost report.

329.     Each year, from 2000-2004, IASIS submitted a cost report to Medicare and to Medicaid for Odessa Regional Hospital in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

330.     Each year, from 2000-2004, the United States made final payment upon the filing of the annual Medicare cost report.

331.     The United States would not pay claims presented by IASIS for services rendered to patients referred by Dr. Srivastava if it has been aware of and understood that Dr. Srivastava's relationship with IASIS violated the Stark Law and the Anti Kickback Act.

332.     The United States would not pay claims presented by IASIS for services rendered to patients referred by Dr. Srivastava where there was no medical necessity for the service.

333.     IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at Odessa Regional Hospital, for 2000-2004 during which time IASIS (1) had an illegal financial relationship with Dr. Srivastava, (2) Dr. Srivastava referred patients to Odessa Regional Hospital for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Dr. Srivastava to Odessa Regional Hospital to federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered by Dr. Srivastava's federally insured patients.

334.     Such statements are false statements material to a false claim and such claims are false or fraudulent claims within the meaning of the federal False Claims Act.

**E.      Submission of False Claims by IASIS for Services Performed on Federally-Insured Patients by Drs. Kohring, Letellier, and Herro at Mesa General Hospital**

335.     Defendants also encouraged physicians to refer patients to Mesa General Hospital by offering physicians sub-leases at a rate substantially below the rates that the Hospital itself was paying for the lease.

336.     For example, from June 1, 1998 to May 31, 2003, defendants leased space for $28.41 a square foot and then sub-leased the space to Dr. Kohring for $12.41 a square foot.

61

Because Dr. Kohring sub-leases 3996 square feet, the hospital subsidized Dr. Kohring's rent by $64,000 per year over the five year period for a total rent subsidy of nearly $320,000.

337.    Similarly, from July 1, 1999, to June 30, 2004, defendants sub-leased 2,088 square feet of space to Dr. Mark Lettelier for $12.41 a square foot.  Because defendants paid $28.41 per square foot for this space, Defendants subsidized Dr. Lettelier by $34,000 per year or more than $170,000 over the five years.

338.    Dr. Ralph Herro also received a similar rental subsidy of $16 per square foot for a 1,080 square foot space.  As a result, his annual rental subsidy from defendants totaled $17,280 per year.

339.    While Drs. Kohring, Lettelier and Herro had discounted sub-leases with Mesa General described above, these three physicians referred patients to IASIS, including patients covered by Medicare and other federal programs.

340.    While Drs. Kohring, Lettelier and Herro had discounted sub-leases with Mesa General described above, IASIS submitted claims to federal health programs for procedures and admissions of patients referred by these physicians, including patients insured under Medicare, and which resulted in millions in annual revenue to Mesa General.

341.    While Drs. Kohring, Lettelier and Hero had discounted sub-leases with Mesa General described above, IASIS, through Mesa General, submitted annual cost reports to the Medicare program, certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.

342.    IASIS managers, including the CFOs who signed the annual Medicare cost reports, knew the certification of compliance with the Stark law and the Anti Kickback Act was not true and, nonetheless, submitted claims to federal health programs for procedures and admissions of patients referred by Drs. Kohring, Lettelier and Hero during the period of their illegal financial relationships, including patients insured under Medicare, and which resulted in millions in annual revenue to Mesa General.

343.    The following individuals were responsible for reviewing and signing cost reports for St Luke's Medical Center and Mesa General during the relevant time period that Dr. Siegel and Advanced Cardiac Specialists was referring patients to St Luke's and Mesa General and had favorable financial relationships with IASIS: facility CFOs and market CFOs including, but not limited to, Greg Wojtal, George Horner and John Gallagher.  In addition, some cost reports might have been signed at the corporate level by Donna Whitmer and Doug Wolfe who worked with the corporate reimbursement manager Don Hemphill.  All of these individuals were aware of the Stark violations at St Luke's and other IASIS hospitals and the risks of signing the certification on the hospital cost report.

344.    Each year, from 1999-2004, IASIS submitted a cost report to Medicare and to Medicaid for Mesa General Hospital in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

345.    Each year, from 1999-2004, the United States made final payment upon the filing of the annual Medicare cost report.

346.    The United States would not pay claims presented by IASIS for services rendered to patients referred by Drs. Kohring, Lettelier and Herro if it had been aware of and understood that Drs. Kohring, Lettelier and Herro's relationship with IASIS and Mesa General violated the Stark Law and the Anti Kickback Act.

347.    IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at Mesa General, for 1999, 2000, 2001, 2002, and 2004 during which time IASIS (1) had an illegal financial relationship with Drs. Kohring, Lettelier and Herro, (2) Drs. Kohring, Lettelier and Herro referred patients to Mesa for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Drs. Kohring, Lettelier and Herro to federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered by Drs. Kohring, Lettelier and Herro's federally insured patients.

348.     Such statements are false statements material to a false claims and such claims are false or fraudulent claims within the meaning of the federal False Claims Act.

**F.**     **Submission of False Claims by IASIS for Services Performed on Federally-Insured Patients at Palms of Pasadena by Dr. James Pollack**

349.     Dr. James Pollack was a surgeon who specializes in the Barnett Continent Intestinal Reservoir Procedure.  In order to induce Dr. Pollack to refer the substantial number of patients he saw to Palms of Pasadena Hospital, the hospital paid him up to $165,000 per year as a "Medical Director" and consultant for the hospital's ostomy surgery program.

350.     While in some instances Dr. Pollack submitted time sheets which purport to support these payments, Dr. Pollack actually provided few directorship services.  Indeed, time sheets "documenting" the services provided by Dr. Pollack were submitted even during the two months each year that the doctor is on his boat in the Caribbean.  Defendants were aware that Pollack is out of the country for months at a time, and yet continued to accept these time sheets as support for continuing his directorship fees.

351.     In other instances, Dr. Pollack either failed to submit time sheets or submitted time sheets representing that he worked less than the hours required in his directorship and consulting agreements.  Even in these cases, however, defendants did not reduce Dr. Pollack's compensation, as required by the agreements, but still paid him his full directorship and consulting fees.

352.     In 2003, Dr. Pollack's malpractice insurance costs increased.  Pollack informed defendants that unless Palms of Pasadena agreed to pay these costs he would move his practice and patients to another hospital.  As a result, defendants entered into a Retention Agreement with Pollack and provided him an additional amount of over $158,000 under his contract as a Medical Director Consultant.

353.     Randy Bruce worked on the Pollack Retention Agreement for IASIS and it was approved by, among others, McRee, White, Phil Mazzucca, Mike Jennessee, and Derek Morkel.

354.    The Total budget for Palms of Pasadena was $23 million for the budget year ended September 30, 2004.  Dr. Pollack brought in $4-$5 million in EBIDITA each year so he was able to extort any payment he chose from the hospital.

355.    Despite this compensation, Dr. Pollack met almost none of his obligations under the agreement.  IASIS managers including McRee who were instrumental to putting together the deal with Dr. Pollack knew he would never meet those obligations.   The transaction with Dr. Pollack demonstrated to Frazier that defendants would do whatever it took to induce physicians who make significant contributions to the bottom line of the company for their referrals.

356.    IASIS also paid for a full time employee to travel over the country to market Dr. Pollack's services.  This deal was made between Dr. Pollack and IASIS in approximately 2002 by former Palms of Pasadena CEO John Bartlett at the direction and with the approval of IASIS corporate managers.

357.    In return for these substantial payments, Pollack referred approximately $20 million in surgical business to IASIS's Palms of Pasadena each year before his death.

358.    Dr. Pollack had approximately 20-30% of his patients insured by Medicare.

359.    While Dr. Pollack had the financial arrangements with IASIS and Palms of Pasadena described above, Dr. Pollack referred patients to IASIS, including patients covered by Medicare and other federal programs.

360.    While Dr. Pollack had the financial arrangements with IASIS and Palms of Pasadena described above, IASIS submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Pollack, including patients insured under Medicare, and which resulted in millions in annual revenue to Palms of Pasadena.

361.    While Dr. Pollack had the financial arrangements with IASIS and Palms of Pasadena described above, IASIS, through Palms of Pasadena, submitted annual cost reports to the Medicare program, certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.

362.     IASIS managers, including the CFOs who signed the annual Medicare cost reports, knew the certification of compliance with the Stark law and the Anti Kickback Act was not true and, nonetheless, submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Pollack during the period of his illegal financial relationship, including patients insured under Medicare, and which resulted in millions in annual revenue to Palms of Pasadena.

363.     The following individuals were responsible for reviewing and signing cost reports for Palms of Pasadena during the relevant time period that Dr. Pollack was referring patients to Palms of Pasadena receiving inducements:  facility Chief Financial Officers and market Chief Financial Officers including, but not limited to, Bill Masterson, Mike Jennessee, and David Verinder.  In addition, some cost reports might have been signed at the corporate level by Donna Whitmer and Doug Wolfe who worked with the corporate reimbursement manager Don Hemphill.  All of these individuals were aware of the Stark violations at Palms of Pasadena and other IASIS hospitals and the risks of signing the certification on the hospital cost report.

364.     Each year, from 1999-2004, IASIS submitted a cost report to Medicare and to Medicaid for Palms of Pasadena in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

365.     Each year, from 1999-2004, the United States made final payment upon the filing of the annual Medicare cost report.

366.     The United States would not pay claims presented by IASIS for services rendered to patients referred by Dr. Pollack if it has been aware of and understood that Dr. Pollack's relationship with IASIS and Palms of Pasadena violated the Stark Law and the Anti Kickback Act.

367.     IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at Palms of Pasadena, for 1999-2004 during which time IASIS (1) had an illegal financial relationship with Dr. Pollack, (2) Dr. Pollack referred patients to Palms of

66

Pasadena for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Dr. Pollack to federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered by Dr. Pollack's federally insured patients.

368.    Such statements are false statements material to a false claims and such claims are false or fraudulent claims within the meaning of the federal False Claims Act.

G.    **Submission of False Claims by IASIS for Services Performed on Federally-Insured Patients at Palms of Pasadena by Dr. John Barrett and His Affiliated Physicians**

369.    Dr. John Barrett is an orthopedic surgeon who was responsible for approximately $22 million in annual revenue to defendant at its Palms of Pasadena Hospital.  Dr. Barrett's practice at one time produced approximately one third to one fourth of Palms of Pasadena's EBITDA.  Dr. Barrett's practice produced much more revenue for the hospital than most orthopedic practices would produce.

370.    From at least 1999 through 2004, defendants paid Barrett $5,000 monthly as a medical directorship fee, and Barrett submitted monthly time sheets to support this fee.  These reports however were submitted and payment was made each month, despite the fact that Barrett is out of the country and on vacation (usually in Switzerland all summer) for three months each year.

371.    Defendants made these and other direct and indirect payments to Dr. Barrett to prevent him from taking his referrals to another hospital.

372.    In addition, to these payments, in order to retain referrals from Dr. Barrett, IASIS provided other free services to Dr. Barrett for his patients.  These free services included transportation to and from the hospital for surgery and rehabilitation, and a free night's stay at the hospital the night before surgery. IASIS allowed Dr. Barrett his own wing at Palms of Pasadena and to receive privileges and services as a quid pro quo for his referrals.

373.     IASIS also compensated Dr. Barrett indirectly through his numerous investment vehicles, including JointCare Centers of America, Televisual Communications, the Florida Knee and Joint Center, and JB Management.  In particular, defendants paid $24,000 per year to maintain its membership in JointCare Centers of America, of which Dr. Barrett was the principal owner.  Defendants also routinely purchased videotapes from Dr. Barrett's company Televisual Communications.  These purchases were made when defendants were negotiating most intensely with Dr. Barrett about his medical directorship.  One infamous incident occurred in 2002 or 2003 when White called a conference call and directed each Iasis hospital to purchase a series of videotapes produced by Barrett concerning practice management with each set costing approximately $60,000.  Defendants also purchased Dr. Barrett's garamycin bone cement from entities partially owned or controlled by Dr. Barrett at significantly above fair market value.

374.     In October 2001, Mr. Frazier attended a meeting of Senior Managers at IASIS. Present at that meeting were White, Richard Algood, Sammy Cantrell, McRee, and Dewey Green.  It was reported that McRee had met with Dr. Barrett at Palms of Pasadena the week before and that Dr. Barrett will be staying at Palms.  Dr. Barrett had a few conditions that Palms and IASIS had to meet to keep him referring to Palms but the IASIS managers were confident they could meet those conditions.

375.     IASIS managers were aware that Dr. Barrett's time records were fraudulent because he was spending a fair amount of the time he was recording as work time out of the country including White and McRee.

376.     While Dr. Barrett had the financial arrangements with IASIS and Palms of Pasadena described above, Dr. Barrett referred patients to IASIS, including patients covered by Medicare and other federal programs.

377.     While Dr. Barrett had the financial arrangements with IASIS and Palms of Pasadena described above, IASIS submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Barrett, including patients insured under Medicare, and which resulted in millions in annual revenue to Palms of Pasadena.

378.    While Dr. Barrett had the financial arrangements with IASIS and Palms of Pasadena described above, IASIS, through Palms of Pasadena, submitted annual cost reports to the Medicare program, certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.

379.    IASIS managers, including the CFOs who signed the annual Medicare cost reports, knew the certification of compliance with the Stark law and the Anti Kickback Act was not true and, nonetheless, submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Barrett during the period of his illegal financial relationship, including patients insured under Medicare, and which resulted in millions in annual revenue to Palms of Pasadena.

380.    The following individuals were responsible for reviewing and signing cost reports for Palms of Pasadena during the relevant time period that Dr. Pollack was referring patients to Palms of Pasadena receiving inducements:  facility Chief Financial Officers and market Chief Financial Officers including, but not limited to, Bill Masterson, Mike Jennessee, and David Verinder.  In addition, some cost reports might have been signed at the corporate level by Donna Whitmer and Doug Wolfe who worked with the corporate reimbursement manager Don Hemphill.  All of these individuals were aware of the Stark violations at Palms of Pasadena and other IASIS hospitals and the risks of signing the certification on the hospital cost report.

381.    Each year, from 1999-2004, IASIS submitted a cost report to Medicare and to Medicaid for Palms of Pasadena in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

382.    Each year, from 1999-2004, the United States made final payment upon the filing of the annual Medicare cost report.

383.    The United States would not pay claims presented by IASIS for services rendered to patients referred by Dr. Barrett if it has been aware of and understood that Dr. Barrett's

relationship with IASIS and Palms of Pasadena violated the Stark Law and the Anti Kickback Act.

384.    IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at Palms of Pasadena, for 1999-2004 during which time IASIS (1) had an illegal financial relationship with Dr. Barrett, (2) Dr. Barrett referred patients to Palms of Pasadena for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Dr. Barrett to federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered by Dr. Barrett's federally insured patients.

385.    Such statements are false statements material to a false claims and such claims are false or fraudulent claims within the meaning of the federal False Claims Act.

### H.    Submission of False Claims by IASIS for Services Performed on Federally-Insured Patients at Pioneer Valley Hospital by Physicians from the Granger Clinic Physicians Group

386.    The Granger Clinic Physician Group produced approximately 60% of the revenue for Pioneer Valley Hospital at the time that defendant IASIS acquired Pioneer Valley Hospital.

387.    When Paracelsus owned the hospital, the Group wanted to finance and build its own office building.  The Group demanded that the hospital lease a substantial amount (approximately 40,000 square feet) of this office space, and made it clear that if Paracelsus declined to do so, they would move their business to a different hospital.

388.    When IASIS purchased the hospital from Paracelsus, it assumed the lease, although IASIS had no need for the space.  By assuming the lease and knowingly continuing to pay rent for space it did not use, IASIS conveyed a significant benefit to the Granger Clinic Physician Group in exchange for referrals for hospital admissions.

389.    Granger Clinic referred patients, including patients insured under Medicare and other government programs, to Pioneer Valley Hospital while IASIS leased space in its medical office building as a subsidy to enable the financing by Granger Clinic of the building.  IASIS's

lease of empty office space provides a substantial benefit to Granger Clinic and an inducement to continue to refer patients to Pioneer Valley Hospital.

390.    Pioneer Valley Hospital provided services to patients referred by Granger Clinic through procedures, ancillary services and inpatient admissions and submitted claims for these patients to Medicare and other government programs.

391.    Each year, from 1999-2004, IASIS submitted a cost report to Medicare and to Medicaid for Pioneer Valley Hospital in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement.

392.    Each year, from 1999-2004, the United States made final payment upon the filing of the annual Medicare cost report.

393.    The United States would not pay claims presented by IASIS for services rendered to patients referred by Granger Clinic physicians if it has been aware of and understood that Granger Clinic's financial relationship with IASIS and Pioneer Valley Hospital violated the Stark Law and the Anti Kickback Act.

394.    IASIS submitted claims for payments, and cost reports certifying compliance with Stark and Anti Kickback laws at Pioneer Valley Hospital, for 1999-2004 during which time IASIS (1) had an illegal financial relationship with Granger Clinic physicians, (2) Granger Clinic physicians referred patients to Pioneer Valley Hospital for procedures, admissions and ancillary services, (3) IASIS submitted claims for patients referred by Granger Clinic physicians to federal health programs and other insurers, and (4) federal health insurers paid claims submitted by IASIS for services rendered by Granger Clinic physician's federally insured patients.

395.    Claims submitted by IASIS for patients referred to Pioneer Valley Hospital from Granger Clinic are false claims within the meaning of the False Claims Act.

## IV.    SUMMARY OF DEFENDANTS' UNLAWFUL CONDUCT

396.    From the time it was created in 1999, IASIS initiated an aggressive strategy to secure business by continuing contracts in place between Tenet and Paracelsus and their

referring physicians, and by expanding on this practice of offering lucrative financial relationships to doctors who could and would refer large volumes of business to IASIS hospitals.

397.    As a part of this strategy, IASIS awarded medical directorships and consultant service agreements to many of those physicians at compensation levels far above fair market value for services performed.  Subsequently, these physicians increased the number of patients, including Medicare, Medicaid and other federally-insured patients that they referred to defendant for outpatient services and inpatient stays.

398.    Defendants pursued this strategy for IASIS aggressively and directed other IASIS managers to do the same under threat of termination or other retaliation.

399.    IASIS also leased space to physicians at below fair market value.  Subsequently, these physicians increased the number of patients, including Medicare, Medicaid and other federally-insured patients that they referred to defendant for outpatient services and inpatient stays.

400.    IASIS also provided physicians with free or below market administrative support in their offices and marketing and promotional support for their practices.  Subsequently these physicians increased the number of patients, including Medicare, Medicaid and other federally-insured patients, whom they referred to defendant for outpatient services and inpatient stays.

401.    IASIS knowingly submitted to Medicare and Medicaid claims for reimbursement and claims for interim payment on annual hospital cost reports covering Fiscal Years 1999-2004 for the medical services provided as a result of these referrals although defendant knew that the claims should not have been submitted under the applicable laws and regulations.

402.    The annual hospital cost reports covering Fiscal Years 1999-2004 falsely certified that the medical services identified therein had been provided in compliance with all applicable laws and regulations.

403.    As part of its consideration about which physicians to recruit and to pay incentive compensation, defendants analyzed data for each physician or physician group to project estimated or projected revenues (volume and value of referrals for procedures and ancillary

72

services) that defendant would receive from referrals for inpatients and outpatients for designated health services from the physicians once they became referral sources for IASIS.

404.     Beginning in 1999, defendants received millions of dollars from Medicare, Medicaid and other federal health programs for referrals made by physicians with whom IASIS had improper financial arrangements for outpatient and inpatient services.

405.     Under the Stark and Anti Kickback statutes, defendants were prohibited from billing Medicare, Medicaid, or other federal health care programs for any claims resulting from referrals where IASIS had improper financial relationships with the referring physicians.

406.     Beginning in 1999, defendants received millions of dollars from Medicare, Medicaid and other federal health programs for medically unnecessary procedures performed by various physicians with whom IASIS has improper financial relationships.  These physicians include, but are not limited to, Dr. Siegel and his physicians at Advanced Cardiac Specialists at Mesa General and St. Luke's Medical Center in the Arizona market, Drs. Rao and Keisz at Park Place Medical Center, and Drs. Srivastava at Odessa Regional Hospital in the Texas market.

407.     The conduct alleged in this Complaint continues to the present and causes ongoing damage to federal programs.

<u>COUNT I</u>

<u>DEFENDANT IASIS HEALTHCARE</u>
<u>False Claims Act</u>
<u>31 U.S.C. § 3729(a)(1)(A)</u>

408.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-407.

409.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

410.     Through the acts described above, defendant IASIS (since at least 1999) has knowingly presented, or caused to be presented, false or fraudulent claims, to the United States

Government, in order to obtain reimbursement for services provided under Medicare, Medicare, Tricare/Champus, and the Federal Employees Health Benefits Program.

411.    As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT II

### DEFENDANT IASIS HEALTHCARE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

412.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-407.

413.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

414.    Through the acts described above, defendant IASIS (since at least 1999) has knowingly made, used and caused to be made and used false records and statements material to false or fraudulent claims to obtain reimbursement for services provided under Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

415.    As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT III

### DEFENDANT IASIS HEALTHCARE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

416.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-407.

417.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

418.    Through the acts described above, defendant IASIS (since at least 1999) conspired with defendants White and McRee and with physicians identified in this complaint to

defraud the United States by submitting false and fraudulent claims for reimbursement from the Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

419.    As a result of these false claims and this conspiracy, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT IV

### DEFENDANT IASIS HEALTHCARE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

420.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-407.

421.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

422.    Through the acts described above, defendant IASIS (since at least 1999) has knowingly failed to reimburse the Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program for moneys wrongfully received.

423.    As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT V

### DEFENDANT DAVID WHITE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

424.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-407.

425.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

426.    Through the acts described above, defendant IASIS (since at least 1999) has knowingly presented, or caused to be presented, false or fraudulent claims, to the United States

Government, in order to obtain reimbursement for services provided under Medicare, Medicare, Tricare/Champus, and the Federal Employees Health Benefits Program.

427.     As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT VI

### DEFENDANT DAVID WHITE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

428.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-407.

429.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

430.     Through the acts described above, defendant IASIS (since at least 1999) has knowingly made, used and caused to be made and used false records and statements material to false or fraudulent claims to obtain reimbursement for services provided under Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

431.     As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT VII

### DEFENDANT DAVID WHITE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

432.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-407.

433.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

434.     Through the acts described above, defendant White conspired with defendants IASIS and McRee and with physicians identified in this complaint to defraud the United States

by submitting false and fraudulent claims for reimbursement from the Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

435.    As a result of these false claims and this conspiracy, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT VIII

### DEFENDANT SANDRA MCREE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

436.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-407.

437.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

438.    Through the acts described above, defendant McRee has knowingly presented, or caused to be presented, false or fraudulent claims, to the United States Government, in order to obtain reimbursement for services provided under Medicare, Medicare, Tricare/Champus, and the Federal Employees Health Benefits Program.

439.    As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT IX

### DEFENDANT SANDRA MCREE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

440.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-407.

441.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

442.    Through the acts described above, defendant McRee has knowingly made, used and caused to be made and used false records and statements material to  false or fraudulent

claims to obtain reimbursement for services provided under Medicare, Medicaid,

Tricare/Champus, and the Federal Employees Health Benefits Program.

443.    As a result of these false claims, the United States has been damaged and

continues to be damaged, in an amount yet to be determined.

## COUNT X

### DEFENDANT SANDRA MCREE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

444.    Plaintiff re-alleges and incorporates by reference the allegations in

paragraphs 1-407.

445.    This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. § 3729 *et seq.*

446.    Through the acts described above, defendant McRee conspired with defendants

IASIS and White and with physicians identified in this complaint to defraud the United States by

submitting false and fraudulent claims for reimbursement from the Medicare, Medicaid,

Tricare/Champus, and the Federal Employees Health Benefits Program.

447.    As a result of these false claims and this conspiracy, the United States has been

damaged and continues to be damaged, in an amount yet to be determined.

## PRAYER

WHEREFORE, plaintiff prays for judgment against defendant as follows:

1.      that Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.      that this Court enter judgment against defendants in an amount equal to three time

the amount of damages the United States has sustained because of Defendants' actions, plus a

civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C.

§ 3729;

3.      that plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C.

§ 3730(d) of the False Claims Act;

4.      that plaintiff be awarded all costs of this action, including attorneys' fees and

expenses; and

5.      that the United States and plaintiff recover such other and further relief as the

Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a

trial by jury.

DATED this 22nd day of November, 2010

By:  /s/ Colette G. Matzzie

ASHLEY D. ADAMS PLC (#013732)
8245 North 85th Way
Scottsdale, AZ 85258
Telephone: (480) 219-1366


PHILLIPS & COHEN, LLP
Mary Louise Cohen
Colette G. Matzzie
2000 Massachusetts Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 833-4567
Fax: (202) 833-1815

Attorneys for Qui Tam Plaintiff