1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Larry A. Hammond, 004049
Mark I. Harrison, 001226
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
lhammond@omlaw.com
mharrison@omlaw.com

Michael K. Fee (admitted *pro hac vice*)
Joan McPhee (admitted *pro hac vice*)
Michael G. McGovern (admitted *pro hac vice*)
ROPES & GRAY LLP
800 Boylston Street, Prudential Tower
Boston, Massachusetts 02199
(617) 951-7000
michael.fee@ropesgray.com
joan.mcphee@ropesgray.com
michael.mcgovern@ropesgray.com

Michael L. Dagley (admitted *pro hac vice*)
Matthew M. Curley (admitted *pro hac vice*)
BASS, BERRY & SIMS PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238-3001
(615) 742-6200
mdagley@bassberry.com
mcurley@bassberry.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

United States of America,
ex rel. Jerre Frazier,

                Plaintiff,

v.

IASIS Healthcare Corporation, David
White, and Sandra McRee,

                Defendants.

No. CV 05-0766-PHX-JAT

**DEFENDANTS' MOTION TO DISMISS
RELATOR JERRE FRAZIER'S THIRD
AMENDED COMPLAINT**

Pursuant to Rules of Civil Procedure 8, 9(b), and 12(b)(6), Defendants IASIS Healthcare Corporation ("IASIS Healthcare" or "the Company"), David White, and Sandra McRee hereby move to dismiss in its entirety and with prejudice Relator Jerre Frazier's Third Amended Complaint ("TAC").

## INTRODUCTION

This Court is well-acquainted with the procedural history of this case and the sweeping, broad-brush fraud allegations that Frazier has lodged against IASIS Healthcare. According to Frazier — a former IASIS Healthcare insider who served as an attorney at the Company's Tennessee headquarters — IASIS Healthcare violated the False Claims Act by (1) seeking federal reimbursement for "medically unnecessary" cardiac procedures at select hospitals in Arizona and Texas, and (2) submitting year-end Medicare cost reports that "falsely certified" compliance with the Stark Act and Anti-Kickback Statute.

On November 5, 2007, IASIS Healthcare moved to dismiss Frazier's Second Amended Complaint ("SAC") for failure to comply with Rule of Civil Procedure 9(b)'s heightened pleading requirements and failure to state a claim under Rule of Civil Procedure 12(b)(6). On April 21, 2008, this Court entered an order ("Dist. Ct. Order")

- 2 -

1   dismissing with prejudice Frazier's Second Amended Complaint, holding that Frazier
2   had failed to plead facts demonstrating that IASIS Healthcare had filed any false or
3   fraudulent claims with the government.   Frazier subsequently appealed to the Ninth
4   Circuit.   On August 12, 2010, the Ninth Circuit issued a decision ("App. Ct. Dec.")
5   agreeing that Frazier's Second Amended Complaint failed to satisfy Rule 9(b), but the
6   appeals court remanded to afford Frazier one last chance to try to cure the deficiencies
7   in his pleading.  On November 22, 2010, Frazier filed his Third Amended Complaint.

8        Because Frazier's Third Amended Complaint suffers from precisely the same
9   defects that compelled the dismissal of his Second Amended Complaint, IASIS
10  Healthcare moves this Court to dismiss the Third Amended Complaint with prejudice.

11              **SUMMARY OF THE ARGUMENT**
12
13       Frazier's Third Amended Complaint runs 42-pages longer than his Second
14  Amended Complaint, and it contains a number of allegations that were not included in
15  his prior pleadings.  Frazier's verbose amendments, however, fail to fill the voids which
16  the Ninth Circuit and this Court agreed were fatal to his Second Amended Complaint.
17  Frazier's Third Amended Complaint still lacks the detailed allegations that the Ninth
18  Circuit instructed Frazier was required to plead in this case to satisfy Rule 9(b).  Simply
19  put, Frazier has "provided a lengthy False Claims Act complaint, without particulars
20  necessary to meet Rule 9(b) obligations."  *United States ex rel. Karvelas v. Melrose-*
21  *Wakefield Hosp.*, No. 01-10583, 2003 U.S. Dist. LEXIS 8846, at *28-29 (D. Mass. May
22  21, 2003).  Indeed, in many respects Frazier's allegations are little more than "formulaic
23  recitation[s]" of the elements of a False Claims Act cause of action, which does not
24  suffice to satisfy even the basic pleading requirements of Rule 8.  *Bell Atlantic Corp. v.*
25  *Twombly*, 550 U.S. 544, 557 (2007) (holding that, to satisfy Rule 8, a complaint must
26  plead facts showing that the complainant's allegations are   "plausible," as opposed to
27  merely "possible").

28

25961140_1

Especially in light of Frazier's status as an IASIS Healthcare insider during the time frame covered by his complaint, his inability — on his fourth attempt — to plead his claims with the requisite particularity is as telling as it is inexcusable.  Accordingly, for the following reasons, this Court should dismiss Frazier's Third Amended Complaint with prejudice:

**1.    *Frazier's Allegations Regarding Medically Unnecessary Procedures Fail to Satisfy Rule 9(b)* —** In its opinion upholding this Court's first ruling on IASIS Healthcare's motion to dismiss,  the Ninth Circuit was clear that, in order to satisfy Rule 9(b), Frazier would need to amend his pleading to "provide 'reliable indicia' that IASIS Healthcare submitted claims for medically unnecessary procedures."  App. Ct. at Dec., at 3.  The Second Amended Complaint had "fail[ed] in this regard" because Frazier's allegations regarding medically unnecessary procedures were "conclusory at best."  *Id.*  The Ninth Circuit's decision was entirely consisted with this Court earlier order, which recognized that, "[m]ost importantly," Frazier had not alleged with the requisite particularity "why the procedures were medically unnecessary" and had not sufficiently identified "a single specific 'unnecessary procedure' for which IASIS [then] submitted a claim for funds from a government health care program."  Dist. Ct. Order, at 6.

Precisely the same defects exist in Frazier's Third Amended Complaint.  Although Frazier has peppered his Third Amended Complaint with allegations regarding eight essentially unidentified patients (patients "A" through "H"), Frazier has failed to provide the detailed allegations that the Ninth Circuit's decision demands.  Specifically, Frazier fails to offer any facts showing *why* the patients' treatment was unnecessary.  Moreover, Frazier presents nothing to support his conclusory allegations that IASIS Healthcare sought federal reimbursement for the supposedly medically unnecessary procedures patients "A" through "H" allegedly underwent.

***2.*** ***Frazier's*** ***Allegations*** ***Regarding*** ***IASIS*** ***Healthcare's*** ***"False*** ***Certifications" Fail to Satisfy Rule 9(b)*** — The Ninth Circuit's decision made clear that, to satisfy Rule 9(b), Frazier would need to "sufficiently allege[ ] an illegal kickback scheme violating the Stark Act or the Anti-Kickback Provision *and* provide[ ] a sufficient basis to infer that IASIS Healthcare or its hospitals expressly certified compliance with those provisions as part of the process of submitting Medicare and Medicaid claims for patients referred by doctors involved in those schemes."  App. Ct. Dec., at 4.  Frazier's Second Amended Complaint "fail[ed] in this regard" as well.  *Id.* In this Court's words, although Frazier had "dedicate[d] pages and pages to describing the allegedly improper relationships between certain physicians and IASIS hospitals," the Second Amended Complaint provided "no detail regarding the referral of Medicare-eligible patients as a result of those relationships or the submission of claims to the government for payment."  Dist. Ct. Order, at 8.

These very same defects exist in Frazier's Third Amended Complaint.  Frazier has added a panoply of colorful allegations regarding the supposedly improper financial relationships that existed between IASIS Healthcare and certain physicians.   Yet, Frazier fails to plead specific facts giving rise to a strong inference that IASIS Healthcare provided kickbacks to these physicians in exchange for the referrals of Medicare and Medicaid patients, nor does he plead facts showing that these physicians referred federally-insured patients to IASIS Healthcare hospitals as part of an improper financial exchange.  Frazier likewise provides only the barest of allegations that IASIS Healthcare sought federal reimbursement for procedures furnished pursuant to prohibited financial arrangements, and he never supports with particularity — beyond providing a six-year range (1999 through 2004) — his allegation that certain IASIS Healthcare hospitals' year-end Medicare cost reports contained "false certifications." *Cf. United States ex rel. Lam v. Tenet*, 481 F. Supp. 2d 673, 688 (W.D. Tex. 2006) (holding that complaint failed to satisfy "Rule 9(b)'s requirements to plead the 'when'

- 5 -

with specificity" where it alleged that fraudulent events took place "between 1995 and 2002" and "in 1999").

3.      ***Frazier's Claims Against White and McRee Are Time Barred and Procedurally Improper*** — Frazier's eleventh-hour attempt to add two individuals, David White and Sandra McRee, as defendants in his lawsuit against a Tennesse-based parent corporation that is not itself a provider of health care services should be dismissed for at least two additional reasons: First, Frazier's prior complaints named IASIS Healthcare as the sole defendant.  Under well-established Ninth Circuit law, Frazier's newly-minted claims against White and McRee do not relate back to those prior pleadings.  As a result, Frazier's claims against White and McRee are time barred.  Second, Frazier was not entitled to add new defendants to his Third Amended Complaint without first obtaining this Court's approval.

## ARGUMENT

Frazier's False Claims Act allegations may be summarized as follows: he alleges in his Third Amended Complaint (1) that medically unnecessary procedures were performed at IASIS Healthcare hospitals and that IASIS Healthcare thereafter sought federal reimbursement for such procedures, and (2) that, through its financial relationships with certain physicians, IASIS Healthcare violated the Stark Act and Anti-Kickback Statute and that IASIS Healthcare thereafter "falsely certified" its compliance with those two provisions.  Frazier made identical allegations in his Second Amended Complaint, but both this Court and the Ninth Circuit found that Frazier's allegations were not sufficiently specific to satisfy Rule 9(b)'s heightened pleading requirements. Following well-established precedent in the False Claims Act context, the Ninth Circuit held that Frazier had failed to plead any actual *facts* to support his conclusory allegations that IASIS Healthcare had (1) fraudulently sought federal reimbursement for medically unnecessary procedures, (2) fraudulently sought federal reimbursement for procedures resulting from referrals either prohibited under the Stark Act or induced by

- 6 -

illegal kickbacks, or (3) fraudulently filed year-end Medicare cost reports that "falsely certified" that the services identified in those cost reports were provided in compliance with the Stark Act and Anti-Kickback Statute.

The Ninth Circuit's decision establishes the law of the case. *See, e.g.*, *Maag v. Wessler*, 993 F.2d 718, 720 n.2 (9th Cir. 1993). Accordingly, the operative question with respect to IASIS Healthcare's instant motion to dismiss is whether Frazier's Third Amended Complaint meaningfully fills the gaps that compelled the Ninth Circuit to deem Frazier's Second Amended Complaint deficient. As more fully explained below, the answer to this question is a resounding "no."

**I.     The Dismissal of Frazier's Second Amended Complaint Was Compelled by the Firmly Established Requirement That a *Qui Tam* Relator Plead With Particularity All the Essential Ingredients of the Alleged False Claims Act Violations.**

In his Second Amended Complaint, Frazier made two sets of sweeping allegations against IASIS Healthcare. First, Frazier alleged that IASIS Healthcare fraudulently submitted to the federal government claims for reimbursement for medically unnecessary procedures. Second, Frazier alleged that, in their 1999 through 2004 year-end Medicare cost reports, certain of IASIS Healthcare's hospitals falsely certified that the medical services identified in those cost reports had been provided in compliance with the Stark Act and the Anti-Kickback Statute. This Court held that Frazier's complaint failed to comply with the heightened pleading requirements of Rule 9(b), a decision with which the Ninth Circuit on appeal expressly agreed.

With respect to Frazier's allegations regarding the supposedly medically unnecessary procedures, this Court explained that, "most importantly," Frazier had not alleged facts showing "why the procedures were medically unnecessary." Dist. Ct. Order., at 6. The Ninth Circuit similarly concluded that Frazier had failed to "provide 'reliable indicia' that IASIS Healthcare submitted claims for medically unnecessary procedures," calling Frazier's allegations "conclusory at best." App. Ct. Dec., at 3.

- 7 -

1   With respect to Frazier's allegations regarding the supposed "false certifications," this
2   Court held that, although Frazier had dedicated "pages and pages to describing the
3   allegedly improper relationships between certain physicians and IASIS hospitals," he
4   had provided insufficient "detail regarding the referral of Medicare-eligible patients as a
5   result of those relationships or the submission of claims to the government for
6   payment." Dist. Ct. Order, at 8. The Ninth Circuit agreed, holding that Frazier could
7   survive a motion to dismiss only if "he sufficiently allege[d] an illegal kickback scheme
8   violating the Stark Act or the Anti-Kickback Provision *and* provide[d] a sufficient basis
9   to infer that IASIS Healthcare or its hospitals expressly certified compliance with those
10   provisions as part of the process of submitting Medicare and Medicaid claims for
11   patients referred by doctors involved in those schemes." App. Ct. Dec., at 4.

12       The dismissal of Frazier's Second Amended Complaint was an unexceptional
13   application of well-established law regarding a *qui tam* relator's burden at the pleading
14   stage. To satisfy Rule 9(b), a relator must "'state with particularity the circumstances
15   constituting fraud or mistake,' including 'the who, what, when, where, and how of the
16   misconduct charged.'" *Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (quoting
17   *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1087, 1106 (9th Cir. 2003)). This requirement has
18   a two-fold purpose: It prevents a relator seeking a *qui tam* bounty from doing "serious
19   damage to the goodwill of a business" by "tossing" allegations of fraud into a
20   complaint, *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.
21   1992), and it also ensures that a defendant is provided enough "notice of the particular
22   misconduct . . . so that [it] can defend against the charge and not just deny that [it has]
23   done anything wrong," *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)
24   (internal quotation marks omitted).

25       Rule 9(b)'s heightened pleading requirements apply to all of the essential
26   ingredients of the relator's cause of action. *See United States ex rel. Clausen v. Lab.*
27   *Corp. of Am.*, 290 F.3d 1301, 1313 (11th Cir. 2002) ("If Rule 9(b) is to carry any water,
28

- 8 -

it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in . . . conclusory fashion."). Thus, where a relator's False Claims Act suit is based upon allegations that the defendant billed the government for medically unnecessary procedures, the relator must plead with particularity facts giving rise to a strong inference both (1) that medically unnecessary procedures were performed, and (2) that any such unnecessary procedures culminated in the filing of a claim for federal reimbursement. *See, e.g.*, *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (dismissing complaint where allegations of medically unnecessary procedures were not stated with particularity); *United States ex rel. Serrano v. Oaks Diagnostics, Inc.*, 568 F. Supp. 2d 1136, 1143 (C.D. Cal. 2008) (dismissing action because "it [was] unclear from the Complaint why the tests were medically unnecessary"); *see also United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir. 1996) (holding that liability attaches not to underlying regulatory violations, but rather to the subsequent submission of a false claim for payment).

Similarly, where a relator's suit is based upon the defendant's supposed "false certification" of compliance with the Stark Act and/or Anti-Kickback Statute, the relator must plead with particularity facts giving rise to a strong inference both (1) that such underlying violations of the Stark Act and/or Anti-Kickback Statute actually occurred, and (2) that false certifications of compliance with those laws were made as part of the process of submitting claims for federal reimbursement. *See* App. Ct. Dec., at 4; *see also Peterson v. Comm. Gen. Hosp.*, No. 01-CV-50356, 2003 U.S. Dist. LEXIS 1783, at *5-6 (N.D. Ill. Feb. 7, 2003) (dismissing *qui tam* complaint predicated on Stark Act violations because relator failed to allege with particularity the actual billing of Medicare for services furnished pursuant to prohibited referrals); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) (dismissing complaint where relator made "specific allegations of deceit but fail[ed] to link them to any claim for payment").

- 9 -

Even beyond Rule 9(b)'s requirements, a *qui tam* complaint must also satisfy Rule 8's "plausibility" standard.  As the Supreme Court has made clear, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" and must be dismissed for failure to satisfy Rule 8.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557).  The False Claims Act is not a strict liability statute; it penalizes only the *knowing* submission of a false claim.  *See, e.g.*, 31 U.S.C. § 3729(a)(1)(A).  Thus, even assuming that a false claim was submitted, to satisfy Rule 8, a relator still must "plead[ ] factual content that [would] allow[ ] the court to draw the reasonable inference that the defendant" submitted that claim despite *knowing* that it was false.  *Iqbal*, 129 S. Ct. at 1949 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).

Given these well-established principles, Defendants IASIS Healthcare, David White, and Sandra McRee urge this Court to dismiss Frazier's Third Amended Complaint because it fails to meaningfully fill the gaps that compelled the dismissal of his Second Amended Complaint and is deficient under the Ninth Circuit's standards.

## II.   Frazier's Allegations Regarding Medically Unnecessary Procedures Fail to Satisfy Rule 8 and Rule 9(b).

In his Third Amended Complaint, Frazier again alleges that medically unnecessary procedures were performed at certain IASIS Healthcare hospitals and that claims for federal reimbursement for such procedures were thereafter submitted. Although it includes some new allegations — including some colorful allegations regarding patients identified only as "A" through "H" — Frazier's Third Amended Complaint retains the two fundamental defects that, according to the Ninth Circuit, compelled the dismissal of his Second Amended Complaint.  First, Frazier yet again has failed to plead facts amounting to "reliable indicia" that medically unnecessary procedures were actually performed at IASIS Healthcare hospitals.   Second, even

- 10 -

*assuming* that some medically unnecessary procedures were performed, Frazier yet again has failed to plead facts amounting to reliable indicia that IASIS Healthcare actually submitted claims for federal reimbursement for any such procedures.   Instead, contrary to the Ninth Circuit's mandate, Frazier again has chosen to rely on wholly conclusory allegations to complete these two necessary links in the liability chain.  As a result, Frazier's allegations do not even satisfy the minimum pleading standards of Rule 8, let alone the heightened pleading requirements of Rule 9(b).

>    **A.    Frazier's Allegations That Patients "A" Through "H" Underwent Medically Unnecessary Procedures, and That These Procedures Resulted in Subsequent Submissions of Claims for Federal Reimbursement, Are Conclusory And Cannot Survive a Motion to Dismiss.**

As this Court recognized in its order dismissing Frazier's Second Amended Complaint, to sufficiently allege that a patient received "medically unnecessary" treatment, a *qui tam* relator must plead facts showing "*why* the procedures [in question] were medically unnecessary."  Dist. Ct. Order, at 6.  A conclusory allegation that a particular procedure was "medically unnecessary" is simply not enough.  *See Serrano*, 568 F. Supp. 2d at 1142-43 (dismissing *qui tam* complaint under Rule 9(b) because it was "unclear from the Complaint why the tests were medically unnecessary"); *United States ex rel. Phillips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879, 883 (W.D. Tex. 2005) (holding that a *qui tam* complaint's "allegations amount[ed] to nothing more than mere speculation" where it "provided no factual basis for [the relators'] belief that Defendant submitted claims for medically unnecessary services other than the conclusory statement that the services were performed only to obtain money").

Furthermore, a *qui tam* relator cannot satisfy his pleading burden by alleging that another physician, examining either the patient or the patient's records *post hoc*, expressed disagreement with the treating physician's decisions.  Rather, courts have made clear that "the judgment of the treating physician should be given extra weight." *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1032 (D. Nev. 2006) (internal quotation

marks omitted).  This ensures that *qui tam* relators such as Frazier do not use the False Claims Act "to call into question a health care provider's judgment regarding a specific course of treatment."  *Phillips*, 386 F. Supp. 2d at 884 ("[C]ourts have limited the False Claims Act from becoming a federal malpractice statute.").   As such, to sufficiently plead a cognizable claim under the False Claims Act, a *qui tam* relator must allege facts showing that, even when viewed without the benefit of hindsight, the treating physician must have known that the medical procedure in question was so clearly unnecessary as to be "worthless."  *Id.*

Frazier — who is not a doctor, does not claim to be an expert in medicine, and does not profess ever to have set foot in the treatment wings of any of the hospitals that he now accuses of fraud — disregards these precedents, ignoring even this Court's and the Ninth Circuit's criticisms of his prior pleading.   While the newest version of Frazier's pleading focuses on eight particular patients (cryptically identified only by the letters "A" through "H"), this cures only one of the many gaps that this Court and the Ninth Circuit identified in Frazier's prior complaint.[1]  "Most important," just as with his Second Amended Complaint, Frazier has yet again failed to plead any facts showing "why the procedures [in question] were medically unnecessary."  Dist. Ct. Order, at 6. Nothing in the Ninth Circuit's opinion suggests that, to survive a motion to dismiss, Frazier needs only to "identify" a set of patients by a single initial and then tack on conclusory allegations that these patients received medically unnecessary treatments. Yet, this is precisely what Frazier has done:

*1.*      *"Patient A"* — As an initial matter, Frazier concedes that "Patient A is not a beneficiary of a federal health program," TAC, ¶ 214, which effectively renders

---

[1]  Though Frazier has provided details about the procedures that these eight patients underwent, he has refused to provide further identifying information, such as "gender, age, the date of the referral, . . . [or] the date [the patient] received medical services."  Dist. Ct. Order, at 10 n.4.  Frazier's inability to provide this fundamental and required information in his complaint provides further support for dismissal.

- 12 -

the allegations regarding Patient A legally irrelevant.[2]  *See, e.g., United States ex rel. Montgomery v. St. Edward Mercy Med. Ctr.*, No. 05-CV-00899, 2007 U.S. Dist. LEXIS 73376, at *13-14 (E.D. Ark., Sep. 28, 2007) (holding that a *qui tam* complaint failed to state a claim because the "specific individuals alleged to have received unnecessary medical procedures" were concededly "privately insured").  That failing aside, Frazier provides no factual support for his allegation that "Patient A was placed on an invasive device (heart pump) and hospitalized without medical necessity."  TAC, ¶ 212.  Even assuming that Patient A did in fact subsequently take his medical records "to three separate cardiologists including a very well respected cardiologist in Phoenix" and was told by "[a]ll three" that he had "a minor lesion, much smaller than what would justify stenting let alone surgery, and could be treated with aspirin and Lipitor," this does satisfy Frazier's pleading requirements.  *Id.* at ¶ 211.  The fact that three other unspecified cardiologists, viewing Patient A's "medical records" at some unspecified time, disagreed with the course of treatment that Patient A received at Mesa General does not constitute "reliable indicia" that Patient A received treatment that was — at the time of treatment — medically unnecessary to the extent that it may form the basis of an action under the False Claims Act.

   2.     **"Patient B"** — According to Frazier, Patient B underwent bypass surgery

---

   [2] Frazier insists that Patient A's "experience was not unique to him" and that "[m]any beneficiaries within the federal health care program experienced similar procedures without medical necessity . . . ."  TAC, ¶ 214.  But this conclusory allegation is not meaningfully different from the variety of insufficient allegations that Frazier included in his Second Amended Complaint.  *See, e.g.*, SAC, at ¶¶ 10 ("Dr. Siegel . . . and Drs. Rao and Keise . . . have performed a large number of medically unnecessary interventional cardiology procedures"), 11 ("Dr. Stein performed a large number of unnecessary radiology procedures"), 89 ("Dr. Siegel and his practice ACS have performed medically unnecessary interventional cardiology procedures"), ("Dr. Stein routinely . . . add[s] additional [unnecessary] imaging studies for patients referred to the radiology department").  Such generalized allegations plainly fail to satisfy Rule 9(b).  *See* App. Ct. Dec., at 3; Dist. Ct. Order, at 6 (holding insufficient allegations that do not point to "specific surgeries"); *see also, e.g., United States ex rel. Citizens United to Reduce & Block Fed. Fraud, Inc. v. Metro. Med. Ctr., Inc.*, No. 89-0592-CIV, 1990 U.S. Dist. LEXIS 18339, at *8-9 (S.D. Fla. Jan. 11, 1990) (holding that, to comply with Rule 9(b), "specific patients must appear in [a *qui tam*] complaint" alleging performance of medically unnecessary procedures).

at Mesa General and three days later died of sepsis. *Id.* at ¶ 215. Rather than pleading facts showing "why the procedures [performed on Patient B] were unnecessary," Dist. Ct. Order, at 6, Frazier offers only the conclusory allegation that "Patient B received procedures in excess of medical necessity," TAC, ¶ 223. That is patently insufficient. Moreover, to the extent Frazier is alleging that Patient B received inadequate post-operative care, *see id.* at ¶ 215, his allegations are both conclusory and fail to state a claim under the False Claims Act as a matter of law, *see, e.g.*, *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 699-700, 703 (2d Cir. 2001) (holding that a False Claims Act suit cannot be based on allegations of substandard care).

   **3.   "Patient C"** — According to Frazier, Patient C underwent unnecessary open heart surgery at Mesa General and also was "scheduled for insertion of two cardiac stent[s] at Mesa General at two different times." TAC, ¶ 227. Once again, Frazier pleads no facts showing "why the procedures [performed on Patient C] were unnecessary." Dist. Ct. Order, at 6. Instead, he falls back on various unexplained allegations: "Patient C understands, in retrospect, that the open heart surgery was unnecessary," TAC, ¶ 226; "Patient C did not understand why they were putting in stents one at a time," *id.* at ¶ 227; and "Patient C received procedures in excess of medical necessity," *id.* at ¶ 230.[3] These averments epitomize the conclusory allegations that are found throughout Frazier's revised complaint.

   **4.   "Patient D"** — According to Frazier, "Patient D lost a leg after insertion of an unnecessary intraortic [sic] balloon pump at St. Lukes Medical Center . . . ." *Id.* at

---

[3] With respect to the stenting procedure, Frazier appears to be alleging merely that it was medically unnecessary to implant the stents over the course of multiple visits. Frazier does not plead any facts showing why the decision of Patient C's treating physician to spread the implantation of multiple stents over multiple days amounted to fraudulent provision of health care services. *Cf. United States ex rel. Benett v. Medtronic, Inc.*, No. H-08-3408, 2010 U.S. Dist. LEXIS 105018, at *92 (S.D. Tex. Sep. 30, 2010) (dismissing *qui tam* complaint because the relator did "not allege a basis for an inference that" that the specified surgical procedures were "categorically medically unnecessary").

¶ 232.  Frazier does not allege that Patient D was federally insured, which on its own renders his allegations regarding Patient D meaningless.  In any event, Frazier makes no attempt to plead facts showing why Patient D's treatment — viewed at the time the treating physician actually made the treatment decision — was so clearly unnecessary as to be worthless.  Instead, Frazier strings together a series of unexplained conclusory assertions: "Patient D's records demonstrate that there was no medical necessity for insertion of the balloon pump," *id.* at ¶ 234; "the "way the[ ] procedure[ was] staged was all about 'making a buck' for [the] hospital and physicians according to expert cardiologists who reviewed the case," *id.*; there "was no medical justification for putting Patient D on a balloon pump," *id.*; and "Patient D received procedures in excess of medical necessity," *id.* ¶ 237.  Frazier conspicuously fails to plead facts to support these naked allegations.  To the extent Frazier infers that, because doctors were unable to save Patient D's leg, the insertion of the balloon pump into Patient D's heart must have been medically unnecessary, he ignores the reality that even necessary medical intervention can have unfortunate results.

 **5.**     ***"Patient E"*** **—** According to Frazier, while undergoing "rehabilitation after spinal surgery" at Mesa General, Patient E "narrowly avoided having a pacemaker implanted in [him] by ACS physicians."  *Id.* at ¶ 238.  Frazier then jumps to the remarkable conclusion that "Patient E received procedures in excess of medical necessity," *id.* at ¶ 243, this despite the fact that, according to all indications from the complaint, Patient E did not undergo any medical procedure — necessary or otherwise — at an IASIS Healthcare hospital.  To say that Frazier fails to plead facts supporting this allegation would be an understatement.

 **6.**     ***"Patient F"*** **—** According to Frazier, "Patient F was admitted to Mesa [General] with a gastric bleed and while there was told by an ACS physician that [he] had to have a carotid artery stent."  *Id.* at ¶ 245.  Frazier alleges that, after the stenting procedure, Patient F was given conflicting information regarding the use of Plavix,

- 15 -

developed a post-surgical clot, and died. *Id.* Although Frazier alleges that Patient F's stenting procedure was medically unnecessary and the cause of Patient F's unfortunate death, *id.* at ¶ 245, 247, he pleads no facts to support these conclusory allegations. Frazier's allegation that "[i]t turned out" that the blockage was not as serious as suspected, *id.* at ¶ 245, is simply 20/20 hindsight, and it hardly gives rise to a reasonable inference that the physician knew the procedure was "medically unnecessary" at the time it was performed.

7.    ***"Patient G"*** — Frazier alleges that "Patient G had an unnecessary septal occlusion device implanted into him by Dr. Siegel at age 43." *Id.* at ¶ 249. Frazier concedes that Patient G was privately insured. *Id.* at ¶ 250. By definition, then, the allegations regarding Patient G do not state a cause of action under the False Claims Act. *See Montgomery*, 2007 U.S. Dist. LEXIS 73376, at *13-14. Moreover, Frazier once again fails to plead a single fact to support this conclusory allegation that the septal occlusion was so clearly unnecessary that it may form the basis of fraud action.

8.    ***"Patient H"*** — Frazier alleges that Texas-based surgeon Dr. Rao "inserted seven stents in Patient H over a multi-month period." TAC, ¶ 291. As an initial matter, Frazier does not allege (in conclusory terms or otherwise) that Patient H was insured by a federal program. *See, e.g.*, *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (dismissing complaint that alleged specific instances of medically unnecessary treatments but failed "to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes" (emphasis in original)). Moreover, Frazier does not plead facts amounting to "reliable indicia" that either the stents themselves, or the placement of the stents over several procedures, was medically unnecessary. Rather, Frazier alleges merely that "Patient H subsequently learned that the stents were medically unnecessary under established criteria," and that "spacing the insertion of the stents over a multi month period was . . . medically unnecessary[.]" *Id.* at ¶ 291.

- 16 -

1

2

3

4

5

6

7

8

As the above discussion of patients "A" through "H" demonstrates, Frazier once again has utterly failed to plead facts that would support threshold issue upon which the remainder of his complaint rests — namely, that, viewed from the contemporaneous perspective of the treating physicians, the medical procedures that patients "A" through "H" underwent were so clearly unnecessary that they may form the basis of a fraud action under the False Claims Act.  This Court should reject Frazier's invitation to second-guess the real-time medical decisions of surgeons confronted with patients presenting with life-threatening cardiac conditions.

9

10

11

12

13

14

15

16

17

18

19

20

Furthermore, even *assuming* that medically unnecessary procedures were performed on patients "A" through "H," Frazier again fails to plead any facts providing reliable indicia that IASIS Healthcare thereafter submitted claims seeking federal reimbursement for such procedures.  The "*sine qua non*" of any False Claims Act violation is the actual submission of a claim for payment.  *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002).  Accordingly, as the Ninth Circuit made clear in approving this Court's application of Rule 9(b) to Frazier's Second Amended Complaint, Frazier must not only plead particularized facts showing that medically unnecessary procedures had been performed on federally-insured patients, but also must plead  "with sufficient particularity" facts giving rise "to a strong inference that false claims were actually submitted." App. Ct. Dec., at 3.

21

22

23

24

25

26

27

28

Frazier has ignored the Ninth Circuit's mandate.  Just as Frazier's Second Amended Complaint "suffer[ed] from a lack of detail regarding the submission of the claims," Dist. Ct. Order, at 6, so too does his Third Amended Complaint.  Instead of pleading facts showing that the supposedly medically unnecessary procedures actually culminated in the filing of a claim for federal reimbursement, Frazier opts to repeat in mantra-like fashion the same conclusory allegation over and over again: "IASIS submitted claims to Medicare for the treatment of Patient B, " TAC, ¶ 221; "IASIS submitted claims to Medicare for the treatment of Patient C," *id.* at ¶ 228; "IASIS

- 17 -

submitted claims to Medicare and Tricare for the treatment of Patient E," *id.* at ¶ 242; and "IASIS submitted claims to Medicare for the treatment of Patient F," *id.* at ¶ 246.[4] This is not sufficient.  *See Peterson*, 2003 U.S. Dist. LEXIS 1783, at *5 ("All of relator's allegations follow this same general pattern, only changing the name of the doctor and . . . the dates.  In the court's opinion, such allegations do not satisfy Rule 9(b)'s particularity requirement.").

Given that Frazier was a corporate insider during the time of the alleged fraudulent conduct, there is no excuse for his inability to plead facts demonstrating the actual submission of a false claim for payment.  *See, e.g.*, *Bly-Magee*, 236 F.3d at 1019. At the same time, in light of the fact that Frazier's role as a lawyer in IASIS Healthcare's home office did not necessarily make him "privy to the details of patient billing" at hospitals located in Arizona and Texas, Frazier's naked allegations that false claims were submitted should be viewed with an especially skeptical eye.  *Ebeid*, 616 F.3d at 999 (dismissing *qui tam* complaint under Rule 9(b) where relator conclusorily alleged the elements of a False Claims Act violation but had failed to "supply reasonable indicia that false claims were actually submitted"); *cf. Atkins*, 470 F.3d at 1359 (11th Cir. 2006) (dismissing *qui tam* complaint alleging that the defendant sought reimbursement for medically unnecessary procedures because the relator was "a psychiatrist responsible for the provision of medical care, not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement," did not "profess to have firsthand knowledge of the defendants' submission of false claims," and had simply "heard rumors from staff and observed records of what he believed to be the shoddy medical and business practices of two

---

[4] Frazier concedes that Patient A and Patient G were privately insured.  With respect to Patient D, Frazier alleges merely that "IASIS submitted claims for the treatment of Patient D," *id.* at ¶ 235, without specifying whether those claims were submitted to the government or a private insurer.  Frazier's complaint does not specify whether Patient H was federally-insured, nor does it allege that Patient H's treatment resulted in the submission of a claim for federal reimbursement.  *See id.* at ¶ 291.

- 18 -

other psychiatrists").

In sum, Frazier's conclusory allegations regarding the submission of false claims plainly do not satisfy Rule 9(b).  *See, e.g.*, *Clausen*, 290 F.3d at 1312 (dismissing *qui tam* complaint alleging performance of medically unnecessary testing procedures where relator failed to "provide any factual basis for his conclusory statement tacked on to each allegation that bills were submitted to the Government as a result of the schemes . . . on the date of service or within a few days thereafter" (internal quotation marks omitted)).  Like his failure to plead facts showing that patients "A" through "H" actually underwent medically unnecessary procedures, Frazier's failure to plead facts showing that any of the identified procedures culminated with the submission of a claim is fatal to his complaint.  "If Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in . . . conclusory fashion."  *Id.* at 1313.

### B.   The Vague Statistical Analyses to Which Frazier Refers in His Complaint Do Not Lend Any Credibility to Frazier's Conclusory Allegations That IASIS Healthcare Sought Federal Reimbursement for Medically Unnecessary Procedures.

In an attempt to bolster his allegations that Dr. Siegel performed medically unnecessary procedures at Mesa General, Frazier alleges that the "the volume of open heart bypass surgeries at Mesa reached approximately 400 heart surgeries a year, a number which far exceeds what one would expect from a small suburban/rural osteopathic hospital," TAC, ¶ 188; that the "rate of implantation of Intra-Aortic Balloon Pumps at Mesa General between 2004 and 2007 is staggering," *id.* at ¶ 196; and that "[m]ore balloon pumps were implanted by Siegel and ACS at Mesa General than any other hospital in Arizona for 2004, 2005, 2006, and 2007," *id.*

Even if Frazier's general statistics are true, however, they do not help Frazier clear Rule 9(b)'s pleading bar.  *See, e.g.*, *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 45 (D. Mass. 2000) (holding that a relator must

provide "greater specificity than statistical analysis"); *see also Thompson*, 125 F.3d at 903  (holding that relator's allegation that "based on statistical studies performed by the Government and others, approximately 40 percent of claims submitted by defendants . . . were for services that were not medically necessary" did not satisfy Rule 9(b)'s requirements (internal quotation marks omitted)).  After all, inevitably *some* Arizona hospital must be the State's highest volume user of balloon pumps, and so Mesa General's top ranking is simply a "neutral fact[ ]."  *Vess*, 317 F.3d at 1106 (internal quotation marks omitted).  Indeed, while Frazier views his statistics as evidence of fraud, at *worst* an equally consistent explanation for the statistics is that Dr. Siegel and ACS have demonstrated sought after expertise in interventional cardiology.[5]  *See Iqbal*, 129 S. Ct. at 1149 (holding that Rule 8 is not satisfied by pleading facts that are "merely consistent" with the defendant's liability).

Furthermore, it is not enough for Frazier to plead facts suggesting that *some* procedures performed at IASIS Healthcare hospitals may have been medically unnecessary within the meaning of the False Claims Act.  Instead, as a threshold matter, Frazier must plead facts that lead to a strong inference that medically unnecessary procedures were performed on particular *federally-insured* patients.  *See* Dist. Ct. Order, at 8 (recognizing that the Stark Act and Anti-Kickback Statute "do not regulate private pay patients").  The statistical analyses to which Frazier refers in his Third Amended Complaint do not lend themselves to that requisite strong inference. Nor do Frazier's asserted statistics provide any basis for concluding that IASIS Healthcare ever

---

[5] Frazier has not even *attempted* to plead facts that would rule out all the various benign explanations for why a comparatively large proportion of Dr. Siegel's patients might have been placed on balloon pumps: Perhaps Dr. Siegel personally believes that, in his expert medical judgment balloon pumps are a better option than the alternatives, either generally or for the specific patient he is dealing with; perhaps Dr. Siegel's patients are sicker than average cardiac patients and thus require more frequent use of balloon pumps; or perhaps patients who opt for bypass surgery requiring a balloon pump rather than stenting seek out Dr. Siegel due to his expertise.  Without ruling out such explanations, the statistical analyses to which Frazier's Third Amended complaint refers are at most are "merely consistent with" the inference that medically unnecessary procedures were performed on federally-insured patients.  *Iqbal*, 129 S. Ct. at 1149.

- 20 -

submitted any *claims for federal reimbursement* for medically unnecessary procedures performed on federally-insured patients.

### C. Frazier's Panoply of Additional Broad-Brush Allegations Fail to Bolster His Deficient Allegations Regarding IASIS Healthcare's Supposed Submission of False Claims for Payment for Medically Unnecessary Procedures.

Ostensibly relying entirely on the hearsay accounts of unnamed individuals, Frazier makes a number of broad-brush allegations that either explicitly accuse or indirectly suggest that certain physicians performed medically unnecessary procedures at IASIS Healthcare hospitals.  For example, Frazier alleges that "witnesses noted that Dr. Siegel appeared to use balloon pumps on approximately 50% of his patients," as compared to a "range of 5-8% for most cardiologists," *id.* at ¶ 193; that Dr. Rao had a "propensity for giving everyone without a 'spring in their step' a heart cath procedure," *id.* at ¶ 281; that Frazier himself "received a number of reports from [unnamed] personnel at Park Place Medical Center that Dr. Keisz was also performing unnecessary interventional cardiology procedures," *id.* at ¶ 286; that Dr. Rao "directed other cardiologists to 'find something to treat,'" *id.* at ¶ 290; and that certain persons were concerned about the clinical outcomes and supposed overutilization of cath lab procedures performed by Dr. Srivastava, *id.* at ¶ 317.

Frazier's inclusion in his Third Amended Complaint of these sorts of broad-brush allegations is reminiscent of the approach he took in his deficient Second Amended Complaint.   These broad-brush allegations do not call into question the medically necessity of any *specific* surgeries — let alone specific surgeries that ultimately resulted in the submission of a claim for federal reimbursement — nor do they make Frazier's allegations regarding patients "A" through "H" any less defective. Simply put, these sweeping, conclusory allegations, which amount to nothing more than groundless opinion, utterly fail to provide the "'who, what, when, where, and how'" of the alleged fraud, contrary to the Ninth Circuit's well-established case law.  *Ebeid*, 616

- 21 -

1    F.3d at 998 (quoting *Vess*, 317 F.3d at 1106).

2    **III.    Frazier's False Certification Allegations Fail to Satisfy Rule 8 and Rule 9(b).**

3            In his Third Amended Complaint, Frazier renews the allegation — ruled

4    deficient in the Second Amended Complaint by this Court and the Ninth Circuit — that

5    IASIS Healthcare hospitals, in their 1999-2004 year-end Medicare cost reports, falsely

6    certified compliance with the Stark Act and Anti-Kickback Statute.  Yet, in his Third

7    Amended Complaint, Frazier does not provide any meaningful additional details

8    regarding either (1) physicians' actual referrals of federally-insured patients in violation

9    of the Stark Act or induced by illegal kickbacks, or (2) the actual submission of year-

10   end Medicare cost reports that included line item entries for services furnished in

11   violation of the Stark Act or Anti-Kickback Statute.  Instead, Frazier has sought to hide

12   these deficiencies by peppering his complaint with rote repetition of the same general

13   allegation that this Court found defective in the Second Amended Complaint, namely

14   that "the physicians referred 'patients' to IASIS hospitals" and that "IASIS improper

15   billed the government for services to those patients . . . ."  Dist. Ct. Order, at 8.  This is

16   fatal to his cause of action.  As this Court previously recognized, "without pleading

17   some detail regarding actual Medicare referrals, billing and payment for services

18   provided to the Medicare patient, and the submission of the certification of billing

19   compliance, a complaint cannot sufficiently allege a claim under the FCA for violations

20   of the Stark Law and the Anti-Kickback Statute."  *Id.* at 10.

21           Moreover, a close inspection of Frazier's complaint reveals that Frazier's

22   threshold accusations of illegal financial relationships between IASIS Healthcare and

23   certain physicians are based entirely upon his speculative and spurious assertions, as

24   well as unilateral characterizations, that IASIS Healthcare disregarded principles of fair

25   market value when entering into otherwise permissible financial transactions with those

26   physicians.

27           As explained below, Frazier has failed to adequately plead either (1) that medical

28                                              - 22 -

services performed at IASIS Healthcare hospitals were furnished pursuant to referrals prohibited by the Stark Act or induced by illegal kickbacks, or (2) that IASIS Healthcare hospitals' year-end Medicare cost reports actually included line item entries for services furnished pursuant to unlawful financial arrangements between IASIS Healthcare and the referring physician.

### A.   Frazier's Allegations of Underlying Violations of the Stark Act and Anti-Kickback Statute Fail to Satisfy Rule 8 and Rule 9(b).

The Stark Act and the Anti-Kickback Statute do not broadly prohibit financial relationships between physicians and hospitals.  Instead, the Stark Act merely prohibits an entity from "present[ing] or caus[ing] to be presented" a claim for *federal reimbursement* for services furnished to a *federally-insured* patient who was referred to the entity by a physician with whom the entity has a "compensation arrangement" that does not meet certain specified exceptions.  *See* 42 U.S.C. § 1395nn(a)(1)(B), (e). Similarly, the Anti-Kickback Statute merely prohibits an entity from using illegal "remuneration" to induce a physician to furnish medical services to a *federally-insured* patient.  *See* 42 U.S.C. 1320a-7b(b)(2).   In short, the only transactions that even potentially violate the Stark Act or Anti-Kickback Statute are transactions that involve a federally-insured patient.  Dist. Ct. Order, at 8.

Moreover, a financial arrangement between a health care entity and a physician does not violate either the Stark Act or the Anti-Kickback Statute when it reflects a fair market value exchange and does not depend upon, or take into consideration the value of, the physician's referral of federally-insured patients to the entity.  *See, e.g.*, 42 U.S.C. § 1395nn(e) (specifying types of financial relationships that do not implicate the Stark Act's limitations on referrals); 42 U.S.C. § 1395nn(h)(3) (defining "fair market value" for purposes of the Stark Act); *United States ex rel. Westmoreland v. Amgen, Inc.*, No. 06-10972, 2010 U.S. Dist. LEXIS 98280, at *18 (D. Mass. Sept. 20, 2010) (holding that the Anti-Kickback Statute bars "transfers of items or services for free or

- 23 -

for other than fair market value"); *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 678-79 (N.D. Ill. 2006) ("In the context of the Anti-Kickback Statute, courts use 'fair market value' as the gauge of value when assessing the remuneration element of the offense"); *United States ex rel. Olbert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 & n.2 (N.D. Ill. 2002) ("To comply with the statute, the hospital must simply pay fair market value for the practice's assets."); *see also Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (holding that the Anti-Kickback Statute is violated only where the entity pays a kickback with the intent "to exercise influence over the reason or judgment of another in an effort to cause the referral").

Frazier indisputably premises his false certification allegations upon IASIS Healthcare's supposed underlying violations of the Stark Act and Anti-Kickback Statute.  Thus, unless Frazier has adequately pled underlying violations of those two provisions, by definition his "false certification" allegations are due to be dismissed. Yet, in what is now his *fourth* bite at this apple, Frazier has failed once more to meet his pleading burden.   Frazier's spurious allegations of illegal underlying financial relationships between IASIS Healthcare and certain physicians do not even meet Rule 8's plausibility requirement, and he fails to plead facts amounting to reliable indicia that IASIS Healthcare ever submitted a claim seeking federal reimbursement for any procedures furnished pursuant to an illegal financial arrangement.  *See, e.g.*, *Ebeid*, 616 F.3d at 1000 (holding that "a global indictment of [an entity's] business is not enough" to plead an underlying Stark Act violation under Rule 9(b)).

**1.** **Dr. Heuser —** Frazier alleges that IASIS Healthcare entered into "three sham consulting agreements" with Phoenix-area cardiologist Dr. Heuser.  TAC, ¶ 149. According to Frazier, IASIS "agreed to pay, and did pay Dr. Heuser up to $459,750 per year for services allegedly totaling 140 hours per month," and yet "Dr. Heuser provided practically no services to St. Luke's and certainly substantially less than 140 hours of service each month." *Id.* at ¶¶ 142-43.

- 24 -

1    As an initial matter, Frazier's complaint is puzzlingly cryptic with regard to how

2    much IASIS Healthcare actually paid Dr. Heuser for his consulting work.   Frazier

3    alleges merely that IASIS Healthcare paid Dr. Heuser "up to" $459,750.   Frazier's

4    allegation logically leaves open the possibility that IASIS Healthcare's payments to Dr.

5    Heuser did not come close to approaching $459,750.   Thus, even *assuming* that IASIS

6    Healthcare knew that Dr. Heuser was not performing 140 hours of consulting work per

7    month, Frazier does not actually allege that IASIS Healthcare paid Dr. Heuser as though

8    he *were* performing 140 hours of consulting work per month.

9    Indeed, Frazier's allegations are entirely consistent with the possibility that the

10   only payments IASIS Healthcare ultimately made to Dr. Heuser (as opposed to the

11   *maximum* amount that Dr. Heuser *could have* received under the consulting agreements)

12   were ones that fairly reflected the fair market value of consulting services that Dr.

13   Heuser had actually rendered.   Thus, even assuming the truth of Frazier's allegations,

14   this Court cannot "draw the reasonable inference" that IASIS Healthcare's payments to

15   Dr. Heuser were "kickbacks" designed to induce him to furnish medical services to

16   federally-insured patients, as opposed to payments reflecting the fair market value of

17   consulting services rendered.   *See, e.g.*, *Westmoreland*, 2010 U.S. Dist. LEXIS 98280,

18   at *18; *Klaczak*, 458 F. Supp. 2d at 678-79; *Olbert-Hong*, 211 F. Supp. 2d at 1049 &

19   n.2.

20   Nor can the Court draw a "reasonable inference" that IASIS Healthcare's

21   compensation arrangement with Dr. Heuser did not fit within one of the numerous safe

22   harbor exceptions explicitly identified in the Stark Act.   *See* 42 U.S.C. § 1395nn(e).

23   Accordingly, Frazier's allegations of illegal kickbacks and Stark Act violations do not

24   even satisfy Rule 8's plausibility requirement.   *See, e.g.*, *Iqbal*, 129 S. Ct. at 1949

25   (holding that, "[w]here a complaint pleads facts that are 'merely consistent with' a

26   defendant's liability, it 'stops short of the line between possibility and plausibility'" and

27   must be dismissed for failure to satisfy Rule 8 (quoting *Twombly*, 550 U.S. at 557); *see*

28

- 25 -

1   *also United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1224

2   (10th Cir. 2008) (dismissing *qui tam* complaint where the alleged financial arrangement

3   did "not resemble an illegal kickback arrangement and belies any allegation of willful

4   and knowing intent").  And given that Frazier has failed to live up to Rule 8's pleading

5   standards, it follows that he has missed Rule 9(b)'s standards by a wide margin.

6       Moreover, even *assuming* that Dr. Heuser's compensation arrangement *did not*

7   fall within one of the Stark Act's exceptions, in order for Frazier's Stark Act allegations

8   to satisfy Rule 9(b), Frazier is required to plead with particularity facts showing that

9   IASIS Healthcare subsequently sought federal reimbursement for procedures performed

10  on patients referred by Dr. Heuser.  After all, the Stark Act does not prohibit an entity

11  from entering into with a physician a compensation arrangement not meeting one of the

12  statute's enumerated exceptions; it merely prohibits an entity from seeking federal

13  reimbursement for a procedure resulting from a prohibited referral.  In this respect,

14  Frazier's Third Amended Complaint lacks the requisite particularity.

15      Just as with his prior complaint, Frazier's newest version of his pleading

16  "provides no detail regarding the referral of Medicare-eligible patients [by Dr. Heuser]

17  as a result of [an improper financial] relationship[ ]."  Dist. Ct. Order, at 8.  Instead,

18  Frazier alleges merely that "Dr. Heuser referred patients to IASIS, including patients

19  covered by Medicare and other federal programs," TAC, ¶ 149; "that "IASIS's St Luke

20  Medical Center submitted claims to federal health programs for procedures and

21  admissions of patients referred by Dr. Heuser, including patients insured under

22  Medicare," *id.* at ¶ 150; that IASIS Healthcare "submitted claims to federal health

23  programs for procedures and admissions of patients referred by Dr. Heuser," *id.* at

24  ¶ 152; and that "IASIS submitted claims for patients referred by Dr. Heuser to federal

25  health programs," *id.* at ¶ 158.   Thus, the Third Amended Complaint is not

26  meaningfully different from the Second Amended Complaint, which had similarly

27  "generally allege[d] that the physicians [with whom IASIS had financial relationships]

28

referred 'patients' to IASIS hospitals [and] that IASIS improperly billed the government for services to those patients . . . ."  Dist. Ct. Order, at 8.  Simply repeating that same bare allegation four times, with slight variations in formulation, does not provide the added particularity necessary to overcome the deficiencies of the Second Amended Complaint.  As this Court held before, and as it should hold again, "without pleading some detail regarding actual Medicare referrals [and the] billing . . . for services provided to the Medicare patient, . . . a complaint cannot sufficient allege a claim under the FCA for violations of the Stark Law and the Anti-Kickback Statute." *Id.* at 10.

  **2.** ***Dr. Siegel*** — Frazier alleges that, to "generate the patient referrals for admissions and heart surgeries to Mesa General," IASIS Healthcare negotiated agreements with Dr. Siegel's physician group Advanced Cardiac Specialists ("ACS"). TAC, ¶ 161.  According to Frazier, "[u]nder these agreements, ACS owned the license to the cath lab and assessed a fee from Mesa for each cardiac catheter procedure performed by ACS based on a negotiated fee schedule." *Id.*  Frazier alleges that a third-party appraisal "valued the fee schedule significantly below the rates that ACS demanded as part of its agreement."  *Id.* at ¶ 163.  Frazier alleges in conclusory language that IASIS Healthcare ultimately agreed to pay "ACS greater than fair market rates for cardiac catheterization procedures . . . , a kickback."  *Id.* at ¶¶  166, 169. Frazier also alleges without explanation that the compensation agreement that IASIS Healthcare entered into with Dr. Siegel and ACS did not fall within any of the Stark Act's exceptions.  *Id.* at ¶ 182.  Finally, he alleges — once again in the most conclusory terms — that IASIS Healthcare "submitted claims to federal health programs for procedures and admissions of patients referred by Dr. Siegel and [ACS] . . . , including patients insured under Medicare . . . ." *Id.* at ¶ 257.

  Frazier's allegations of underlying violations of the Anti-Kickback Statute and Stark Act involving Dr. Siegel and ACS are too conclusory to satisfy either Rule 8 or Rule 9(b).  As to the Anti-Kickback Statute, Frazier's allegations regarding Dr. Siegel

and ACS suffer from the same infirmity as his allegations regarding Dr. Heuser. Namely, Frazier has not pled any actual *facts* supporting his conclusory averment that the fee arrangement between IASIS Healthcare and Dr. Siegel and ACS did not reasonably fall within the range of fair market value.

It may well be that IASIS Healthcare did not adopt wholesale a particular third-party appraiser's initial appraisal of the value of ACS's cath lab. Yet, as anyone who has ever purchased a house knows, a single appraiser's opinion does not conclusively establish an asset's "fair market value." Frazier does not even allow this Court to exercise its own judgment on this issue, because he fails to specify the actual difference between the appraisal and the fee schedule to which IASIS Healthcare agreed. Ultimately, then, Frazier's allegation that the consideration IASIS Healthcare paid for the cath lab exceeded fair market value, and thus constituted a "kickback," is unsupported by sufficient facts either to satisfy Rule 9(b) or even Rule 8's minimum plausibility requirement. *See, e.g.*, *Iqbal*, 129 S. Ct. at 1949; *see also Conner*, 543 F.3d at 1224. It similarly provides too little for Court to draw the reasonable inference that the compensation arrangement between IASIS Healthcare and ACS and Dr. Siegel fell outside of the Stark Act's safe harbor exceptions. *See* 42 U.S.C. 1395nn(e).

Further, Frazier's allegations that Dr. Siegel and/or other ACS physicians referred federally-insured patients to IASIS Healthcare hospitals, and that IASIS Healthcare subsequently sought federal reimbursement for procedures performed pursuant to those referrals, are likewise insufficient to satisfy the applicable pleading requirements. To be sure, Frazier alleges that patients "B" and "C" were federally insured and, on some unspecified date, referred to Mesa General by Dr. Siegel or another ACS physician and that, on some later unspecified date, IASIS Healthcare sought federal reimbursement for the procedures performed on those two patients.[6]

---

[6] Frazier identifies no other individual federally-insured patients referred to an IASIS Healthcare hospital by Dr. Siegel or another ACS physician.

- 28 -

Nevertheless, Frazier fails to provide any details to support those naked allegations.  It simply cannot be that, to comply with the Ninth Circuit's mandate, Frazier needs only to conclusorily allege that (1) "Patient B was referred to Mesa General by ACS" and "IASIS submitted claims to Medicare for the treatment of Patient B," TAC, ¶ 216, 221, and (2) "Patient C was referred [to Mesa General] by ACS physicians Boswell and Siegel after a stress test" and "IASIS submitted claims to Medicare for the treatment of Patient C," *id.* at ¶ 225, 228.  The Ninth Circuit's decision requires Frazier to plead *facts*, not formulaically recite the elements of an underlying Stark Act violation.  *See Twombly*, 550 U.S. at 555 (holding that a "formulaic recitation of the elements" of a claim is insufficient to satisfy Rule 8's plausibility requirements).

**3.    *Drs. Rao and Keisz* —** Frazier alleges that IASIS Healthcare had "several financial arrangements with Drs. Rao and Keisz," including a "medical directorship contract" with Dr. Rao.  TAC, ¶ 271.  According to Frazier, "Dr. Rao did not peform the number of hours required for payment under the medical directorship" but "IASIS continued to pay Dr. Rao" in exchange for referrals of patients to IASIS Healthcare hospitals.  *Id.* at ¶¶ 271-72.  Frazier also alleges that "IASIS purchased land owned by Dr. Rao and Dr. Kirk Williams . . . at a greater than fair market value price."  *Id.* at ¶ 273.  In addition, Frazier alleges that IASIS Healthcare engaged in at least two other real estate purchases with Dr. Rao, with Dr. Rao receiving greater than fair market value in each exchange.  *Id.* at ¶¶ 275-76.  Frazier also contends that on four occasions someone at IASIS Healthcare had dinner with Drs. Rao and Keisz and paid the bill.  *Id.* at ¶ 277.  Finally, Frazier alleges without providing any factual details that "Drs. Rao and Keisz referred patients to IASIS, including patients covered by Medicare and other federal programs," *id.* at ¶ 303, and that "IASIS submitted claims to federal health programs for procedures and admissions of patients referred by Drs. Rao and Keisz, including patients insured under Medicare," *id.* at ¶ 304.

Frazier's allegations of underlying Anti-Kickback Statute and Stark Act

- 29 -

violations involving Drs. Rao and Keisz satisfy neither Rule 8 nor Rule 9(b).  Frazier's complaint lacks any particularized facts supporting his allegations that IASIS Healthcare paid Dr. Rao under a consulting agreement for work that he did not perform, or that IASIS Healthcare paid Drs. Rao and Keisz amounts that exceeded fair market value in various real estate transactions.  This is fatal to Frazier's contention that IASIS Healthcare's financial arrangements with Drs. Rao and Keisz violated the Anti-Kickback Statute or fell outside the Stark Act's enumerated safe harbor exceptions.  Moreover, Frazier once again refuses to plead facts giving rise to a strong inference that Drs. Rao and Keisz referred patients to IASIS Healthcare in violation of the Stark Act and that IASIS Healthcare thereafter sought federal reimbursement for services provided pursuant to such referrals, both of which are essential factual elements of an underlying Stark Act violation.  Instead, as with his Second Amended Complaint, Frazier only "generally alleges that the physicians referred 'patients' to IASIS hospitals" and "that IASIS improperly billed the government for services to those patients[.]"  Dist. Ct. Order, at 8.

**4.   *Dr. Srivastava* —** Frazier alleges that Dr. Srivastava had a consulting agreement "under which he was to perform services" but that he "did not provide services to the value of the payments made to him."  TAC, ¶ 314.  This is the full extent of Frazier's allegations regarding the supposed impropriety of IASIS Healthcare's compensation arrangement with Dr. Srivastava.  Without having pled particularized facts showing that Dr. Srivastava received payments exceeding the fair market value of the services he provided to IASIS Healthcare, Frazier has not adequately pled an underlying violation of the Anti-Kickback Statute or the Stark Act.

Furthermore, separately fatal to his averment of an underlying Stark Act violation is Frazier's failure to provide *facts* supporting his general conclusory allegation that "Dr. Srivastava referred patients to IASIS, including patients covered by Medicare and other federal programs," *id.* at ¶ 324, and that "IASIS submitted claims to

federal health programs for procedures and admissions of patients referred by Dr. Srivastava, including patients insured under Medicare," *id.* at ¶ 325. These broad-brush allegations fail to identify even one federally-insured patient and are materially indistinguishable from the general averments that this Court found deficient when Frazier included them in his Second Amended Complaint.

    ***5.***    ***Drs. Kohring, Letellier, and Herro*** — Frazier alleges that IASIS Healthcare subleased office space to Drs. Kohring, Letellier, and Herro for less than fair market value. According to Frazier, IASIS Healthcare paid $28.41 per square foot for the space but charged Drs. Kohring, Lettelier, and Herro $12.41 per square foot under the sublease. Frazier describes the arrangement as the provision of a "rent subsidy." *Id.* at ¶¶336-38.

    To adequately plead an underlying Anti-Kickback Statute or Stark Act violation, however, it is incumbent upon Frazier to plead facts leading to a "strong inference" that IASIS Healthcare provided the office space to Drs. Kohring, Lettelier, and Herro for less than fair market value. Frazier has not done so. Instead, he has pled facts that, while consistent with the *possibility* that IASIS Healthcare was providing a "rent subsidy" to the three physicians, are equally consistent with the possibility (1) that IASIS Healthcare had simply inherited a bad lease and subleased the space to Drs. Kohring, Lettelier, and Herro at then-prevailing market rates, or (2) that the portions of the building that Drs. Kohring, Lettelier, and Herro were less valuable than other portions of the building.[7] Accordingly, Frazier's allegations of an underlying Anti-Kickback Statute or Stark Act violation do not satisfy Rule 8's plausibility requirement, let alone Rule 9(b)'s heightened pleading standards. *See Iqbal*, 129 S. Ct. at 1949

---

[7] Frazier's complaint imagines a world where the value of each and every square foot of a commercial building is uniformly the same in perpetuity. That obviously is not the real world. Even assuming that IASIS Healthcare had not inherited a bad lease, it is entirely logical to infer that, while the fair market value of the *entire building* averaged out to $28.41 per square foot, the discrete office spaces that Drs. Kohring, Lettelier, and Herro occupied had a fair market value of $12.41.

- 31 -

1   (holding that, "[w]here a complaint pleads facts that are 'merely consistent with' a

2   defendant's liability, it 'stops short of the line between possibility and plausibility'" and

3   must be dismissed for failure to satisfy Rule 8 (quoting *Twombly*, 550 U.S. at 557)).

4       Furthermore, once again Frazier fails to plead *facts* supporting his conclusory

5   allegation that Drs. Kohring, Lettelier, and Herro "referred patients to IASIS, including

6   patients covered by Medicare and other federal programs," TAC, ¶ 339, and that "IASIS

7   submitted claims to federal health programs for procedures and admissions of patients

8   referred by [the three physicians], including patients insured under Medicare," *id.* at

9   ¶ 340.   Yet, Frazier is required to plead such facts in order to adequately allege an

10  underlying Stark Act violation involving these three physicians.

11      **6.     *Dr. Pollack*** — Frazier alleges that, although IASIS paid "Dr. Pollack up

12  to $165,000 as a medical director and consultant for the [Palms of Pasadena's] ostomy

13  surgery program," Dr. Pollack "actually provided few directorship services."   *Id.* at

14  ¶¶ 349-350.   According to Frazier, "time sheets 'documenting' the services provided by

15  Dr. Pollack were submitted even during the two months each year that the doctor is on

16  his boat in the Caribbean."   *Id.* at ¶ 350.   Frazier also alleges that, at other times, Dr.

17  Pollack submitted "time sheets representing that he worked less than the hours required

18  in his directorship and consulting agreements" but that IASIS "still paid him his full

19  directorship and consulting fees."   *Id.* at ¶ 351.

20      Frazier, however, pleads no actual *facts* that would give rise to a "strong

21  inference" that Dr. Pollack was being paid for work that he did not perform: Frazier

22  does not provide any specific examples of time sheets that reflected Dr. Pollack's failure

23  to perform his contractual obligations, nor does he plead any facts ruling out that Dr.

24  Pollack worked more hours in certain months to make up for shortfalls from other

25  months.   And, while it might personally surprise Frazier that some people actually work

26  during their vacations, Frazier has no basis for asserting that Dr. Pollack performed no

compensable services while away from hospital premises.[8]  "Where," as here, "a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" and must be dismissed.  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

Having failed to plead any facts that would allow this Court to infer that IASIS Healthcare's payments to Dr. Pollack exceeded fair market value for services actually performed, Frazier's allegations of an underlying Anti-Kickback Statute or Stark Act violation do not satisfy either Rule 8 or Rule 9(b).  Furthermore, separately fatal to his averment of an underlying Stark Act violation is Frazier's failure to provide *facts* supporting his allegation that Dr. Pollack "referred patients to IASIS, including patients covered by Medicare and other federal programs," TAC, ¶ 359, and that "IASIS submitted claims to federal health programs for procedures and admissions of patients referred by [Dr. Pollack], including patients insured under Medicare," *id.* at ¶ 360.  Again, it is not sufficient for Frazier to "only generally allege that [Dr. Pollack] referred 'patients' to IASIS hospitals [and] that IASIS improperly billed the government for services to those patients."  Dist. Ct. Oder, at 8.

7.    ***Dr. Barrett*** — Frazier alleges that IASIS Healthcare paid Dr. Barrett "$5,000 monthly as a medical directorship fee, and Barret submitted monthly time sheets to support his fee."  TAC, ¶ 370.  According to Frazier, Barrett submitted these reports "and payment was made each month, despite the fact that Barrett is out of the country and on vacation (usually in Switzerland all summer) for three months each year."  *Id.*  Frazier also alleges that IASIS Healthcare provided "free services to Dr. Barrett for his patients," such as "transportation to and from the hospital for surgery" and "a free night's stay at the hospital the night before surgery . . . ."  *Id.* at ¶ 370.  Frazier also alleges that IASIS Healthcare "paid $24,000 per year to maintain its

---

[8] Frazier does not allege that he was in the Caribbean with Dr. Pollack.  Nor does he allege any facts suggesting that Dr. Pollack would be incapable of performing compensable services while away from hospital premises.

membership in JointCare Centers of America, of which Dr. Barrett was the principal owner" and "routinely purchased videotapes from Dr. Barrett's company Televisual Communications." *Id.* at ¶ 373.

These allegations fail to adequately plead an underlying Anti-Kickback Statute or Stark Act violation. Frazier pleads no facts that would allow this Court to infer that Dr. Barrett did not perform work during his vacation time in Switzerland, that IASIS Healthcare knowingly allowed Dr. Barrett to submit fraudulent time sheets, that incidental services such as transporting and providing overnight lodging to Dr. Barrett's surgical patients were intended to be a kickback to Dr. Barrett, that IASIS Healthcare's membership in JointCenters of America was not *bona fide*, or that IASIS Healthcare's purchase of videotapes was merely a pretext to providing Dr. Barrett a kickback. Frazier is engaged in sheer speculation, and his allegations thus fail to satisfy either Rule 8 and Rule 9(b). *Cf. Conner*, 543 F.3d at 1224 (dismissing complaint because the alleged financial arrangement between the hospital and the physician did "not resemble an illegal kickback arrangement and belies any allegation of willful and knowing intent").

Furthermore, with respect to his Stark Act allegations, Frazier again relies on the naked allegations that Dr. Barrett "referred patients to IASIS, including patients covered by Medicare and other federal programs," *id.* at ¶ 376, and that "IASIS submitted claims to federal health programs for procedures and admissions of patients referred by [Dr. Barrett], including patients insured under Medicare," *id.* at ¶ 377. Frazier is required to plead *facts* supporting these essential ingredients of an underlying Stark Act violation; falling back on formulaic recitations of the elements of a violation of the statute does not suffice.

**8.    *The Granger Group* —** Frazier alleges that the former owner of Pioneer Valley Hospital, Paracelus, had leased part of an office building constructed and owned by the Granger Clinic Physician Group. According to Frazier, "[w]hen IASIS

- 34 -

purchased the hospital from Paracelus, it assumed the lease, although IASIS had no need for the space." *Id.* at ¶ 388.  Frazier alleges that by "assuming the lease and knowingly continuing to pay rent for space it did not use, IASIS conveyed a significant benefit to the Granger Clinic Physician Group in exchange for referrals for hospital admissions." *Id.*

Frazier's averments plainly fail to satisfy Rule 8, let alone Rule 9(b).  As Frazier's own allegations indicate, IASIS Healthcare paid rent to the Granger Group because it had acquired the preexisting lease as part of its purchase of Pioneer Valley Hospital.  Frazier provides no logical reason why this Court should infer that IASIS Healthcare's assumption of a *preexisting lease* and subsequent discharge of its inherited contractual obligations under that lease was intended to induce the Granger Group to refer patients to Pioneer Valley Hospital.  *Conner*, 543 F.3d at 1224 (dismissing complaint because the alleged financial arrangement between the hospital and the physician did "not resemble an illegal kickback arrangement and belies any allegation of willful and knowing intent").

In addition, as with his Stark Act allegations against the other physicians in his complaint, Frazier is unable to plead *facts* supporting his conclusory allegation that the Granger Group physicians "referred patients to IASIS, including patients covered by Medicare and other federal programs," TAC, ¶ 389, and that "IASIS submitted claims for patients referred by Granger Group physicians to federal health care programs," *id.* at ¶ 394.  As such, he has not adequately pled an underlying violation of the Stark Act involving the Granger Group.

**B.      Frazier's Allegations That Medicare Cost Reports Filed Between 1999 and 2004 by Hospitals Affiliated With IASIS Healthcare Contained False Certifications Fails to Satisfy Rule 8 or Rule 9(b).**

Because Frazier has not adequately alleged any underlying violations of the Anti-Kickback Statute or the Stark Act, by definition he has not adequately alleged that IASIS Healthcare hospitals' 1999-2004 year-end Medicare cost reports contained a

- 35 -

"false certification."   In addition, however, Frazier's allegations regarding the 1999-2004 year-end cost reports filed by the IASIS Healthcare hospitals fail because, even *assuming* the existence of underlying violations of the Anti-Kickback Statute or Stark Act, he still has failed to plead facts giving rise to a strong inference that the *cost reports* contained a "false certification."

In relevant part, the year-end cost report's certification states as follows: "I HEREBY CERTIFY . . . that the services *identified in the cost report* were provided in compliance with [federal health care] laws and regulations."   *Id.* at ¶ 102 (emphasis added).   Thus, to plead facts giving rise to a strong inference that IASIS Healthcare falsely attested to that certification statement, Frazier must plead facts giving rise to a strong inference that the services *identified in the cost reports' line items* included services that had been furnished pursuant to either an illegal kickback or a referral prohibited under the Stark Act.

Frazier has not pled any such facts.   Instead, like a broken record, Frazier merely repeats *six separate times* the conclusory allegation that "[e]ach year, from 1999-2004, IASIS submitted a cost report to Medicare and Medicaid . . . in violation of law because it knew that the certification that all services were provided in compliance with the Stark and Anti Kickback laws was a false statement."   *Id.* at ¶¶ 154, 308, 344, 364, 381, 391.   Frazier's newest approach to pleading the *sine qua non* of IASIS Healthcare's supposed "false certifications" is thus not meaningfully different from the approach he employed in his Second Amended Complaint.   That pleading was adjudged to be inadequate because he had alleged in conclusory fashion that the "annual hospital cost reports covering Fiscal Years 1999-2004 falsely certified that the medical services identified therein had been provided in compliance with all applicable laws and regulations."   Frazier obviously cannot turn a deficient allegation into an adequate one merely by repeating it over and over again, changing merely the name of the hospital at issue.   *See Peterson*, 2003 U.S. Dist. LEXIS 1783, at *5 ("All of relator's allegations

- 36 -

follow this same general pattern, only changing the name of the doctor and . . . the dates.  In the court's opinion, such allegations do not satisfy Rule 9(b)'s particularity requirement.").

In its written order dismissing Frazier's Second Amended Complaint, this Court criticized Frazier's tactic of "only generally alleg[ing] that the physicians referred 'patients' to IASIS hospitals, that IASIS improperly billed the government for services to those patients, and that IASIS nonetheless certified it had complied with health care regulations in annual cost reports from at least 1999 to 2004."  Dist. Ct. Order, at 8.  This Court then listed a series of questions that Frazier's conclusorily allegations had failed to answer.  Among those were the following questions: "What line items in the cost reports were affected by illegal physician relationships? . . . By how much was a reimbursement in the cost report allegedly overstated? . . . [W]hen did the physician[s] make the [allegedly prohibited] referral? . . . When did the hospitals submit claims for interim payment to Medicare? . . . When, if at all, did Medicare pay on those claims?" *Id.* at 9.

Despite knowing that these were the *central questions* that his Third Amended Complaint needed to answer, Frazier barely attempts to answer them.  Among other things, Patient B and Patient C, allegedly treated on some unspecified date at Mesa General, are the only federally-insured patients that Frazier's complaint identifies with *any* specificity as having received treatments pursuant to a supposedly prohibited referral.  And even with respect to those two patients, Frazier still pleads no *facts* that would allow this Court to draw the strong inference that the referrals of these two patients in fact were induced by illegal kickbacks or prohibited under the Stark Act, or that IASIS Healthcare sought federal reimbursement for the treatments provided to them.  Moreover, although as an IASIS Healthcare insider Frazier presumably would have been able to access hospitals' cost reports, Frazier pleads no facts suggesting that he has ever personally examined the content of any of the cost reports he now asserts

- 37 -

1    contained false certifications.  Instead, he simply seeks to assure this Court that IASIS

2    Healthcare must have submitted false interim claims and that those interim claims must

3    have ended up in the year-end cost reports.  *See* TAC, ¶ 98.

4         On remand, there is no basis to relieve Frazier from his burden of pleading with

5    particularity all the essential ingredients of his false certification claim.  Consistent with

6    the Ninth Circuit's ruling and well-established False Claims Act precedent, Frazier's

7    failure to plead facts giving rise to a strong inference that that the cost reports actually

8    identified as line items unlawfully furnished services compels the dismissal of his "false

9    certification" claims.[9]  *See United States ex rel. Sanderson v. HCA-The Healthcare*

10   *Company*, 447 F.3d 873, 877 (6th Cir. 2006) (agreeing that "Rule 9(b) does not permit a

11   False Claims Act plaintiff merely to describe a private scheme in detail but then to

12   allege simply . . . that claims requesting illegal payments must have been submitted,

13   were likely submitted or should have been submitted to the Government.").

### IV.   Frazier's Entirely New Claims Against Newly-Added Defendants David White and Sandra McRee Are Both Time-Barred and Procedurally Improper.

16        Frazier's prior complaints named IASIS Healthcare, a parent corporation situated

17   in Tennessee that is not itself a provider of health care services, as the sole defendant.

18   In his Third Amended Complaint, however, Frazier has added as individual defendants

---

[9] Frazier's Third Amended Complaint cryptically advances a theory of "implied false certification," which is a theory that Frazier had expressly disclaimed during oral argument in the Ninth Circuit.  Frazier suggests that, "even without [an express] false certification of compliance with federal healthcare laws," it constitutes an implied false certification of the Stark Act for a hospital to seek interim reimbursement for a service furnished pursuant to a referral prohibited by the Stark Act.  *See* TAC, at ¶ 27.  Even assuming the general legal validity of this theory of liability — and even assuming that Frazier is entitled to resuscitate on remand a legal theory that he explicitly disclaimed during his appeal — Frazier has failed to plead with particularity either that any physicians made such prohibited referrals to IASIS Healthcare hospitals or that IASIS Healthcare sought federal reimbursement for such procedures.

Frazier also alleges that "IASIS . . . failed to repay Medicare and other federal healthcare programs for overpayments it had received and of which it was aware repayment was owed."  *Id.* at ¶ 28.  Frazier likewise has pled no facts to support this "reverse false claim" theory.

25961140_1

David White and Sandra McRee, former IASIS Healthcare executives whose names appeared only fleetingly in Frazier's Second Amended Complaint.[10]   Frazier's decision to add White and McRee at this late juncture — five years after filing his original complaint, years after government investigation while his complaint was under seal, and after the filing of two prior amended pleadings — is inexcusable.   In addition to dismissing the claims against White and McRee for failure to satisfy applicable pleading requirements, this Court should also dismiss them as time barred and procedurally improper.

## A.     Frazier's Claims Against White and McRee Are Time Barred.

In the five years between Frazier's filing of his initial complaint (which named only IASIS Healthcare as a defendant) and his filing of the Third Amended Complaint (which for the first time named White and McRee as defendants), the False Claims Act's six-year statute of limitations as to White and McRee continued to run.   Thus, to the extent Frazier's claims against White and McRee arise out of conduct occurring prior to November 22, 2004, those claims are time barred.[11]   *See* 31 U.S.C. § 3731(b) (six year statute of limitations).

Frazier cannot surmount this time bar obstacle by asserting that his claims against White and McRee "relate back" to his prior complaints.   Under Rule 15(c), a plaintiff's addition of a new defendant relates back to a prior pleading only if the newly-added defendant "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."   Fed. R. Civ. P. 15(c)(1)(C); *see Krupski v. Costa Crociere S.p.A.*, 130 S. Ct. 2485, 2490 (2010).   It

---

[10] Frazier's claims against White and McRee are wholly parasitic of his claims against IASIS Healthcare.   Accordingly, the pleading deficiencies discussed in the preceding portions of this brief compel the dismissal of Frazier's claims against White and McRee as well as IASIS Healthcare.

[11] To the extent Frazier's claims arise out of supposed False Claims Act violations occurring after November 22, 2004, he should be required to point those claims out specifically.

would defy reason to suggest that White and McRee should have assumed that Frazier's decision not to include them in any of three prior versions of his complaint was simply a "mistake concerning the proper party's identity."   As the Ninth Circuit has explained, "Rule 15(c) was never intended to assist a plaintiff who ignores . . . a potential party . . . [and who] engage[s] in piecemeal litigation."   *Kilkenny v. Arco Marine Inc.*, 800 F.2d 853, 857 (9th Cir. 1986).

## B.    Frazier's Addition of White and McRee is Procedurally Improper.

Frazier's attempt to add two new defendants to his complaint at this late stage also ignores the vital fact that his leave to amend his Second Amended Complaint came solely by virtue of the Ninth Circuit's limited remand to this Court.   After ruling that Frazier's Second Amended Complaint "fail[ed] to plead his claims with sufficient particularity," the Ninth Circuit remanded the case in order to "permit[]" Frazier to respond to this Court's "Rule 9(b) sufficiency analysis."   App. Ct. Dec., at 5.   Frazier's decision not merely to replead his claims against IASIS Healthcare, but also to add White and McRee as defendants, exceeds both the letter and the spirit of the Ninth Circuit's mandate.

The Ninth Circuit has held repeatedly that where "the scope of the remand" is clear, "additional issues [are] not open for review" on remand.   *United States v. Thrasher*, 483 F.3d 977, 982-83 (9th Cir. 2007) (internal quotation marks omitted). Nothing in the Ninth Circuit's opinion in this case indicates that it was issuing an "open remand" that would allow Frazier to add new defendants or entirely new legal claims to his complaint.   *Twentieth Cent. Fox. Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 883 (9th Cir. 2005).   Rather, the court of appeals remanded this case merely to allow Frazier one final opportunity to plead additional *facts* that might cure the deficiencies in his allegations against IASIS Healthcare.   The addition of White and McRee as defendants, however, adds no particularity to the claims against IASIS Healthcare, or to the allegations made against the individual hospital-providers where the relevant conduct

- 40 -

1    supposedly occurred, and is accordingly inappropriate at this late stage of the litigation.

2    *Cf. Brass v. Cnty. of Los Angeles*, 328 F.3d 1192, 1198 (9th Cir. 2003) ("Plaintiff cannot

3    take advantage of the Ninth Circuit's limited remand by now adding these new

4    individuals to the litigation.").

5        Moreover, even assuming that the Ninth Circuit's remand contemplated Frazier's

6    addition of new defendants, his addition of White and McRee without seeking leave of

7    court was improper.  As the Ninth Circuit has explained, when a plaintiff seeks to . . .

8    add a new defendant," he must seek leave of court.  *Percy v. San Francisco Gen. Hosp.*,

9    841 F.2d 975, 978 (9th Cir. 1988) (holding that a district court's refusal to allow the

10   proposed addition is reviewed only for abuse of discretion).  If such leave is not sought,

11   the district court is entitled to treat the amended pleading as a nullity.[12]  *See Aanestad v.*

12   *Cnty. of San Francisco*, 83 Fed. App'x 162, 164 (9th Cir. 2003) ("Because [the

13   plaintiff] did not first request leave of the court before adding his mother as a plaintiff to

14   his action, the district court did not abuse its discretion in rejecting the amendment."

15   (citation omitted)); *Hoover v. Blue Cross Blue Shield of Ala.*, 855 F.2d 1538, 1544 (11th

16   Cir. 1988) (approving of district court's treatment of amended complaint "as a nullity,"

17   where plaintiff attempted to join additional defendants without obtaining the court's

18   leave); *Friedman v. Village of Skokie*, 763 F.2d 236, 239 (7th Cir. 1985) ("Filing an

19   amendment to a complaint without seeking leave of court or written consent of the

20   parties is a nullity.").

21   **V.    This Court's Dismissal of Frazier's Third Amended Complaint Should Be
22          With Prejudice.**

23       The Ninth Circuit remanded this case to provide Frazier one final chance to

24   amend; nothing in the Ninth Circuit's opinion remotely suggests that Frazier was

25   entitled to any more than that.  Having demonstrated once again his inability to

26   _____

27   [12] To the extent Frazier makes a *nunc pro tunc* request for leave to add White and
     McRee as defendants, this Court should deny it; there is simply no excuse for Frazier's
     delay in adding White and McRee as defendants.  This Court need not accept Frazier's
28   belated attempt to draw White and McRee into this ongoing litigation.

1    adequately plead a single False Claims Act violation, this Court should dismiss

2    Frazier's complaint with prejudice.

3                              **<u>CONCLUSION</u>**

4         For the foregoing reasons, Defendants IASIS Healthcare, David White, and

5    Sandra McRee respectfully requests that the Court dismiss with prejudice Relator Jerre

6    Frazier's Third Amended Complaint.

7         DATED this 14th day of January, 2011.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25961140_1

1

2

ROPES & GRAY LLP.

3

By  /s/ Michael K. Fee

4

Michael K. Fee (admitted *pro hac vice*)

5

Joan McPhee (admitted *pro hac vice*)

Michael G. McGovern (admitted *pro hac vice*)

6

ROPES & GRAY LLP

7

800 Boylston Street, Prudential Tower

Boston, Massachusetts 02199

8

(617) 951-7000

9

michael.fee@ropesgray.com

joan.mcphee@ropesgray.com

10

michael.mcgovern@ropesgray.com

11

Larry A. Hammond, 004049

12

Mark I. Harrison, 001226

OSBORN MALEDON, P.A.

13

2929 North Central Avenue, Suite 2100

Phoenix, Arizona 85012-2793

14

(602) 640-9000

15

lhammond@omlaw.com

mharrison@omlaw.com

16

17

Michael L. Dagley (admitted *pro hac vice*)

Matthew M. Curley (admitted *pro hac vice*)

18

BASS, BERRY & SIMS PLC

315 Deaderick Street, Suite 2700

19

Nashville, Tennessee 37238-3001

(615) 742-6200

20

mdagley@bassberry.com

21

mcurley@bassberry.com

22

Attorneys for Defendants

23

24

25

26

27

28

- 43 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- Ashley D. Adams
- Mary Louise Cohen
- Matthew M. Curley
- Michael L. Dagley
- Michael K. Fee
- Helen Perry Grimwood
- Lon R. Leavitt
- Colette G. Matzzie
- Kirsten V. Mayer
- Michael G. McGovern
- Joan McPhee
- Stuart Rennert
- Jon L. Rewinski
- Brent N. Rushforth
- Andrew D. Skowronek

<u>/s/ Michael K. Fee</u>

- 44 -

25961140_1