ASHLEY D. ADAMS PLC (#013732)
8245 North 85th Way
Scottsdale, AZ 85258
(480) 219-1366

PHILLIPS & COHEN LLP
2000 Massachusetts Avenue NW
Washington, D.C.  20036
Tel: (202) 833-4567
Mary Louise Cohen (D.C. Bar #298299)
Colette G. Matzzie (D.C. Bar #451230)

Attorneys for Qui Tam Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. JERRE FRAZIER, | : : : | CIVIL ACTION NO. 05-766-PHX-RCJ |
| Plaintiff-Relator, | : : | |
| v. | : : | |
| IASIS HEALTHCARE CORPORATION, DAVID WHITE, and SANDRA MCREE, | : : : | |
| Defendants. | : | February 18, 2011 |

## OPPOSITION TO MOTION TO DISMISS
## RELATOR JERRE FRAZIER'S THIRD AMENDED COMPLAINT

Relator Jerre Frazier's Third Amended Complaint ("TAC" or "Complaint") fully satisfies

the requirements for pleading fraud with particularity articulated by the Ninth Circuit in *United*

*States ex rel. Frazier v. Iasis Healthcare*, No. 08-16305 (9th Cir., Aug. 12, 2010) and in *United*

*States ex rel. Ebeid v. Lungwitz, et al*, 616 F.3d 993 (9th Cir. 2010).   Under the Ninth Circuit

standard, "it is sufficient to allege 'particular details of a scheme to submit false claims paired

with reliable indicia that lead to a strong inference that claims were actually submitted.'"  616

F.3d at 998-99.   The Ninth Circuit explicitly adopted the pleading standard from *United States*

*ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) and rejected the pleading standard used by the First Circuit in *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.23d 220 (2004), the Sixth Circuit in *United States ex rel. Bledsoe v. Community Health Systems*, 501 F.3d 493 (2007) and the Eleventh Circuit in *United States ex rel. Clausen v. Lab Corp. of America*, 290 F.3d 1301 (11th Cir. 2002), on which Iasis continues to erroneously rely. Motion to Dismiss at 3, 8, 18, 19.[1]

Here, the Complaint provides extensive "particularized" detail about the "who, what, when, where, and how of the misconduct charged." *Ebeid*, 616 F.3d at 998. In 407 paragraphs set forth on 79 pages, the Complaint painstakingly alleges the involvement and roles of over 40 Iasis managers and employees in fraudulent schemes to submit false claims including illegal inducements to high volume physicians and physician groups (identified by name and location) to refer patients to six Iasis hospitals (identified) in four states, referrals for unnecessary medical procedures (identified by procedure and specific examples), and knowing submission of false or fraudulent claims (described) to federal payors. The Complaint pleads specific dates, dollar values, and places relevant to the fraudulent relationships. The Complaint reports specific conversations concerning the physician relationships and false representations made to patients. The Complaint explains why each of the allegedly illegal relationships violates the Anti Self Referral Act, 42 U.S.C. 1395nn (Stark) and the Medicare and Medicaid Fraud and Abuse Statute, 42 U.S.C. 1320a-7b (Anti Kickback) law.

---

[1] Iasis also continues to cite district court cases like *United States ex rel. Lam v. Tenet*, 481 F. Supp. 2d 673, 688 (W.D. Tex. 2006) which have been overruled or at least narrowed by the Fifth Circuit's decision in *Grubbs,* and cases like *Peterson v. Comm. Gen. Hosp.*, No. 01-CV-50356, 2003 U.S. Dist. LEXIS 1783 (N.D. Ill. 2003) which are flatly inconsistent with the Ninth Circuit standard. Motion at 5, 9.

The Complaint also pleads particularized detail to support the allegations that Dr. Siegel and Advanced Cardiac Specialists in Arizona and Drs. Rao, Keisz and Srivastava in Texas referred patients to Iasis hospitals for medically unnecessary cardiology procedures.  The Complaint pleads nine examples (Patients A –H) of inappropriate heart surgeries, unnecessary implantation of intraortic balloon pumps (IABPs) and devices, and unnecessary angioplasties and stents.  The Complaint explains why the procedures did not meet well established criteria for medical necessity and details fraudulent misrepresentations made to patients and their families at Iasis hospitals.  The Complaint also pleads descriptive details relayed by patients, physicians, and Iasis nurses, managers and facility compliance officers about Iasis' calculated decision not to conduct peer review or utilization review of Drs. Siegel, Rao, Keisz, and Srivastava over the objections of other physicians and hospital staff.

Finally, the Complaint pleads "reliable indicia" to support the reasonable inference that Iasis submitted claims to federal health care programs for improperly-referred patients and unnecessary procedures.  The Complaint details numerous contemporaneous statements made by Iasis employees and managers that the intended purpose of the referral schemes was to submit claims to federal payors; data analyses by Iasis of the referral and admission and claims submission patterns for recruited physicians, including revenue from federal payors; and, the names and the titles of Iasis employees who submitted knowingly false certifications of compliance with Stark and Anti Kickback on Medicare hospital cost reports.  The Complaint also pleads data demonstrating that Mesa General submitted claims to Medicare for intraortic balloon pumps implanted by ACS physicians; that claims were submitted to federal payors for Patients B, C, and E; and that Iasis had previously reimbursed Medicare for patients of Dr. Keisz

on whom he performed experimental procedures.  There is no serious question that Iasis submitted claims to Medicare and Medicaid from the physicians identified in the Complaint.

The Complaint also readily satisfies Rule 8 because it pleads "sufficient factual content" to support a "reasonable inference" that false claim were submitted with the requisite scienter. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Scienter remains a matter appropriate for general pleading under Federal Rule of Civil Procedure 9b.  To the extent Federal Rule of Civil Procedure 8 requires pleading sufficient factual content to demonstrate that the defendant's scheme is not susceptible to an innocent explanation, s*ee Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007), the Complaint also meets this standard.

In sum, the Complaint amply pleads (1) particularized details of Iasis' scheme to submit false claims (2) paired with reliable indicia that leads to a strong inference that claims were actually submitted to federal programs.  Iasis' protestations that the complaint does nothing more than provide recite formulaic allegations is without merit.  The Complaint more than serves the function of ensuring that Iasis knows exactly of what it is accused and what kinds of evidence Relator will be presenting.   Accordingly, Iasis' Motion to Dismiss should be denied.

## I.      THE COMPLAINT READILY SATISFIES RULE 9(B) AND RULE 8.

To survive a Rule 9(b) and Rule 12 motion to dismiss, the Third Amended Complaint must plead with particularity allegations that provide a reasonable basis to infer that (1) Iasis explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted.  *Ebeid*, 616 F.3d at 998.   Here, Relator alleges with particularity that Iasis undertook a duty to comply with the Stark and Anti-Kickback statutes by becoming Medicare providers and submitting claims for reimbursement to federal payors.  Iasis also undertook an obligation to submit claims to federal payors only for medically necessary

services.  In contravention of those duties, Iasis implemented an illegal scheme to submit claims

it knew to be false.  Some claims were false because they involved services performed on

patients referred from physicians with improper financial relationships (Heuser, Advanced

Cardiac Specialists, Herro, Kohring, Letellier, Barrett, Pollack, Srivastava, Rao and Keisz).

Some were false because the services were performed without requisite medical necessity (Rao,

Keisz, Srivastava, Advanced Cardiac Specialists).  Some were false because of both violations.

   To survive the motion to dismiss, the pleading should provide "particular details of a

scheme to submit false claims" and "reliable indicia that lead to a strong inference that claims

were actually submitted.  *Id.* at 999.  Representative examples may be pled but are not required.

*Id.*  Moreover, the pleading must provide enough detail so as to give the defendant "notice of the

particular misconduct which is alleged to constitute the fraud charged so that it can defend

against the charge and not just deny that it has done nothing wrong."  *Id.* (citing *United States ex*

*rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001)) and *Neubronner v.*

*Milken*, 6 F.3d 666, 671 (9th Cir. 1993)).  A pleading need not provide the same level of proof of

false claims required at trial.  *Grubbs*, 565 F.3d at 190.

   No federal pleading standard requires production of the actual documentation and proof

of fraud.  *Id.* (citing *Tellabs Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 328 (2007) (strong

inference standard does not require a plaintiff to please more than she would be required to

prove)).  What are essential under *Ebeid* and a long line of Ninth Circuit cases, is the particular

details concerning the fraudulent scheme rather than merely pleading claims which would not

reveal fraud without the underlying scheme.  *See Grubbs,* 565 F.3d at 190 ("It is the scheme in

which particular circumstances constituting fraud may be found that make it highly likely the

fraud was consummated through the presentment of false bills.").

**A.**     **The Complaint Alleges Particularized Detail of Schemes To Submit False Claims.**

From the beginning, IASIS's business plan was to develop small or poor performing hospitals and to establish intensive programs in a few areas of high utilization including cardiology, obstetrics, orthopedic surgery, and bariatric surgery.  IASIS sought to achieve very optimistic short term financial goals by recruiting physicians likely to perform high numbers of lucrative procedures and providing those physicians with financial compensation in exchange for their referrals to IASIS hospitals.  In a presentation made to Bank of America Securities, UBS Warburg, Lehman Brothers, and JP Morgan in 2002/2003, IASIS presented itself as uniquely qualified among the for-profit hospital chains to "monitor, review and understand product line margins and net revenues at each hospital" by performing a monthly product line analysis (cardiology, orthopedics, bariatric, etc.) at each hospital, evaluate margin and net revenue by service line, case, physician and payor."  TAC ¶¶ 4-5.  IASIS also touted that it had a unique "opportunity to expand profitable lines of business and improve business mix" and an "ability to capitalize on price and volume trends through expansion of certain services."  *Id.*  IASIS repeatedly emphasized its potential for driving high margins and increasing volumes with lowered expenses through intense operational scrutiny specifically by its top three managers, David White, Sandra McRee and Derek Morkel.  *Id.*

The Third Amended Complaint focuses on two primary sets of allegations: (1) the illegal physician relationships scheme and (2) the unnecessary medical procedures scheme.

**1.**     **Illegal Physician Relationship Scheme:**  Since at least 1999, Iasis has implemented an illegal scheme to pay improper compensation to physicians to induce them illegally to refer patients, including Medicare and Medicaid patients, exclusively or nearly exclusively to hospitals owned by Iasis and to submit claims to federal payors.  The

compensation in exchange for referrals included (1) salaries or consulting services fees, that was

greater than fair market value and payments to physicians in excess of contract terms; (2) sham

medical directorship contracts including falsified time records and excessive compensation; (3)

below market rent for office and lab space; (4) lease payments for catheter labs or other

diagnostic equipment owned or controlled by a physician at prices above fair market value; (5)

failure to seek reimbursement from physicians for use of hospital based labs for services

performed for private pay clients; (5) payments to physicians without written agreements to

support the payments; (6) provision of free services to physicians; (7) forgiveness of

indebtedness owed by physicians to IASIS,  (8) retention payments to physicians; and (9)

agreements to purchase supplies and equipment from physicians at above fair market value.

TAC ¶¶ 6-9. The physicians with financial arrangements were responsible for referral of

significant portions of the revenues for each of the identified hospitals.  TAC ¶¶10-17.

       The allegations provide concrete and particularized detail of the recruitment and retention

of physicians in exchange for referrals of patients.  For example, the Complaint provides many

pages of specifics about the recruitment of Dr. Siegel and Advanced Cardiac Specialists (ACS)

to Mesa General Hospital and St. Luke's.  TAC ¶¶ 13-14, 18,160-206.  Iasis managers recruited

ACS because of Dr. Siegel's promise to refer "400 hearts per year" for cardiac surgery,  Dr.

Siegel spoke openly that he preferred to treat what he called "Medicaid trailer trash" rather than

patients from Scottsdale  who might "ask too many questions." *Id.*  Similar allegations are made

about recruitment of heart surgeons in Texas by Iasis.  TAC ¶¶ 15, 18, 267-326.  McRee and

then-CEO of Odessa Regional Hospital, Mike Potter, recruited Dr. Srivastava by offering a large

consulting contract to "jump start" a cardiology program.  TAC ¶¶ 19, 314-326.  IASIS

managers in Florida took similar steps to retain Drs. Barrett and Pollack at Palms of Pasadena.

CEO David White stated openly that these doctors each produced $4-$5 million "bottom line revenue" and Palms could not survive without their referrals.  TAC ¶¶ 16, 349-379.

    **2.**    **Medically Unnecessary Procedures Scheme.**  The medically unnecessary procedures scheme alleges that Iasis knowingly submitted claims for procedures performed by Dr. Siegel and Advanced Cardiac Specialists at Mesa General and St Luke's in Arizona, and by Drs. Rao, Keisz and Srivastava at Iasis hospitals in Texas.  Particularized detail is provided of who performed unnecessary procedures, what procedures were performed, when they were performed, how they were unnecessary under well established medical criteria, and why Iasis willfully ignored the evidence of illegal conduct brought to it by other physicians, its own employees, and patients.   TAC ¶¶ 170-255, 279-302, 314-325.

In Arizona, details are provided of managers White and McRee overriding efforts by key Iasis managers in Arizona, including Cathy Story and Dolores Horvath, to implement utilization and peer review controls and thwarting efforts by the medical staff, including Dr. Gina Conflitti and Dr. Mark Kartub, to implement peer review including of Dr. Siegel's use of intraortic balloon pumps.  TAC ¶¶ 189, 254.  In Texas, Frazier, Bill Hammock and Debra Nicholson tried to conduct medical necessity reviews of heart surgeries and cardiology procedures and met firm opposition from Iasis managers.  TAC ¶¶ 282-302, 319-320. At Park Place Medical Center, White, McRee and former CEO Mike Miller went so far as to replace the cardiac surgeon practice because the surgeons objected to procedures performed by Dr. Stephan Keisz including experimental carotid stenting.  TAC ¶ 297.

**B.**    **The Who, What, Where, When and How of the Referral Schemes Are Alleged.**

The Complaint provides concrete detail about the "who, what, where and when" of Iasis' business plan to illegally induce physicians to refer patients especially for high margin procedures like interventional cardiology, orthopedics and bariatric surgery.

1.        **The Complaint Details "Who" Was Involved in the Fraudulent Schemes.**

The Complaint alleges that **Dr. Richard R. Heuser**, a high profile cardiologist, was recruited to St Luke's Medical Center in late 1999 by IASIS agreeing to pay fees totaling up to $459,750 annually to Dr. Heuser under three separate medical director and consulting contracts.  The complaint alleges specific Iasis employees involved in recruiting and retaining Dr. Heuser including **Bobbi Kale** who identified Heuser for recruitment and **Robert Luther**, a personal friend of Heuser's, who was hired to be CEO of St. Luke's to recruit Heuser.   The Complaint alleges that Dr. Heuser was recruited to obtain access to his referral stream and that Relator attended a dinner meeting with **Wayne Gower, Carol Beauchamp, and Bob Luther** in 1999 where Dr. Heuser's recruitment was discussed as a means of obtaining his referrals.  Other key former employees who were in a position to have knowledge of the relationship with Dr. Heuser include **Maridell Sladerbeck**, the former CEO/COO of St Luke's, **Linda Hischke**, former Arizona Market President, **Wayne Gower**, former Arizona Market President, and **George Horner,** former St Luke's Chief Financial Officer (CFO).    The Complaint also avers that Iasis managers knew that the compensation offered to Dr. Heuser was for his referrals and that Heuser could not reasonably fulfill the contracts.  CEO **Maridell Sladerbeck** signed the original 1999 Directorship Agreement reluctantly.  **Mike Georgeluis** signed the IASIS Corporate Consulting Service Agreement with serious concerns about its legality of the contract.  CEO **Arthur Layne** signed the Directorship Agreement for Heart Cath/Lab Services.  TAC ¶¶ 135-159.

The Complaint also avers an illegal financial relationship for referrals between Iasis and **Dr. Robert Siegel**, a cardiologist, and his physician group **Advanced Cardiac Specialists** ("ACS") starting in 2002 with similar particularized detail.  Iasis' goal in recruiting Dr. Siegel and ACS was to develop an interventional cardiology program for Mesa General Hospital and to join St Luke's Medical Center where Siegel had previously been denied staff privileges by the medical staff in the 1990s.  **David White** and **Sandra McRee** worked together to force through the deal.  McRee ruthlessly beat the third party appraiser down to a sales price below fair market value.  White directed IASIS General Counsel **Frank Coyle** and then-CEO for Mesa, **Pam Maher**, that they could not leave the office until they had finalized a deal on the terms directed by White.  The transaction was finalized at 2:00-3:00 am in the morning.  IASIS managers who would have been aware of the overutilization by ACS at IASIS hospitals and lack of peer review at the Arizona market level include **Pam Maher, Greg Wojtal, Dolores Horvath, John Gallagher, Cathy Stevens, Joy Bennett, Mary Shaw, Rose Edwards** and at the corporate level would include **Kathy Story** as well as **White** and **McRee**.  TAC ¶¶ 160-208, 252-255.

Cardiac surgeons at Mesa who performed the "400 heart surgeries" per year included **Dr. Maxwell, Dr. Dreicer, Dr. J Hessel, Dr. Smollens, and Dr. Bowles**.  Members of the medical staff including **Dr. Kartub and Dr. Gina Conflitti** and certain IASIS managers including **Dolores Horvath, Cathy Stevens, Joy Bennett and Mary Shaw** sought to put procedures in place b to monitor medical necessity but met opposition from IASIS corporate managers including **White and McRee** because **Dr. Siegel** was bringing in  revenue for St. Luke's and Mesa General.  *Id.*

In Texas, the Complaint alleges improper financial relationships between Iasis and **Dr. Srinavasava Rao-Kothapalli**, an interventional cardiologist in Port Arthur, Texas; **Dr.**

**Radoslaw Stephan Keisz**, an interventional cardiologist recruited to IASIS from UT San Antonio by then-CEO of Park Place Medical Center **Mike Miller**, and **Dr. Srivastava**, recruited by **Sandra McRee** and **Mike Potter** to Odessa, Texas.  Drs. Rao and Keisz performed interventional cardiology procedures at Park Place Medical Center and Mid Jefferson Hospital and, later for Dr. Rao, Southeast Medical Center of Texas.  **Dr. Rao** is also the principal owner of office buildings and land near Southeast Medical Center and has had other financial transactions with IASIS including medical directorship agreements and sales/transfers of land. TAC ¶¶ 267-279.

 **Drs. Rao and Keisz** were permitted to use cardiac catheter labs at IASIS's Texas hospitals to perform medically unnecessary procedures.  Then-CEO Park Place **Mike Miller** promised that these physicians would not be subject to peer or utilization review.  Among those Texas IASIS managers who were aware of the unnecessary medical procedures (and concerned about them) were **Craig Desmond, former CEO, Park Place; Debra Nicholson, Risk Manager, Park Place Medical; and Mike Miller, former CEO, Park Place Medical Center and Mid Jefferson Hospital.**  TAC ¶¶ 279-302.

 Allegations about illegal referral relationships are similarly made about two physicians at Iasis Florida hospitals: **Dr. James Pollack** (a surgeon who specialized in the Barnett Continent Intestinal Reservoir Procedure) and **Dr. John Barrett** (an orthopedic surgeon). In October 2001, Mr. Frazier attended a meeting with David **White, Richard Algood, Sammy Cantrell, McRee,** and **Dewey Green.  McRee** had met with Dr. Barrett and that Dr. Barrett had laid out conditions Iasis must meet for him to refer.   For **Dr. Pollack, Randy Bruce** worked on the Pollack Retention Agreement and it was approved by, among others, **McRee, White, Phil Mazzucca, Mike Jennessee,** and **Derek Morkel**.  TAC ¶¶ 349-385.

For each of the illegal physician relationships, the Complaint also avers that while the physicians were receiving remuneration they referred federally insured patients to Iasis hospitals and that Iasis submitted claims to federal payors for patients referred by these physician including annual Medicare cost reports certifying compliance with federal health care laws and seeking final reconciliation and payment for interim claims submitted and paid during the cost report year.  Facility CFOs and market CFOs -- Gr**eg Wojtal, George Horner and John Gallagher (in Arizona), Mike Taylor and Bernard Leger (in Texas) and Bill Masterson, Mike Jennessee, and David Verinder** (in Florida) -- were responsible for reviewing and signing cost reports.  At the corporate level **Donna Whitmer and Doug Wolfe** with the corporate reimbursement manager **Don Hemphill would have signed some cost reports**.  All of these individuals were aware of the Stark and AKS violations but signed the certifications so as to receive Medicare reimbursement.  TAC ¶¶ 152-154, 258-261, 305-308, 326-329, 341-344,362-364.

The Complaint spells out in detail the extensive involvement of former CEO **David White** and former COO **Sandra McRee** in the illegal conduct.  **David White** is a former Group President for Columbia HCA, heading what was known as the Atlantic Group during the government's investigation of Columbia.  **David White** knowingly and recklessly turned a blind eye to compliance problems within IASIS as well as reports that patients were undergoing procedures without proper medical necessity.  **Sandra McRee** is the former Chief Operating Officer of IASIS and had also been at Columbia HCA.  **Sandra McRee** was responsible for many of the violations of law set forth herein including payments to **Drs. Pollack and Barrett**, the land purchase from **Drs. Rao and Williams**, and the cardiac cath lab deal with **Dr. Siegel** and Advanced Cardiac Specialists.  TAC ¶¶ 51-54.

Particularized detail is also pled about **Frazier**'s role at Iasis.  Frazier raised initial concerns as early as 2001 with the Board of Directors Compliance Committee (members: **Jeff Lightcap and Clayton McWhorter**) in **Clay McWhorter**'s office in Nashville, Tennessee including ongoing Stark violations, medically unnecessary procedures and billing violations. **McWhorter** expressed support for compliance and brought up some issues at the September 2001 Board of Directors meeting but **White** disagreed.  A few days later **McWhorter** resigned from the Board and from the Compliance Committee.  The vacancies on the Board Compliance Committee were not filled and that Committee ceased to function.   TAC ¶¶ 41-42.  **White** ordered **Frazier** not to comment about compliance concerns in meetings and not to talk to **McWhorter** or anyone from **Joseph, Littlejohn and Levy (JL&L),** the initial investors in IASIS.  TAC ¶¶ 43, 48.  Frazier repeatedly attempted to audit physician relationships and radiology and laboratory billing, and advocated for clinical reviewers, like **Bill Hammock**, to review patient files for medical necessity.  TAC ¶¶ 44-48.  Employees at IASIS who cared deeply about running a compliant company but could not do so included **Richard Algood, Art Bell, David Verinder, Dolores Horvath, Sammy Cantrell, Roy Matthews, Alan Chapman, and Lelan Daines**.  TAC ¶ 45.

> 2.     **The Complaint Avers "What" and "When" and "Where" Of The Schemes**

**Dr. Richard Heuser** had three contracts with Iasis.  The first was a directorship contract for "Interventional Cardiology Services,"  effective as of December 1, 1999 paid Dr. Heuser $202,500 per year for 90 hours per month ($185.70 per hour).  The 1999 Agreement also allowed for an expense allowance of $42,250 and reimbursement of up to $40,000 annually for travel- and publication-related expenses.  The second agreement between Dr. Heuser and St Luke's was a directorship contract for the Heart Cath and Lab.  That agreement, which was

effective as of June 1, 2000, paid Dr. Heuser $75,000 a year for 33 hours a month

($187.50/hour).  The final agreement between Dr. Heuser and St Luke's, which was effective as

of February 3, 2000 paid Dr. Heuser $100,000 per year for 17 hours per month of consulting on

"Cardiology Equipment and Supply Purchasing" ($500/hour).  The Complaint is also specific

about how much was paid to Dr. Heuser: "In total, IASIS agreed to pay, and did pay Dr. Heuser

up to $459,750 per year for services allegedly totaling 140 hours per month into 2004.  In

actuality, Dr. Heuser provided practically no services to St Luke's and certainly substantially less

than 140 hours of service each month.  At the same time Dr. Heuser was committed to spend 140

hours per month, or approximately 35 *hours a week* for consulting, Dr. Heuser was also running

a busy medical practice and providing consulting services to at least seven other companies.

St. Luke's also paid $45,000 for half of the salary and benefits for one of Dr. Heuser's

employees.  TAC ¶¶ 135-144.

 **Dr. Robert Siegel and Advanced Cardiac Specialists:  Iasis and ACS ne**gotiated

agreements in 2002, 2003, 2004 and 2005.  Under these agreements, ACS owned the license to

the cath lab and assessed a fee from Mesa for each procedure performed based on a negotiated

fee schedule.  Under this arrangement, the hospital was essentially leasing the cath lab from ACS

and paying a fee to ACS for the reimbursement it received from billing Medicare for the

technical component fee for each service performed by ACS.  Before completing the contract,

IASIS and ACS agreed to obtain a third party appraisal of the fair market value for the cath lab

services.  That appraisal valued the fee schedule significantly below the rates that ACS

demanded.  Despite this appraisal, White insisted that the agreement be finalized at the higher

price demanded by ACS, providing the physician group with a substantial "above fair market"

financial benefit.  As a result, starting in 2002, IASIS, through Mesa, paid ACS greater than fair

market rates for cardiac cath procedures.  The Complaint also alleges that the marginal value of the cath lab lease to Dr. Siegel may be even greater because ACS physicians have a practice of acquiring medical devices below fair market value by purchasing them on the black market including purchases on EBay.  TAC ¶¶  160-180.

IASIS managers were well aware that the margins were below those earned by the hospital on other physician and tolerated these lower margins because (1) Dr. Siegel and other physicians in his practice including e.g., Dr. Charles Jost, Dr. Mark Eckhauser, Dr, Garg, and Dr. Rahul Molhotra, referred, and performed services on a very high volume of patients including federally insured, (2) ACS physicians performed services at a high intensity and beyond medical necessity including "unbundling" stent procedures, aggressive use of pacemakers and other implantable devices, aggressive use of stents, and exceedingly high numbers of intraortic balloon pumps, and, (2) as promised, ACS physicians referred patients to Mesa for 400 open heart surgeries.  McRee was quite explicit in saying that she did not care about lost margin on the cath procedures to ACS because what she wanted was the revenue from the referred open heart surgeries.  TAC ¶¶ 170-179.  ACS imposed no controls on ACS's billing of Medicare for its professional fees and did not require ACS to code its claims to reflect the reduced payment for services provided in a hospital based clinic.  TAC ¶ 180.  ACS had a similar financial relationship at St. Luke's Hospital with a fee schedule for cath lab services above fair market value and St. Luke's tolerated that loss on margin to induce the high number of referrals from ACS.  TAC ¶ 181.

The Complaint also provides extensive additional detail to support the allegations that Iasis knowingly submitted claims for unnecessary interventional cardiology procedures performed by ACS physicians including Dr. Siegel.  IASIS managers analyzed documents

showing that ACS re-admitted patients to the hospital up to four times more frequently than the national average and that ACS admitted patients for a high number of one day stays.  Additional indicia of overutilization and unnecessary procedures can be inferred from the volume of open heart bypass surgeries at Mesa and the volume of use of intraortic balloon pumps, numbers which far exceeds what one would expect from a small suburban/rural osteopathic hospital.  TAC ¶¶ 185-255.

Physicians, managers and staff reported their concerns to top IASIS managers including, Chief Nursing Officer **Cathy Story** and Market President **Dolores Horvath** about unnecessary medical procedures, an inordinately high number of placement of intraortic balloon pumps with one day stays, and unbundling of stent procedures.  According to published studies, use of the intraortic balloon pump should be in the range of 5-8% for most cardiologists.  Witnesses noted that Dr. Siegel appeared to use balloon pumps on approximately fifty percent of his patients putting many patients in the hospital and at risk.  Medical staff at St. Luke's including Dr. **Mark Kartub and** Dr. Kaplan worked with then-CEO of St Luke's Bob Luther to attempt to gather data to assess the incidence of Dr. Siegel's use of intraortic balloon pumps but were blocked by Iasis managers.  *Id.*

IASIS also submitted claims where Dr. Siegel and the ACS physicians had "unbundled" stenting procedures.  ACS physicians would determine that they would be inserting stents on three vessels, for example, and would schedule patients to return to an IASIS hospital every two weeks to do each vessel separately imposing risks on the patients.   Some former co workers noted that Siegel produced very high revenues for the practice described Siegel as "very dangerous and unethical."  IASIS managers including White and McRee were acutely aware that ACS performed a high rate of intensive procedures and had high rates of readmissions and high

rates of one day stays.  TAC ¶¶ 199-207.  IASIS closely tracked referrals from ACS, including

by payor code, and calibrated its compensation agreements to allow ACS to earn a significantly

higher margin by comparison with other non ACS physicians.  TAC ¶¶ 190-191.

Another cardiac surgeon who was recruited to Mesa General by IASIS manager **Jim**

**McKinney** to perform open heart bypass surgeries noted that Dr. Siegel's practices were well

known and that he would do stress tests on the patients in remote areas and then ship them by

helicopter to Mesa.  The physicians from ACS would do very aggressive interventions and do as

many as twenty five heart catheters in a twenty four hour period, a tremendous amount of

volume.  TAC ¶¶ 205-207.  Additional indicia of reliability of these allegations derives from

specific and concrete  examples of unnecessary procedures prescribed for or performed on

patients by ACS at Mesa General for **Patients A-F**. TAC ¶¶ 208-252.  These examples are

representative of a pattern and practice of unnecessary procedures performed by ACS physicians

on patients insured by both federal and non-federal payors.[2]

---

[2] *See* TAC ¶¶ 208-252 Patient A (prescribed a medically unnecessary open heart surgery on the basis of false representations and placed on intraortic balloon pump at Mesa without proper consent; lack of medical necessity confirmed by three separate cardiologist who reviewed medical records and angiograms including cardiologists at top Arizona heart hospital); Patient B (Medicare beneficiary died from sepsis after unnecessary bypass surgery and poor post surgical care at Mesa; Patient B's family was told by the physicians at Banner Baywood that Patient B should not have had to die from sepsis if Mesa had handled his care properly); Patient C (Medicare beneficiary received heart surgery at Mesa from ACS physicians and Dr. Fang; understands to be unnecessary and experienced abusive practice of unbundled insertion of stents prior to surgery; aware of another Mesa patient who, similarly, had five stents put in by Dr. Siegel and all had been put in at different times at Mesa); Patient D (unnecessary intraortic balloon pump at St Luke's by Dr. Garg and lost his leg to ischemia; also put on unnecessary intraortic balloon pump by Dr. Mulhotra); Patient E (Tricare and Medicare beneficiary who escaped unnecessary procedures implanting pacemaker while hospitalized at Mesa for rehabilitation from spinal surgery; internist from ACS named Dr. Mohammed Arful Islam attempted to coerce Patient E into pacemaker and told on release by Dr. Breed at Banner Heart who he did not need a pacemaker); Patient F (Medicare beneficiary who received an unnecessary carotid artery stent and died from clot at stent location); Patient G (unnecessary septal occlusion device implanted into him by Dr. Siegel at age 43 at St. Luke's).

**Mesa Sub Leases:** The Complaint also provides very concrete details about the lease terms for Dr. Kohring, Dr. Herro and Dr. Letellier.  From June 1, 1998 to May 31, 2003, Iasis leased space for $28.41 a square foot and then sub-leased the space to Dr. Kohring for $12.41 a square foot.  Because Dr. Kohring sub-leases 3996 square feet, the hospital subsidized Dr. Kohring's rent by $64,000 per year over the five year period for a total rent subsidy of nearly $320,000. Similarly, from July 1, 1999, to June 30, 2004, Iasis sub-leased 2,088 square feet of space to Dr. Mark Lettelier for $12.41 a square foot.  Iasis paid $28.41 per square foot for this space and subsidized Dr. Lettelier by $34,000 per year or more than $170,000 over the five years.  Dr. Ralph Herro also received a similar rental subsidy of $16 per square foot for a 1,080 square foot space, totaling $17,280 per year.  TAC ¶¶ 335-340.

**Texas Physicians**:  Dr. Rao had a medical directorship contract with Iasis but did not perform the hours required under the contract.  IASIS continued to pay Dr. Rao because of Dr. Rao's referrals of patients for interventional cardiology procedures.  In September 2002, IASIS purchased land owned by Dr. Rao and Dr. Kirk Williams for the construction of the Greater Southeast Medical Center at greater than fair market value price. IASIS chose the Rao/Williams land over land being offered by the City of Nederland which would have been free, would have offered easy access and would have provided some tax abatement and another site that would have cost significantly less as well.  White and McRee were personally involved in the land purchase.  White, McRee and Miller decided to contract with Rao and Williams for the land over the objection of many physicians on medical staff.  TAC ¶¶ 267-276.

IASIS has additional financial arrangements with Dr. Rao.  In 2004, Drs. Rao and Williams bought 5 acres from IASIS for medical office building for $1.14 per square foot.  Dr. Rao owns the land and office buildings immediately adjacent to Southeast Medical Center and

IASIS has tenancies in some of Dr. Rao's office buildings. In September 2005, Drs. Rao and Williams sold 7.028 acres to IASIS (or to Park Place Medical Center) for $8 per square foot ($2.4 million).  These non-fair-market-value exchanges were provided to encourage Dr. Rao's referral of patients. *Id.*  Managers at Texas IASIS hospitals routinely used expense accounts to entertain physicians including on hunting trips, expensive dinners and professional sporting events.  For example, on July 24, 2001, then-CEO of Park Place Medical Center, Mike Miller, paid for dinner for physicians Drs. Rao and Keisz, on July 25, 2001, Mike Miller paid for dinner for Rao and Keisz, on July 27, 2001, Mike Miller paid $527.31 for dinner with Drs. Rao and Keisz and Craig Desmond, and on August 7, 2001 Mike Miller paid for dinner for Dr. Keisz, two other physicians referring to Park Place Medical Center, and Sandra McRee.  TAC ¶ 277.

The Third Amended Complaint also sets forth detailed allegations about unnecessary cardiology procedures performed at Iasis Texas hospitals.  Shortly after Frazier began work at IASIS in early 2000 he learned that there were concerns among IASIS nursing staff and administrators, that Dr. Rao was performing unnecessary cardiology procedures.  Frazier relayed the concerns to then CEO Wayne Gower and CFO John Crawford.  Gower told Frazier that he wanted to "slow play" the situation and not risk losing the revenue that Dr. Rao was generating. Frazier was contacted by then-CEO Mike Miller, who asked "are we going to get in trouble with all of these heart cath procedures being performed?" and facility Risk Manager Debra Nicholson expressed concerns.  Frazier requested that Bill Hammock, an internal auditor, be permitted to conduct a clinical review for medical necessity but was initially forbidden by White.  After significant protest from Frazier, IASIS conducted some review of the rate of "normal" heart catheterizations but not a clinical chart review.  TAC ¶¶279-295.  Frazier received a number of reports from personnel at Park Place that Dr. Keisz was also performing unnecessary

interventional cardiology procedures including experimental procedures for stenting of carotid arteries. ¶¶ 296-302.

The Complaint avers that Drs. Rao and Keisz have read normal diagnostic studies to suggest heart disease (or failed to perform any proper and adequate diagnostic tests) and then performed medically unnecessary cardiac catheterizations even if the patient was asymptomatic and have performed unnecessary bilateral heart catheterizations. Dr. Rao performed five hundred plus interventional procedures per year, a number in excess of what one would expect for any interventional cardiologist working a reasonable schedule.  Dr. Rao often performed procedures on patients who had no blockages and directed other cardiologists to "find something to treat." Dr. Rao would also diagnose "unstable angina" even when the patient had no chest pain. Dr. Rao inserted seven stents in Patient H over a multi-month period that were medically unnecessary under established criteria.  In addition, spacing the insertion of stents over a multi month period is contrary to established medical practice. Patient H subsequently died from an occlusion, a known risk of stenting.  Dr. Rao recommended to another patient who already had seven stents that he needed an additional stent although another local cardiologist told that patient that this was not medically appropriate.  TAC ¶¶ 279-302.  Dr. Keisz was equally excessive in his volume of procedures, averaging 8 to 12 interventional cardiology procedures per day.  The cardiac surgeons at Park Place refused, as a group, to back up Dr. Keisz and wrote to Iasis and Park Place and Mike Miller expressing their concern with Dr. Keisz.  Within weeks, IASIS recruited a different cardiac surgery group rather than stop Dr. Keisz.  Among other incidents, Dr. Keisz performed an unnecessary carotid stent on a patent whose neurological symptoms were properly attributable to a brain tumor.  *Id.*

In Odessa, Texas, Dr. Sudhir Srivastava was recruited by IASIS to "jump start" a cardiovascular program at Odessa Regional Hospital through a substantial sham consulting agreement.  Because Odessa had been primarily a maternity hospital, there was significant concern among staff about the absence of adequate support for a heart program, such as heart qualified ICU capability, physician support staffing, equipment and infrastructure needs.  A heart cath lab was set up in a small temporary building adjacent to the hospital where bloody water from the sink was drained through a water hose on to the grass outside.  In a period of less than three months, Dr. Srivastava performed 85 surgical procedures.  The Quality Control Manager at Odessa reported to Frazier concerns about medical necessity for the procedures, the frequency of patient returns to the operating room, and poor clinical outcomes.  The hospital was ill-equipped and poorly staffed to handle that volume of cardiac surgeries.  TAC ¶¶ 314-318.

IASIS encouraged the reckless performance of open heart surgeries in a hospital facility ill equipped to handle heart patients post-surgery. Frazier advocated for a clinical chart review of these procedures.  Bill Hammock found clinical concerns in 25% of the cases he reviewed. Frazier continued to advocate for an outside review.  A small town doctor in Indiana chosen by McRee reviewed some of the charts and concluded that some of the charts did not meet the criteria for surgery.  Those findings were never reported or otherwise disclosed and no repayments were made to payors from these cases by IASIS.  A source for Dr. Srivastava's surgeries was Dr Gatasali, an interventional cardiologist, who had been excluded from Blue Cross/Blue Shield because of overutilization.  Iasis new about Dr. Gatasali's overutilization and that approximately 40% of Gatasali's patients are Medicare beneficiaries.  Approximately 30-50% of referrals to Dr. Srivastava are from Dr. Gatasali.  TAC ¶¶ 318-325.

**Florida Physicians:**  **A**llegations about Dr. Pollack are quite simple and yet detailed.  To induce Dr. Pollack to refer a substantial number of patients to Palms of Pasadena, the hospital paid him up to $165,000 per year as a "Medical Director" and consultant for the hospital's ostomy surgery program.  While in some instances Dr. Pollack submitted time sheets which purport to support these payments, Dr. Pollack actually provided few directorship services.  Time sheets "documenting" the services provided by Dr. Pollack were submitted even during the two months that Dr. Pollack was on his boat in the Caribbean.  Iasis knowingly accepted these false time sheets and did not reduce Dr. Pollack's compensation, as required by the agreements, but still paid him his full directorship and consulting fees.  In 2003, Dr. Pollack's malpractice insurance costs increased.  Pollack informed Iasis that unless Palms paid these costs he would move his patients to another hospital.  Iasis entered into a Retention Agreement for an additional amount of over $158,000.   Dr. Pollack brought in $4-$5 million in EBIDITA each year of a total budget of $23 million and he was able to extort any payment he chose from the hospital.   TAC ¶¶349-354.

Despite this compensation, Dr. Pollack met almost none of his obligations under the agreement and IASIS managers including McRee knew he would never meet those obligations.  IASIS also paid for a full time employee to travel over the country to market Dr. Pollack's services at direction of former Palms of Pasadena CEO John Bartlett and with the approval of IASIS corporate managers.  In return for these substantial payments, Pollack referred approximately $20 million in surgical business to Palms of Pasadena each year with approximately 20-30% of his patients insured by Medicare.  TAC ¶¶355-359.

Dr. John Barrett was responsible for approximately $22 million in annual revenue at Palms, at one time approximately one third to one fourth of Palms of Pasadena's EBITDA.

From at least 1999 through 2004, Iasis paid Barrett $5,000 monthly under a medical directorship despite the fact that Barrett was out of the country and on vacation (usually in Switzerland) for three months each year.  The Complaint avers additional payments: free services for Dr. Barrett's patients, transportation to and from the hospital for surgery and rehabilitation, and a free night's stay at the hospital.  IASIS allowed Dr. Barrett his own wing at Palms.  IASIS also compensated Dr. Barrett indirectly through his numerous investment vehicles, including JointCare Centers of America, Televisual Communications, the Florida Knee and Joint Center, and JB Management. Iasis paid $24,000 per year to maintain its membership in JointCare Centers of America, of which Dr. Barrett was the principal owner.  Iasis also routinely purchased videotapes from Dr. Barrett's company Televisual Communications during negotiations over his medical directorship.  One infamous incident occurred in 2002 or 2003 when White directed each Iasis hospital to purchase a series of videotapes produced by Barrett concerning practice management with each set costing approximately $60,000.  Iasis also purchased Dr. Barrett's garamycin bone cement from entities partially owned or controlled by Dr. Barrett at significantly above fair market value.  TAC ¶¶ 369-378.

### 3.  The Complaint Avers "How" The Fraudulent Schemes Occurred.

The Complaint also provides additional detail about how Iasis managers tracked physician referrals including by procedures and ancillary services, by Diagnosis Related Groups (DRGs) and by payor.  The Complaint avers details known only to an insider including that IASIS routinely purchased data from the Data Advantage Corp. tracking the "inpatient performance" by physician and customized to obtain a wide variety of information on patient referrals from physicians by name including the number of cases, the charges or costs per case, the average length of stay per patient, the mortality rate associated with that physician and the

readmission rate for the physician.  Comparison groups for each physician were derived from Medicare data normalized to reflect the physician's patient mix including the severity level of illness.  IASIS's main purpose in reviewing physician-specific data was to determine the volume and value of referral business to be derived from financial arrangements with particular physicians including procedures, admission coding, length of stay, and readmissions, and payor for referred patients.  TAC ¶¶ 125-128.  Each hospital CFO prepared a Monthly Operating Report with data from the top 25 referring physicians and the top 25 DRGs.   The report was used to evaluate profitability of service lines including revenue from referrals (for example, ancillary revenues, admissions and surgeries originating from outpatient procedures like cath procedures).   Each month this data would be reviewed by the Market President, the CEO and CFO of the hospital, the Chief Nurse, the Business Office Director, the Managed Care representative, and Sandra McRee or Derek Morkel.  TAC ¶¶ 129-134.

The Complaint also avers some the fraudulent documents created as part of the schemes including Dr. Heuser's false "Consulting Activity Logs" and false time records being created in Texas (Rao) and Florida (Barrett and Pollack).  David White often expressed to Frazier that one would not want a physician actually involved in managing hospitals and that the purpose of directorship contracts was simply to obtain referrals.  TAC ¶ 145.  The Complaint also avers the fraudulent cost report certifications.  TAC ¶¶ 152-154, 258-261, 305-308, 326-329, 341-344,362-364.

## C.    There is Reliable Indicia That False Claims Were Submitted to Federal Payors.

In addition to the particularized detail, the allegations also provide "reliable indicia" that Iasis submitted claims for the referrals generated through illegal financial relationships, and claims for unnecessary procedures, to federal payors.  Reliable indicia to support the inference

that false claims were submitted include the following:  Relator's insider status as Chief Compliance Officer and first hand knowledge that Iasis hospitals submitted claims for referrals generated by physicians identified in the Complaint (TAC ¶¶ 33-45); numerous statements by Iasis managers and staff identified in the Complaint that the very purpose of the referral schemes was to generate revenue including from federal payors; Iasis' careful monitoring and analysis on a weekly and monthly basis of physician referral patterns and reimbursement by federal payors and Iasis' analysis and purchase of data concerning each individual physicians from Data Advantage Corporation (which purchases its data about referrals, admissions, revenue, volume from Medicare) (TAC ¶¶ 125-134); and the knowingly false certifications on Medicare cost reports signed by facility CFOs and CEOs including Gr**eg Wojtal, George Horner and John Gallagher (in Arizona), Mike Taylor and Bernard Leger (in Texas) and Bill Masterson, Mike Jennessee, and David Verinder** (in Florida).  TAC ¶¶ 152-154, 258-261, 305-308, 326-329, 341-344,362-364.

The Complaint also avers in detail data from Medicare that demonstrates Medicare paid for claims submitted by Mesa General to Medicare for intraortic balloon pumps implanted by ACS physicians (TAC ¶¶ 192-207); evidence that claims were submitted to federal payors for Patients B, C, and E (TAC ¶¶215-244); and evidence that Iasis had previously reimbursed Medicare for patients of Dr. Keisz on whom he performed experimental procedures (TAC ¶ 269).  The Medicare data for Mesa General show an extremely high number of claims or intraortic balloon pumps by Mesa.  During that period, ACS was referring almost 93% of the total business for Mesa.   Comparing the rate of placements of balloon pumps for those in a **Nationwide Ranking** of hospitals with 150 or less beds, including heart hospitals, Siegel/ACS and Mesa place in the following rankings.

-25-

**YEAR  RANK**

| | |
|---|---|
| 2003 | 14th (Phoenix Memorial, the hospital in which Siegel practiced for part of the year was ranked #1) |
| 2004 | 1st |
| 2005 | 1st |
| 2006 | 3rd |
| 2007 | 2nd |

The rate of implantation of Intra-Aortic Balloon Pumps ("IABPs" or "balloon pumps") at Mesa between 2004 and 2007 in Medicare data is staggering.  More balloon pumps were implanted by ACS at Mesa than any other hospital in Arizona for 2004, 2005, 2006, and 2007.   Mesa is not a heart hospital or a teaching facility, yet the volume of balloon pumps implanted exceeds those of the larger, more specialized facilities.  TAC ¶¶ 192-197.  Moreover, it is well known that the payor mix in states like Florida and Arizona favors Medicare and in poor areas like Mesa and Beaumont favors Medicaid.  Accordingly, there is no serious question that Iasis submitted claims to federal programs from the physicians identified in the Complaint.

**D.      The Particularized Detail and Reliable Indicia Pled in the Complaint Pass Muster.**

The particularized detail of the Complaint describing the inducements offered to physicians for referrals over a number of years; the weekly and monthly analysis conducted by Iasis of these physicians' referrals and federal payor reimbursement; the Medicare data on balloon pumps at Mesa; Relator's status as a corporate insider; and the pleading of the individual false claims, that reliably support the inference that, not only did Iasis enter into illegal physician relationships to obtain referrals of federally insured patients, but that it also submitted claims for those patients to Medicare and other federal programs.  By comparison, in *Grubbs* itself, the Fifth Circuit upheld a Complaint alleging a fraudulent scheme by several physicians averred the who, what, where and when the Relator learned of the fraud and some specifics about the services that were provided and that logically would have resulted in the submission of false

claims. 565 F.3d at 192. Sufficient detail was presented even though the Complaint did not

plead detail about bills submitted to Medicare. The Fifth Circuit noted "[t]hat fraudulent bills

were presented to the Government is the logical conclusion of the particular allegations." *Id.*[3]

Similarly in U*nited States ex rel. Lusby v. Rolls Royce*, 570 F.3d 849 (7th Cir. 2009), it was

enough that Relator identified specific defects in product and it was not essential for the Relator

to produce the invoices (and accompanying representations) at the outset of the suit." Id. at 853.

The Complaint compares favorably with those pleadings to have survived a Rule 9(b) challenge

under the standards articulated in *Ebeid* and *Grubbs*.

Numerous district court cases are in accord. *See, e.g., United States ex rel. Cox v. Smith

& Nephew, Inc.*, 2010 U.S. Dist. LEXIS 1118493, * 33 (W.D. Tenn. Nov. 4, 2010) (citing *Ebeid*

and holding that complaint alleging details of country-of-origin fraud by medical device

company was specific enough because it contained "significant detail, including the contracts

under which the allegedly illicit sales occurred and the items that are allegedly labeled falsely"

even though specific dates of transactions or tracking numbers for falsely designated products

not pled; allegations also credible because Relator was an insider); *United States ex rel. Branch

Consultants LLC v. Allstate Insurance*, 668 F. Supp. 2d 780, 808 (E.D. La. 2009) (pleading

fraudulent insurance arrangement; noting that claims were paid was "reliable indicia" that claims

were presented to the government); *Wagemann v. Doctor's Hospital*, 2010 U.S. Dist. LEXIS

114305 (E.D. La. Oct. 26, 2010) (reliable indicia met by alleging who was involved with

---

[3] Similarly, the Tenth Circuit recently upheld a *qui tam* pleading alleging of fraudulent
concealment and improper disposition of hazardous waste against a Rule 9(b) challenge. *United
States v. Lemmon*, 614 F.3d 1163, 1172 (10th Cir. 2010). The allegations set forth the names of
employees who observed the conduct and those responsible for submitting the false claims
(who), the contracts and regulations breached (what) and payments requested, the dates of
violations and dates of payments requested (when), location of waste disposal (where), and
extensive factual detail regarding how violations occurred. .

submitting false claims within hospital and how claims submission worked and that Relator directed by managers to ignore concerns about fraud);  *United States ex rel. Davis v. Lockheed Martin Corp.*, 2010 US Dist. LEXIS 120730, *18-*19 (N.D. Tex. Nov., 15, 2010) (sufficient indicia that false claims submitted where alleged scheme to increase profits and enough facts to support inference that Lockheed submitted claims to government).

Moreover, it is well established that a pleading alleging illegal financial relationships in violation of Stark and Anti Kickback will satisfy Rule 9b if the complaint pleads (1) the nature of the financial arrangements and inducements with the physicians, (2) that referrals were made, and (3) that false claims were submitted to the United States and need not describe actual claims. Cases decided in the last two years confirm this standard.  *See, e.g. United States ex rel. Underwood v. Genentech, Inc.,* 720 F. Supp. 2d 671, 680 (E.D. Pa. 2010) (upholding Relator's complaint in challenge under Rule 9(b) where alleged gave kickbacks to doctors to prescribe drug for patients and described kickbacks in detail; no need to allege specifics of prescriptions to meet Rule 9b*); United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F.Supp. 2d 20, 26-27 (D.D.C. 2010) (requiring particularity only for circumstances constituting fraud); *United States ex rel. Carter v. Halliburton Co.*, 2009 U.S. Dist. LEXIS 63649, *25 (E.D. Va. July 23, 2009) (requiring only that basic framework, procedures, nature of fraudulent scheme, and financial arrangements and inducements among the parties be pled with specificity; no requirement to list every false claim in pleading); *Smith & Nephew, supra*.[4]

---

[4] A long line of cases decided prior to the appeal in this case also upheld pleadings against Rule 9(b) challenges where the pleading set forth indicia that the allegations are reliably made. *See United States* ex rel. *Thompson v. Columbia/HCA Healthcare Corp.,* 20 F. Supp. 2d 1017, 1049  (S.D. Tex. 1998) (denying Rule 9(b) challenge where complaint alleges "the basic framework, procedures, the nature of the fraudulent scheme, and the financial arrangements and inducements among the parties and the physicians that give rise to Relator's belief that fraud has occurred"); *see also United States ex rel. Fitzgerald v. Novation*, No. 03-1589 (N.D. Tex. Sept.

Although here Relator has pled representative examples of Medicare and Tricare claims, pleading details about each false claim for illegally-referred patients is not necessary to comply with Rule 9(b) generally and is especially not needed in cases alleging violations of Stark and Anti Kickback.  Defendants are on notice that the basis of the alleged fraud in each claim is the relationship between defendants, not anything unique to a particular claim."  *See United States ex rel. Repko v. Guthrie Clinic*, 557 F. Supp. 2d 522, 527 (M.D. Pa. 2008); *see also United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, 2006 U.S. Dist. LEXIS 65268, *20 (W.D. Pa. Sept. 13, 2006) (rejecting argument that would require Relators to provide claim examples because falsity of the instant claims does not turn on anything unique to any individual claim or that would be revealed from an examination of any claim; the claims are false because of the improper financial arrangements).

Sufficient detail is also provided of the who, what, where and of the fraudulent certifications of compliance with Stark and Anti Kickback by providing the names of all those Iasis managers who would have signed the false certifications of compliance of the annual

17, 2008) (denying motion to dismiss on Rule 9(b) grounds where Relator pled "basic framework" of fraudulent scheme including the parties, contents, time, place and procedures" and noting that Relator is entitled to discovery before the Court will require her to list each false claim, its dates, and the exact amount the government overpaid); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 238 F. Supp. 2d 258, 268 (D.D.C. 2002) (rejecting motion to dismiss where complaint alleged that doctors were paid not for medical directorship duties but on a per-patient basis because crucial element "that false claims were submitted" alleged even though specific examples of claims not pled); *United States ex rel. Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347, 355-56 (D. Mass. 1999) (rejecting motion to dismiss allegations that defendant paid above fair market value for lease to induce patient referrals in violation of Anti Kickback without reference to specific claims for services); *United States ex rel. Bidani v. Lewis*, 1998 US Dist. LEXIS 20647, at *29 (N.D. Ill. Dec. 29, 1998) (upholding complaint against Rule 9(b) challenge where Relator alleged participants in kickback scheme so that defendant had fair notice); *United States ex rel. Pogue v. American Healthcorp, Inc.*, 977 F. Supp. 1329, 1333 (M.D. Tenn. 1997) (denying motion to dismiss where complaint alleged that hospital participated in a systematic, fraud scheme even though specific dates or employees were not alleged).

Medicare cost reports(TAC ¶¶ 152-154, 258-261, 305-308, 326-329, 341-344,362-364. *See*

*United States ex rel. Sharp v. Consol. Med. Transport, Inc.*, 2001 WL 1035720, at*11 (N.D. Ill.

Sept. 4, 2001) (noting the allegation that "hospitals concealed the kickback arrangement when

they falsely certified full compliance with the applicable Medicare statutes" triggers FCA

liability).

Finally, Relator is precisely the type of "insider" whose allegation has the "indicia of

reliability" that such claims were submitted to federal payors.  As Vice President of Ethics and

Business Practices and Chief Compliance Officer from November 1999 to April 2003, Mr.

Frazier was one of the very top managers of Iasis reporting directly to CEO David White and the

Compliance Committee of the Iasis Board.  Relator's responsibilities engaged him in speaking

regularly with Iasis employees at all levels from hospital CEOs, CFOs, and division/market

managers to nurses, technicians, billing clerks, coders and auditors.  Dozens of Iasis employees

shared their concerns about lack of medical necessity for procedures, improper relationships

between the hospitals and referring physicians, and many others concerns about lack of quality,

overutilization, improper admission of patients, and overbilling.  *Compare United States ex rel.*

*Lockhart v. Gen. Dynamics*, 2007 U.S. Dist. LEXIS 95382, *16-*19 (N.D. Fla. Jan. 3, 2007)

(noting that it would be "ironic" if an insider with "reliable knowledge" of fraud on the federal

government was not permitted to bring an action because did not plead details about the

submitted claims).

## III.     Iasis Arguments for Dismissal Are Wholly Without Merit.

Each of Iasis' arguments for dismissal of this case does not withstand scrutiny.

1. Iasis is quite obviously wrong to argue that Relator does not allege facts to support the

allegations that medically unnecessary cardiology procedures have been knowingly performed at its hospitals and that Iasis sought reimbursement for those procedures.  Opposition at 11-17. The Complaint not only alleges extensive detail about what Iasis knew about unnecessary procedures in Texas and Arizona but also set forth the experiences of nine patients (Patients A-H) in vivid detail to show how the fraudulent schemes to coerce, mislead and deceive patients to obtain consent to unnecessary surgeries or other cardiac procedures, occurred  TAC ¶¶ 208-252. Each of the alleged examples are alleged to be, just that, examples of a pattern or practice of high volume interventions, frequent procedures with high rates of use of stents, angioplasties, devices, balloon pumps and bypass surgeries.  TAC ¶¶ 252, 291-292.  Additional indicia that the services were not simply questionable but actually medically unnecessary include the utilization data obtained from Medicare by Iasis and analyzed for each physician, the Medicare data set forth in the Complaint for extremely high use of intraortic balloon pumps at Mesa General by ACS physicians, and the reports from members of the medical staff both named like for example, Drs. Kartub and Conflitti and also those additional physicians who have been interviewed by Relator and Relator's counsel that ACS physicians placed an inordinately high number of unnecessary intraortic balloon pumps and other cardiac devices and referred patients to open heart bypass surgery without medical necessity, and for both ACS physicians and Drs. Rao and Keisz that they performed angioplasties and stenting without necessity and "unbundled" stenting procedures by inserting one stent at a time over a matter of weeks or months.  TAC ¶¶ 160-333.

None of the reports from witnesses or the medical records reviewed suggest simply differences of opinion.  What is alleged is a pattern of making fraudulent misrepresentation of the patient's condition as a means of securing their consent to an unnecessary cardiac procedure solely for revenue purposes.  Numerous physicians and medical staff sought to sound the alarm

to Iasis managers including David White, Sandra McRee, Mike Miller, Mike Potter, and Dolores

Horvath.  Iasis managers including most significantly Sandra McRee and David White persisted

in their determination to block efforts at peer review or utilization review over ACS physicians

in Arizona, and Drs. Rao, Keisz and Srivastava in Texas.  TAC ¶¶ 189, 192, 202-204, 300-302,

320 (describing reports made to Cathy Story and Dolores Horvath and efforts by McRee to

prevent peer review measures); ¶¶ 280-301 (describing concerns over Drs. Rao and Keisz'

medically unnecessary procedures and response of Iasis to terminate surgeons group and to

prevent peer review).

Iasis' suggestion that there is no way to judge whether or not the services met medical

indication criteria is absurd.  Motion at 11-17.  These are not issues of professional judgment

and to suggest as much is simply to extend the cavalier attitude taken by Iasis with patients into

this litigation.  There are well accepted medical standards for cardiology procedures for judging

what is and what not medically necessary.  One point of reference is the American College of

Cardiology and American Heart Association Guidelines concerning the appropriateness

indicators for angioplasty and stenting.  Most studies appear to look to the requirement that there

be at least a 50% occlusion in a vessel to justify treatment through angioplasty and/or stenting.

*See* "Trends in Outcomes After Percutaneous Coronary Intervention for Chronic Total

Occlusions A 25-Year Experience From the Mayo Clinic,"  Abhiram Prasad, MD, *et al., Journal

of the American College of Cardiology*, Dec. 20, 2006 ("The number of diseased coronary

arteries was defined by at least one coronary artery with 70% stenosis and 50% stenosis in the

others."); "Changing outcomes in percutaneous coronary interventions: A study of 34,752

procedures in Northern New England, 1990 to 1997", *Journal of the American College of*

*Cardiology*, Paul D. McGrath, et al., May 10, 1999 ("Clinical success was defined as at least one lesion dilated to <50% residual stenosis and no adverse outcomes.")

Accordingly, a patient like Patient A who had an occlusion at most at 30% in one vessel would not normally be a candidate for angioplasty or stenting much less the extreme conduct of putting him on a balloon pump and scheduling him for open bypass surgery.  That is why all of the cardiologists, included those at the Arizona Heart Hospital, who reviewed his records shortly after his release from Mesa, including his angiogram, were shocked that Mesa and ACS physicians, nurses and staff had attempted to push him into open bypass surgery.  TAC ¶¶ 209-214.  Similarly, Iasis and ACS physicians violated well accepted standards for use of intra-aortic balloon pump (IABP) with Patients A and D.  IABPs are appropriately reserved only for patients at the extreme end of the spectrum of hemodynamic compromise, such as those patients with extremely depressed LV function and patients in cardiogenic shock.  Patient D's records were reviewed by respected cardiologists from outside of Arizona who explained he had lost his leg to ischemia when an IABP was inserted not for medical necessity but as a way of increasing revenues.  TAC ¶¶ 232-237.  So too, there was nothing debatable about the knowing decision to "unbundle" the stents for Patients C and H and subject them to multiple angioplasties and multiple rounds of anesthesia each time inserting a guide wire through their leg and a stent in each vessel.[5]  Accepted practice would either have the patient have multiple stents inserted at once or recommend for bypass if the number of stents is excessive.[6]

---

[5] Iasis' argument (Motion at 14) that Relator does not allege why unbundling stents if fraudulent is simply not true.  TAC ¶ 199.

[6] The two cases cited by Iasis where pleadings were rejected as inadequate to support an inference that medically unnecessary procedures were performed and claims submitted, are both inapposite.  In neither *United States ex rel Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997) nor *United States ex rel. Serrano v. Oaks Diagnostics Inc*., 568 F. Supp.

For these reasons, Iasis' reliance on the decision in *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1032 (D. Nev. 2006) is completely unavailing.  Motion at 11-12.  The allegations in this case concern fraud and not simply a dispute over medical treatment.  The question presented in this case is whether or not the services rendered to the patient met well accepted criteria for medical necessity.  The allegations are simple and susceptible of objective proof.  Patient A did not need a stent much less an IABP and bypass surgery.  Patient B (who died) and Patient C allege they did not need bypass surgery.   Patient D did not need an IABP.  Patient E did not need a pacemaker.  Patient F did not need a carotid stent.  Patient G did not need a septal occlusion device.  Patient H did not need seven stents inserted one at a time (unbundled).

2.   So too, Iasis is simply wrong in arguing that all that Relator alleges is that the medical care that was provided was substandard.  Here, what is alleged is that the "care" was not simply substandard but that it was not necessary under any well accepted medical standards.  This case certainly does not involve "second guessing the real-time medical decisions of surgeons confronted with patients presenting with life-threatening cardiac conditions."  Motion at 17.  This case involves fraud and deceit and coercing patients to implant devices or have surgeries they did not need. [7]  There is substantial support in the case law that allegations that services were provided in contravention of medical necessity, states a claim under the False Claims Act.  See The Complaint also compares favorably with other *qui tam* pleadings alleging that services were provided without medical necessity that have been upheld against Rule 9(b) challenges.  *See, e.g.,  United States ex rel. Riley v. St. Luke's Episcopal Hosp*., 355 F.3d 370, 376-77 (5th

2d 1136 (C.D. Cal. 2008) did the allegations set forth the specificity alleged in the Complaint here.

[7] Iasis' suggestion that Relator should have to name the patients in the pleading or provide the precise dates of their treatment is troubling.  Motion at 12 n.1.  This is a matter for discovery and not appropriate for pleading in a public document.

Cir. 2004); *United States v. Gwinn*, 2008 U.S. Dist. LEXIS 26361, *44-46 (S.D. W. Va. Mar. 31, 2008) (allegations that defendants created false Medicare documents by answering the six questions regarding medical necessity according to a standard formula and without regard to individual beneficiary's condition" sufficient to survive 9(b)); U*nited States v. Gericare Med. Supply, Inc.*, 2000 U.S. Dist. LEXIS 19661, *20-27 (S.D. Ala. Dec. 11, 2000) ("[D]efendants argue that the complaint fails to provide sufficient information concerning each patient and any documentation of medical necessity submitted to Medicare in connection with each claim. Again, however, the defendants confuse the information useful to defend a case at trial with that needed to satisfy the pleading requirements of Rule 9(b).")

In any event, even if the Complaint is read to allege that Iasis provided federally insured patients with substandard care, these allegations also could state a claim under the FCA and here could survive a 9(b) challenge.  *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc*., 2007 U.S. Dist. LEXIS 19274, *9-10 (C.D. Ill. Mar. 2, 2007) (denying 9(b) motion where "[t]he relators identif[ied] supervisors who directed others to falsify patients' records, and some of the patients whose records were falsified;" alleged a cover up of grossly substandard care and/or request Medicare and/or Medicaid payments for medication and services not provided."); *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000) (denying motion to dismiss where government could sufficiently plead that "patients were not provided the quality of care which promotes the maintenance and the enhancement of the quality of life."); *United States ex rel Aranda v. Community Psychiatric Centers of Oklahoma, Inc.*, 945 F. Supp. 1485, 1488 (W.D. Oklahoma 1996) ("a problem of measurement should not pose a bar to pursuing an FCA claim against a provider of substandard health care services").

3.   Iasis is also wrong to suggest that Relator does not allege that Iasis sought federal reimbursement for medically unnecessary treatments.  Motion at 20-21.  As set forth *supra*, numerous reliable indicia support the reasonable inference that Iasis sought reimbursement from federal payors for medically unnecessary services performed by ACS physicians and by the Texas physicians.  Moreover, Iasis is simply wrong to attack the Medicare data set forth in the Complaint as a mere "statistical analysis."  Motion at 19-20.  The actual claims paid data from Medicare claims submitted by Mesa for insertion of IABPs during the time that ACS physicians were responsible for a large percentage of admissions at Mesa.  This is direct evidence of Medicare claims paid to Mesa for ACS referrals.[8]  Moreover, that Iasis repaid Medicare for some of Dr. Keisz's unnecessary procedures, that the patient charts reviewed by Bill Hammock for the surgeries in Odessa up to 25% showed unnecessary procedures, and that claims were submitted to Medicare and Tricare for Patients B, C. and E provides additional indicia that Iasis submitted claims to federal payors for unnecessary procedures.  Taken as a whole, the allegations of the Complaint provide sufficient indicia that Iasis not only permitted unnecessary procedures to be performed in its hospital but also submitted claims for these procedures.[9]

---

[8] Iasis' suggestion that Dr. Siegel is sought out for his expertise in balloon pumps (Motion at 20 & n.5) is contradicted by the evidence and not plausible.  Cardiac patients in Arizona have access to excellent cardiac care at other hospitals in the region.  What Relator describes here is a pattern of what one of Dr. Siegel's former partners called "dangerous and unethical behavior" of lying to patients about their conditions and placing them on IABPs as a means of staging them for bypass surgeries.  Iasis' argument that Mesa General was transformed practically overnight in 2004 from a small osteopathic hospital to a center of cardiac excellence implanting more balloon pumps than anyone else in the region is not plausible.  Statistical data showing unusual patterns of utilization are exactly what the Office of Inspector General uses to identify fraud.

[9] Iasis' charge that the allegations that the procedures were not necessary is not plausible under the Rule 8 standard set forth in *Iqbal*, is without foundation.  Here, there are multiple indicia that claims for unnecessary medical procedures were submitted as was the intended result of the scheme and Rule 8 is easily met.  *See United States ex rel. Compton v. Circle B Enters.*, 2011 U.S. Dist. LEXIS 10949, *15 (M.D. Ga. Feb. 3, 2011) (FCA complaint satisfies the Rule

4.  Iasis is also wrong that the Complaint does not allege sufficient facts to support a reasonable inference that kickbacks and illegal financial remuneration were offered to physicians in exchange for referral of patients or that Iasis sought reimbursement from federal payors for those referrals.  Motion at 22-35.  Each of the referral schemes alleged in the Complaint present classic allegations of kickback and illegal remuneration in exchange for referrals.  For example, Dr. Heuser had consulting contracts totaling over $450,000 a year for which Relator alleges that Heuser performed little or no work.  At the same time, Dr. Heuser referred a large number of patients to St Luke's for which Iasis, in turn, submitted claims and falsely certified Medicare cost reports each year.  Similar allegations are made for Drs. Barrett and Pollack in Florida as well as other above-market arrangements for compensation.  There is no safe harbor for the conduct as alleged.  The Stark and Anti Kickback statutes prohibit doctors from accepting money from hospitals in exchange for referrals rather than paid consultative work as is alleged.  Motion at 25-26.  Likewise, for Dr. Siegel/ACS, numerous kickbacks are alleged most significantly an above fair market value leases for performance of cath lab services at Mesa and St Luke's; for the Mesa sub leases, the Complaint alleges an illegal rent subsidy; for Drs. Srivastava, the Complaint alleges an above fair market value medical directorship and for Drs. Rao and Keisz fraudulent directorship contracts and above market value payments for land purchases.

Iasis's argument that the Complaint fails for not averring details about the submission of claims for patients referred by the physicians receiving kickbacks, also misstates the Ninth Circuit pleading standard.  Motion at 17-18.  Although Relator has actually pled examples of

---

8(a) plausibility and Rule 9(b) particularity standards."); *United States ex rel. Schumann v. Astrazeneca PLC*, 2010 U.S. Dist. LEXIS 109519, *33 (E.D. Pa. Oct. 13, 2010) (kickback claims and best price claims satisfy the pleading requirements of Rules 8(a) and 9(b) and requiring the relator to plead an actual claim would not place defendant in a better position to defend the charges of fraud where pled with sufficient particularity).

false claims, *Ebeid* made crystal clear that Relator need not plead the submission of individual

claims.  Iasis ignores the *Ebeid* standard, and ignores the particularized detail in the Complaint,

and insists that, without the pleading of the claims, the averments fail to pass Rule 9b muster.

Iasis's insistence, however, does not make it true.  Iasis' repeated reliance on case law from other

Circuits (including the Sixth, Seventh and Eleventh) that impose different pleading standards, is

significantly misplaced.  See Motion at 8, 19 (citing Eleventh Circuit's decision in *Clausen*,

*supra*); Motion at 9, 36-37 (citing Northern District of Illinois decision in *Peterson*, supra);

Motion at 9 (citing 7th Circuit decision in *United States ex rel. Garst v. Lockheed-Martin Corp.*,

328 F.3d 374 (2003); Motion at 13 n.2 (citing Southern District of Florida decision in *United*

*States ex rel. Citizens United to Reduce and Block Fed. Fraud, Inc. v. Metro Med. Ctr., Inc.*,

1990 US Dist LEXIS 18339 (Jan. 11, 1990); Motion at 16 (citing Eleventh Circuit decision in

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006); Motion at 38 (citing

Sixth Circuit decision in *United States ex rel. Sanderson v. HCA-The Healthcare Company*, 447

F.3d 873 (2006)).[10]

    4.  Iasis' argument that Relator must plead the specific lines in cost reports that are false by

amount and date and line, is completely contradicted by the case law.  *See United States ex rel.*

*Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007) (where relator

provided a copy of a cost report and billing process, her personal experience provided sufficient

"indicia of reliability" to satisfy 9(b)); *United States v. Solinger*, 457 F. Supp. 2d 743, 755 (W.D.

---

    [10] Iasis's misstatement of the governing law is made most stark by its reliance on *Aflatooni v.*
*Kitsap Physician Services*, 314 F.3d 995 (9th Cir. 2002).  Motion at 17.  *Aflatooni* required the
production of a false claim but only because that decision was rendered at the summary
judgment, and not the pleading, stage.  *Id.* at 1002.  What must be produced at summary
judgment or trial to sustain a burden of proof is far different than what must be pled to ensure
that allegations are reliably and plausibly made with an adequate basis for initiating discovery.

Ky. 2006) (9(b) satisfied where plaintiff "identifies the entities which allegedly committed the fraudulent activity; describes how the fraudulent activity was committed (by signing fraudulent cost report certifications); describes why the certifications were fraudulent (because [Defendant] had a financial relationship with physicians who referred it Medicaid/Medicare patients); describes the time period when the fraudulent activities took place (the years when the cost reports were falsely certified) and identifies the years the named physicians made improper referrals to [defendant]."); *In re Cardiac Devices Qui Tam Litig*., 221 F.R.D. 318, 337 (D. Conn. 2004) (complaints satisfy 'who, what, where, when, and why' requirements of Rule 9(b) where false claim is falsely certified cost reports without listing line items on reports given the specificity of the remaining information that is pled); *United States ex rel. McCready v. Columbia/HCA Healthcare Corp*., 251 F. Supp. 2d 114, 117 (D.D.C. 2003) ("[9(b)] has been fulfilled. The complaint describes the time period during which the allegedly fraudulent acts were perpetrated, the identities of various parties involved, the specific schemes employed, and the inflated reimbursement claims and cost reports that resulted."). Here, Relator has pled adequate facts concerning false certification of cost reports. TAC ¶¶ --.

Finally, if this Court concludes that additional detail is required in the pleading, it should grant leave to amend. Without question, the allegations in this case state a claim under the False Claims Act. Relator has demonstrated that he has additional detail and reliable indicia of the submission of false claims. Accordingly, further amendment would be by no means futile. Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be "freely given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962); <u>*Eminence Capital v. Aspeon, Inc.*</u>, 316 F.3d 1048, 1052 (9th Cir. 2003); <u>*see also*</u> <u>*Lopez v. Smith*</u>, 203 F.3d 1222 (9th Cir. 2000)

(en banc) (emphasizing fifty years of history of applying Rule 15(a) with liberality to facilitate "decisions on the merits").[11]

## **CONCLUSION**

For the foregoing reasons, Relator respectfully requests that this Court deny Defendants' Motion to Dismiss.

PLAINTIFF-RELATOR JERRE FRAZIER

By:    /s/ Colette G. Matzzie

PHILLIPS & COHEN LLP
2000 Massachusetts Avenue NW
Washington, D.C.  20036
Tel: (202) 833-4567
Mary Louise Cohen (D.C. Bar #298299)
Colette G. Matzzie (D.C. Bar #451230)

ASHLEY D. ADAMS PLC (#013732)
8245 North 85th Way

Scottsdale, AZ 85258

(480) 219-1366

---

[11] This Court should grant Relator leave to add David White and Sandra McRee as defendants under Federal Rule of Civil Procedure 15(c)(1)(C).  That rule allows for amendment to add new parties where (i)  the amendment "assert a claim or defense that arose out of the conduct, transaction or occurrence set out . . . in the original pleading"; (ii) the new party received sufficient notice within 120 days after filing of the complaint that "it will not be prejudiced in defending on the merits"; and (iii) the party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." "[R]elation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading. *Krupski v. Costa Crociere S. p. A*., 130 S. Ct. 2485, 2490 (2010). Here, White and McRee have no doubt been aware of the alleged violations against IASIS and knew or should have known that they could be subject to personal liability for IASIS conduct directed by them.