1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF ARIZONA**

8  United States of America, ex. rel. Jerre
   Frazier,

9                                    )
                                     )
10          Plaintiff,               )                2:05-cv-766-RCJ
                                     )
    v.                               )
11                                   )        **ORDER**
                                     )
12  IASIS Healthcare Corporation,    )
                                     )
13          Defendant.               )

14  _____

15          This case arises out of a qui tam action filed by Plaintiff/Qui Tam Relator Jerre Frazier

16  ("Frazier" or "Plaintiff") against Defendant IASIS Healthcare Corporation ("IASIS" or

17  "Defendant") for alleged violations of the False Claims Act.  On June 1, 2011, this Court issued

18  an order dismissing Frazier's Third Amended Complaint ("TAC") with prejudice, but specifically

19  reserved jurisdiction over the collateral issue of sanctions.  (Order (#223) at 16).  Currently

20  before the Court are a Renewed Motion for Sanctions Against Relator Jerre Frazier and His

21  Counsel (#176); a Renewed Motion for In Camera Review of Physician Contract Reviews

22  (#190); a Joint Motion for Attorneys' Fees and Non-Taxable Expenses (#226, 241); and a

23  Motion to Establish Alternative Procedures Under Local Rule 54.2 (#242).  The Court heard

24  oral argument on November 30, 2011.

25                                    **BACKGROUND**

26  **I.    General Facts**

27          Frazier, both a licensed attorney and certified public accountant, was the Chief

28  Compliance Officer and Vice President of Ethics and Business Practices of IASIS Healthcare

    Corporation ("IASIS") from November 1999 through April 2003.  (Frazier Ex. A-1 (#201-1) at

5; Frazier Ex. A-3 (#201-1) at 36).  In April 2003, IASIS CEO David White told Frazier that Frazier's employment would be ending but that he wanted Frazier to provide consulting services to the company on compliance matters for a period of six months to a year to assist with the transition of the new chief compliance officer. (Frazier Ex. A-3 (#201-1) at 42-43, 63). Frazier's consultancy period ended in April 2004.  (Frazier Ex. A-4 (#201-1) at 66).  Frazier contacted the law firm of Phillips & Cohen in October 2004 for possible representation in a qui tam action against IASIS.  (*Id.* at 67).  In March 2005, Frazier's attorneys filed the original, sealed complaint on his behalf.  (*Id.* at 68).  On August 10, 2007, Frazier served IASIS with the unsealed complaint.  (Summons (#47)).

## II.    Frazier's Relationship with IASIS

Defendant contends that Frazier and IASIS had an attorney-client relationship. (Renewed Mot. for Sanctions (Sealed) (#178) at 26).  In support of its position, IASIS cites to the following evidence.  Frank A. Coyle, the Secretary and General Counsel for IASIS, declared the following.  (IASIS Ex. B (#176-1) at 37).  He had been General Counsel since October 1999 and reported directly to the CEO.  (*Id.*).  He was responsible for managing the company's Legal Department and overseeing the company's legal affairs.  (*Id.*).  Frazier reported directly to the CEO and did not report directly to Coyle or the Legal Department.  (*Id.* at 38).  However, Coyle related to Frazier "as an attorney-colleague" and

> Frazier involved himself substantively and consistently in the workings of the Legal Department and legal function of the company, including review of and conferring with in-house legal counsel regarding questions of law and legal advice, performance of legal research and analysis, training of personnel regarding the application of state and federal laws, and the giving and receiving of legal advice regarding the application of state and federal laws to specific factual situations.

(*Id.*).  With Frazier's consent, IASIS "held out Frazier to internal and external audiences as being among the legal counsel employed" by the company.  (*Id.*).  When Frazier joined the company, he was introduced to personnel as "an attorney."  (*Id.*).  The Legal Department identified Frazier on its "Attorney List- Contact Sheet" which the company provided to outside counsel to identify the company's in-house attorneys.  (*Id.* at 39; *see also* IASIS Ex. B-3 (#176-1) at 55).  When talking to outside counsel, Coyle referred to Frazier as one of the "in-house

legal counsel." (IASIS Ex. B (#176-1) at 39).  IASIS paid for Frazier's Texas and Tennessee state bar fees and paid for Frazier's continuing legal education courses.  (*Id.*).  Frazier introduced himself as an attorney in internal meetings and external speaking engagements sponsored by IASIS.  (*Id.* at 39-40).  In written communications, Frazier identified himself as an attorney.  (*Id.* at 40).  In March 2001, Coyle attended a compliance meeting where Frazier had presented documentation that had contained the caption "ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEDGES [sic] DIRECTED BY LEGAL COUNSEL."  (*Id.*).

In April 2003, IASIS and Frazier entered into a Mutual Separation Agreement.  (*Id.* at 41).  The Mutual Separation Agreement stated the following.  (IASIS Ex. B-5 (#176-1) at 61).  "Employee agrees that as a result of Employee's employment with IASIS, Employee has acquired and had access to certain confidential information about IASIS, including but not limited to pricing arrangements with third party payors, business transactions and arrangements with other parties, financial information and trade secrets (the "Confidential Information").  Employee agrees that Employee shall not disclose, discuss, publicize, or reveal any Confidential Information to any third party . . . ."  (*Id.* at 64).  The agreement did not identify any particular projects or assignments for Frazier.  (*See id.* at 61-66).  The agreement required Frazier "to be available for phone calls, consultations, etc. that IASIS may deem necessary."  (*Id.* at 62).

Deborah Bellamy, a contract employee for IASIS who worked for Frazier in 2001, declared the following.  (IASIS Ex. G (#176-1) at 158).  In March 2001, Frazier directed her to prepare a document entitled "Radiology Ordering and Documentation Project." (*Id.* at 158-59).  She worked at Frazier's sole direction in preparing the document and he directed her to add the header,  "Confidential: Attorney-Client and Work Product Privileges; Directed by Legal Counsel," to that document and all documents that she prepared for him.  (*Id.* at 159).  She considered the documents she had prepared for Frazier to be covered by the attorney-client privilege.  (*Id.*).

In contrast, Frazier asserted that he did not act as IASIS's counsel.  (Relator's Response to Renewed Mot. for Sanctions (#201) at 5).  In support of his position, Frazier

declared the following.  (Frazier Ex. A-1 (#201-1) at 5).  He always understood that his communications between IASIS personnel and himself were not privileged because he "served as a compliance officer of the company, and was never a member of, nor reported to, the legal department." (*Id.*).  He "never suggested to any IASIS personnel that [his] interactions with them were privileged, nor did [he] ever form any impression that persons [he] interacted with believed [their] conversations were privileged." (*Id.*).

At Frazier's insistence, IASIS created a reporting structure consistent with the Department of Health and Human Services Office of the Inspector General ("OIG") compliance program guidelines.  (*Id.* at 5-6).  In the 1998 guidelines, the OIG urged hospitals to appoint compliance and audit personnel that were autonomous from the general counsel's office and who reported directly to the hospital's governing body and CEO on a regular basis.  (*Id.*).  When IASIS announced the members of its legal team in August 2000, Frazier chose not to be included. (Frazier Ex. A-3 (#201-1) at 38, 61).  To avoid the conflicts he had witnessed with his former employer, Columbia/HCA, Frazier conditioned his employment at IASIS on the insistence that the Compliance Department would not perform a legal function for the company while he was there, and it did not while he was there.  (*Id.* at 38).  While he was at IASIS, Frazier was never invited to and did not attend any formal or informal meetings of the Legal Department.  (*Id.* at 38-39).  On numerous occasions, he told individuals that their conversations were not privileged because he was a compliance officer who reported to the CEO and was not IASIS's attorney or a member of the Legal Department.  (*Id.* at 39).  Whenever Frazier spoke to non-attorney employees about a particular compliance issue, he told them that their conversations were not privileged.  (*Id.* at 40).  He never told anyone, in writing or orally, that any communication they had with him was privileged or that he was acting as an attorney rather than a compliance officer.  (*Id.* at 41).  He never introduced himself as IASIS's attorney or as someone employed by IASIS in a legal capacity.  (*Id.*).  Although he sometimes mentioned that he had a law degree, it was not his description of his role at IASIS. (*Id.*).  If he learned about a legal issue from an employee, he referred the employee to the Legal Department or its outside lawyers.  (*Id.*).  In response to Bellamy's declaration, Frazier

4

said she was mistaken because he never instructed her to stamp documents attorney-client privileged.  (*Id.* at 41).

Pursuant to the discussions at oral argument, the Court finds that Frazier did not have an attorney-client relationship with IASIS.  Frazier was a compliance officer for IASIS and was not IASIS's attorney.

**III.    Acquisition of the Documents**

With respect to Frazier's acquisition of IASIS's documents, Coyle declared the following.  On November 2, 2007, Frazier filed a motion for in camera review.  (IASIS Ex. B (#176-1) at 42; Docket Sheet Entry #67).  Upon review of that brief, Coyle learned for the first time that, at some point prior to leaving his employment with IASIS, Frazier had "copied and removed approximately 1,300 pages of documents, emails and other IASIS Healthcare-proprietary materials" from the company.  (IASIS Ex. B (#176-1) at 42).  Nobody at the company had authorized Frazier's conduct and Frazier's actions were contrary to the company's code of conduct that stated that employees did not "disclose confidential business information without proper authorization."  (*Id.*).  Frazier never apprised Coyle or anyone else in the Legal Department about his intention to copy and remove such documents from the company notwithstanding Frazier's "numerous discussions with the Legal Department regarding his Mutual Separation Agreement."  (*Id.*).  Frazier did not receive permission to take the documents from anyone in the Legal Department or in management.  (*Id.* at 42-43).

In response, Frazier declared the following.  (Frazier Ex. A-3 (#201-1) at 43).  After he spoke to CEO David White about consulting for the company, Karen Voiles who managed the filing system for the Compliance Department offered to help Frazier gather his personal files to help with the consulting services that White requested Frazier perform.  (*Id.*).  Frazier instructed Voiles "to copy [his] personal files relevant to the current work [he] was doing as Chief Compliance Officer so that [he] could have these documents in order to perform [his] role as a consultant to the company."  (*Id.*).  He never instructed Voiles to copy anyone else's files but his own and to his "knowledge the only files copied were those physically maintained by [him] in the Compliance Department."  (*Id.*).  "Any copies were made in broad daylight

1   during normal business hours in the middle of IASIS' main corporate office with other
2   employees present, without any attempt to hide what was being done." (*Id.*). He instructed
3   Voiles not to give him any document that might be IASIS's sole copy and instructed her not
4   to give him originals. (*Id.*).

5       On at least two separate occasions during his consultancy, IASIS asked Frazier to
6   provide it with information in connection with the due diligence process for a proposed
7   refinancing of IASIS's debt or sale of company stock. (*Id.* at 44). On each of those occasions,
8   Frazier reviewed some of the documents in his possession to refresh his recollection on
9   pertinent matters. (*Id.*).

10      Pursuant to the discussions at oral argument, the Court finds that Frazier stole
11  documents from IASIS without permission and then used those documents against IASIS in
12  the present lawsuit.

13  **IV.     Contacting the Lawyers**

14      Frazier's consultancy ended in April 2004. (Frazier's Ex. A-4 (#201-1) at 66). In
15  October 2004, Frazier believed that IASIS had been defrauding the government and that it
16  was continuing its illegal conduct. (*Id.*). That month he contacted the law firm of Phillips &
17  Cohen for possible representation in a qui tam action against IASIS and for general advice
18  about his rights and obligations in connection with knowledge of the misconduct of his former
19  employer. (*Id.* at 67). Shortly after contacting the firm, he mailed his documents, pursuant to
20  the firm's request, from Houston, Texas, to Phillips & Cohen's offices in Washington, D.C.
21  (*Id.*). Frazier did "not remember being asked to not ship arguably privileged documents." (*Id.*).
22  He did not understand that he was being asked to screen the documents and simply shipped
23  all of the documents. (*Id.*).

24      Mary Louise Cohen, an attorney with Phillips & Cohen, declared the following.
25  (Lawyers' Ex. G (#206-2) at 50). After meeting with Frazier in October 2004, she told him to
26  send documents supporting his claims to the law firm. (*Id.*). She told Frazier not to tell anyone
27  at the law firm anything that might be privileged and not to give the firm any privileged
28  documents. (*Id.* at 51). Frazier sent documents to the firm later that month. (*Id.*).

## V.    Lawyers Conduct

When Cohen received Frazier's documents, she reviewed them as part of the process for drafting the complaint and complying with 31 U.S.C. § 3729(b)(2) of the False Claims Act which required that a qui tam relator provide the government with a written disclosure of material evidence and information in his or her possession relevant to the complaint. (Lawyers' Ex. I (#206-2) at 55; Cohen Decl. (#93-4) at 2).  During the course of this initial review, "it became apparent that there were documents which contained legends such as 'attorney-client privilege' or had information on the header indicating that they might contain privileged or attorney work-product information."  (Cohen Decl. (#93-4) at 2).  Cohen did not further review any such documents.  (*Id.*). She set those documents aside and did not read them.  (*Id.*).  She "reviewed only those documents from which [she] was confident, from a quick glance, that there could be no claim of attorney-client privilege" by IASIS.  (*Id.*).  She nor anyone else at Phillips & Cohen read or relied upon any of the documents that were "segregated."  (*Id.*).  She never read or relied on any document she knew or believed might be subject to a claim of attorney-client privilege.  (*Id.* at 3).

In March 2005, Phillips & Cohen retained Ashley Adams as local counsel after deciding to file Frazier's action in Arizona.  (Lawyers' Ex. J (#206-3) at 3).  After filing the initial complaint under seal, the government requested that counsel move quickly to serve the complaint and the disclosure statement required by 31 U.S.C. § 3730(b)(2).  (*Id.*; *see* Docket Sheet Entry #1-4).  Colette Matzzie, an attorney at Phillips & Cohen, prepared the disclosure. (Lawyers' Ex. J (#206-3) at 1, 3).  As part of the disclosure, Matzzie pulled a few documents relating to the physicians named in the complaint, including IASIS's contracts with Dr. Richard Heuser.  (*Id.* at 3).  In May 2005, Frazier had his first relator interview with the government.  (*Id.* at 4).  During the interview, Matzzie and Adams recognized that two of the documents that had been disclosed to the government were potentially privileged.  (*Id.*). These documents were not the three Physician Contract Reviews ("PCRs").  (*Id.*).  After stopping the meeting and telling the government that there may have been an inadvertent disclosure, the government permitted Matzzie and Adams to remove the documents.  (*Id.*).  After the

7

interview, Matzzie decided to segregate the documents that Frazier had given them that might potentially be subject to a claim of privilege. (*Id.*). Cara Ryan, a paralegal at Phillips & Cohen, went through the documents, segregated potentially privileged ones, and placed the segregated documents, including the documents inadvertently included in the government disclosure, in a box that she had sealed with tape ("Sealed Box"). (*Id.*). Ryan did not do any further work on the IASIS matter. (*Id.*).

In 2006, Phillips & Cohen hired the law firm of Heller Ehrman as co-counsel because they needed a large law firm for document review and litigation support. (*Id.*). Matzzie transferred all of Frazier's documents to Stuart Rennert at Heller Ehrman, including the Sealed Box, and told Rennert that the Sealed Box might contain privileged materials and should not be reviewed or opened. (*Id.*). In June 2006, Matzzie sent a supplemental disclosure to the government which included copies of the three PCRs. (*Id.*).

According to Rennert, when Heller Ehrman received the documents from Phillips & Cohen, the firm placed the boxes in a secure room in their Washington D.C. offices. (Lawyers' Ex. L (#206-3) at 10; Rennert Decl. (#93-2) at 3). On September 4, 2007, Rennert received a letter from IASIS's attorney, Michael McGovern. (Rennert Decl. (#93-2) at 3). McGovern stated that his client had "reason to believe" that Frazier had "misappropriated certain IASIS documents, including documents protected by disclosure by IASIS's attorney-client privilege and the work product doctrine" and demanded "the immediate return of all IASIS documents" in Frazier's possession and all copies thereof. (*Id.* at 9).

On September 13, 2007, Rennert responded that McGovern's letter made "broad and non-specific allegations concerning alleged misappropriation of unspecified documents and their alleged privilege status." (*Id.* at 11). Rennert stated that, in order to meaningly respond, he needed to understand "what documents [McGovern was] referencing in [his] letter, which one (or ones) of these [he claimed were] 'protected from disclosure' by an applicable privilege, why [he] believe[d] this to be the case, and the factual and legal basis of [his] 'reason to believe' that anything ha[d] been misappropriated" from IASIS. (*Id.*).

On September 24, 2007, McGovern responded that Frazier and his attorneys had an

ethical and legal duty not to misappropriate or retain IASIS's property and noted that the duty was heightened when the materials were conspicuously marked confidential, attorney-client privileged and/or work product material. (*Id.* at 13). McGovern stated that he was surprised that Rennert would suggest that neither Frazier nor his counsel were aware of any IASIS documents that were privileged or confidential that were in their possession. (*Id.* at 14). McGovern reiterated his request for IASIS's documents and stated that his client would seek all appropriate avenues of relief, remedies and sanctions, including but not limited to judicial intervention to preserve IASIS's privilege. (*Id.*).

On October 3, 2007, Rennert opened the document boxes containing the non-segregated items. (*Id.* at 4). He conducted a cursory review of the non-segregated materials to determine whether any other materials needed to be included in the segregated document shipment to McGovern. (*Id.*). He found no materials in the non-segregated boxes to include in that shipment. (*Id.*). On October 4, 2007, Rennert unsealed and opened the Sealed Box and prepared to ship the contents to McGovern. (*Id.* at 3). Rennert never read or relied upon the materials contained in the Sealed Box. (*Id.*). On October 5, 2007, Rennert shipped the contents of the Sealed Box to McGovern. (*Id.* at 4, 17-18). On October 18, 2007, McGovern responded that they were concerned that they did not have a complete return of all privileged documents, specifically the three Physician Contract Reviews ("PCRs") that "conspicuously" bore the legend "Legal Memo." (*Id.* at 20-21). McGovern informed Rennert that the Department of Justice ("DOJ") had returned the three PCRs to IASIS on May 15, 2007.[1] (*Id.* at 21).

On November 2, 2007, Frazier's attorneys, including Rennert, filed a Relator's Motion for In Camera Review based on IASIS's intent to assert a privilege over "facially non-privileged audit documents." (*Id.* at 6). That same day, Rennert sent the three PCRs to IASIS and

---

[1] In a letter from the DOJ to IASIS, the DOJ stated that it was enclosing the three PCRs and would delete/destroy any copies it had. (Rennert Decl. (#93-2) at 25). The DOJ stated that, although it was returning, destroying, and sequestering the PCRs, it did "not concede the validity of any factual or legal representations or analyses" made with the PCRs and that the PCRs, in its view, were "not attorney-client privileged communications, and that [it was] not obligated to return them to [IASIS]." (*Id.*).

1  directed that any other copies be destroyed.  (*Id.*).

2      Matzzie declared that, after receiving the September 4, 2007, demand letter from IASIS,
3  she and Rennert "sought and obtained consent from Frazier to return the Sealed Box to
4  IASIS." (Lawyers' Ex. J (#206-3) at 5).

5      Frazier declared that when he met with his lawyers they told him that certain documents
6  contained annotations that "suggested they might arguably be privileged and that, without
7  reading those documents, they had segregated them."  (Frazier's Ex. A-4 (#201-1) at 67).
8  Frazier and his attorneys agreed that those documents would remain segregated and unread
9  while the case was under seal.  (*Id.*).  After the seal was lifted in 2007, Frazier's attorneys
10  advised him that the segregated documents could be returned to IASIS.  (*Id.*).  He accepted
11  that advice and the documents were returned to IASIS.  (*Id.*).

12  **VI.    Physician Contract Reviews ("PCRs")**

13      There are three PCRs at issue.  The first PCR, Bates Nos. 1308-1317, contained an
14  email cover sheet from Bill Stephens, dated December 18, 2002, to a Pam Maher. (Bates No.
15  1308).  The email stated, "Attached please find the results of the contract review performed
16  at Mesa General Hospital the week ending December 13, 2002.  Please work with Operations
17  Counsel and resolve these issues." (*Id.*).  The document was saved as "Legal Memo Mesa."
18  (*Id.*).  The Mesa General Hospital PCR, dated September 30, 2002, had the words "Legal
19  Memo" on the front page.  (*Id.* at 1309).  The PCR listed the hospital's various outstanding
20  contracts, settlements, leases, and payments with physicians.  (*See id.* at 1309-1317).

21      The second PCR, Bates Nos. 1318-1329, contained an email cover sheet from Bill
22  Stephens, dated February 5, 2003, to a Tim Parker and a Bill Masterson and copied to David
23  White, Sandra McRee, Carl Whitmer, Phil Mazzuca[2], Mike Jennesse, Frank Coyle, Randy

24

25      [2]  In its exhibits, IASIS included the declaration of Phil Mazzuca.  (*See* IASIS Ex. P
26  (#176-1) at 201).  Mazzuca, the Division President of IASIS's Texas and Florida markets from
   2001 through 2006, understood that the PCRs were conducted at the direction of the Legal
27  Department.  (*Id.* at 201-02).  At all times, he understood that the PCRs and the process
   associated with the creation were confidential and not to be shared outside of the company
28  or outside senior management.  (*Id.* at 203).  To his knowledge, PCRs were not shared with
   anybody outside of the company.  (*Id.*).

Bruce, Jerre Frazier, and Derek Morkel.[3]  (*Id.* at 1318).  The email stated, "Attached please find the results of the physician contract review performed at Town and Country Hospital the week ending January 31, 2003.  You should work with Operations Counsel and resolve these issues."  (*Id.*).  The document was saved as "Legal Memo T&C."  (*Id.*).  The Town & Country Hospital PCR, dated October 31, 2002, contained the words "Legal Memo" on the front page.  (*Id.* at 1319).  The PCR reviewed various contracts and leases with physicians.  (*See id.* at 1319-1329).

The third PCR, Bates Nos. 1330-1334, contained an email cover sheet from Bill Stephens, dated September 9, 2002, to a Keith Swinney and a Linda Kirks.  (*Id.* at 1330).  The email stated, "Attached please find the results of the physician contract review performed at SWG the week of September 2, 2002.  I realize that you have already addressed 90% of these items but, please respond to these issues by September 30, 2002."  (*Id.*).  The document was saved as "SWG Legal Memo."  (*Id.*).  The Southwest General Hospital PCR, dated June 30, 2002, contained the words "Legal Memo" on the front page.  (*Id.* at 1331).  The PCR reviewed various contracts and leases with physicians.  (*See id.* at 1331-1334).

Bill Stephens, IASIS's Vice President of Internal Audit since 2001, declared the following.  (IASIS Ex. H (#176-1) at 161).  He reported directly to IASIS CEO, David White.  (*Id.*).  In 2001, IASIS's general counsel, Frank Coyle, directed Stephens to conduct a review of the company's physician contracts and submit written reports of those reviews to the company's Legal Department.  (*Id.*).  Coyle directed Stephens to do this so that the Legal Department could provide legal advice to the company regarding any potential regulatory and litigation issues associated with the company's physician contract relationships and to ensure that the company's facilities were adhering to legal department policies with respect to those relationships.  (*Id.* at 161-62).  As a result of those conversations, Coyle and Stephens developed the Physician Contract Review Process ("PCR Process").  (*Id.* at 162).  Stephens

---

[3]  Frank Coyle (General Counsel), Randy Bruce (Operations Counsel), and Jerre Frazier are the only attorneys listed on the PCR email correspondence.  (*See* IASIS Ex. E (#176-1) at 135).

understood the PCR Process to be distinct and separate from the other reviews he performed for the Internal Audit Department because the PCR Process was conducted at the direction of the Legal Department for the purpose of providing legal advice to the company.  (*Id.*).

During the PCR Process, Stephens worked with the Legal Department to develop an audit plan.  (*Id.*).  The Legal Department would review an audit plan and then identify additional matters for Stephens to review during the PCR Process.  (*Id.*).  After the Legal Department approved the PCR Audit Plan, Stephens would work with the Legal Department and the facility being reviewed to identify physician contractual relationships.  (*Id.* at 162-63).  At the facilities, Stephens or other members of his staff communicated directly with members of the Legal Department for the purpose of obtaining legal advice regarding the documents being reviewed and the information being gathered at the facilities.  (*Id.* at 163).  Prior to creating the final version of the PCR for a particular facility, Stephens would provide draft versions to the Operations Counsel and discuss the draft versions with the Operations Counsel.  (*Id.*).  Operations Counsel would then advise him about additional information and recommendations that needed to be included in the PCR.  (*Id.*).

The PCRs have always been saved on the company's computer system as documents entitled "Legal Memo [hospital].doc."  (*Id.*).  Prior to January 2004, all PCRs except for four, were marked with the legend "Legal Memo."  (*Id.* at 163-64).  In January 2004, the Legal Department added the legend "Confidential Attorney-Client Communication" to all PCRs and the directive that the PCR Process was conducted "pursuant to the request of the Legal Department."  (*Id.* at 164).  Stephens distributed the final PCRs to select members of IASIS's senior management, including division and hospital CEOs and CFOs, and the Company's CEO, CFO, COO, and Chief Compliance Officer, and the Legal Department.  (*Id.*).  All senior management who had received copies of the PCRs were apprised of the confidential nature of the documents and, to Stephens's knowledge, were informed that the PCRs were not to be shared with any individuals outside the company.  (*Id.*).  Senior management was directed to work with Operations Counsel to resolve any issues in the PCRs.  (*Id.* at 165).  Frazier had no involvement with the development or implementation of the PCR Process or in conducting any

PCRs.  (*Id.*).

Coyle declared the following.  (IASIS Ex. I (#176-1) at 169).  On December 17, 2001, Coyle met with Stephens and directed Stephens to "begin conducting periodic reviews of the Company's contractual relationships with physicians whenever [Stephens] made site visits" to the company's facilities.  (*Id.*).  Coyle instructed Stephens to submit written reports of those reviews to the Legal Department.  (*Id.*).  Coyle instructed Stephens to undertake the PCR Process so that in-house attorneys working within the Legal Department could provide legal advice to the company's corporate and facility leadership regarding any potential regulatory and litigation issues.  (*Id.* at 170).  Since the inception of the PCR Process, Coyle and the Legal Department have worked with Stephens regarding the scope of the PCRs.  (*Id.*).  When Stephens and his staff visited PCR facilities, they communicated directly with the Operations Counsel to obtain direction and legal advice regarding the documents being reviewed and gathered at the facilities.  (*Id.* at 171).  During the PCR Process, Stephens directed all substantive questions about the PCRs to the Operations Counsel.  (*Id.*).  After Stephens distributed finalized PCRs to senior management, the Operations Counsel used the PCRs to provide specific legal advice to senior management and to prepare action plans to resolve any questions raised by the PCRs.  (*Id.* at 172).  IASIS personnel were instructed to maintain the confidentially of the PCRs and were directed not to share the PCRs with third parties outside of the company.  (*Id.* at 173).  Coyle always had considered the PCRs to be confidential and protected by the attorney-client privilege because he had initiated the PCR Process.  (*Id.*).  Frazier's involvement with the PCR Process was limited to receiving copies of the PCRs.  (*Id.*).  Frazier had no involvement with the development or implementation of the PCR Process or in conducting PCRs.  (*Id.*).

Frazier declared the following.  He had made clear to senior management that he was only going to join IASIS if they hired an internal auditor who could act independently from the Legal Department and directly reported to the CEO and Board.  (Frazier Ex. A-1 (#201-1) at 7).  When IASIS hired Stephens it was understood that he would operate independently of the legal and compliance departments and would report directly to the CEO.  (*Id.*).  Shortly after

Stephens was hired, Stephens decided to engage in a "high-level factual review of IASIS's relationship with physicians, including a superficial examination of the basic terms of the contracts between IASIS and physicians." (*Id.*). Stephens's findings were memorialized in the three PCR documents at issue. (*Id.* at 7-8).

Frazier knew "for a fact that these internal audits did not originate with Frank Coyle." (Frazier Ex. A-2 (#201-1) at 25). After Frazier told Coyle that Stephens was going to focus on physician relationships in his first audits, Coyle's "reaction was that he did not want to be identified as the initiator of these audits because David White would not be happy with the results these audits would report." (*Id.*). Coyle wanted "to put as much distance as he could between the initiation of these audits and himself." (*Id.*). Frazier knew that the internal audits did not originate with Coyle because he spoke to Coyle and Stephens almost daily and neither of them had suggested to Frazier that Coyle had "instructed" Stephens to perform the internal audits or that the Legal Department was directing the internal audits. (*Id.*).

If Coyle wanted to shield a communication based on privilege or attorney-work product, he would direct a person to place the words "attorney-client privilege," "attorney-client communication," or "attorney work product" on the document. (*Id.* at 26). Frazier never knew Coyle to use the words "legal memo" on a document in an attempt to shield the document from disclosure. (*Id.*). IASIS had a policy, approved by Coyle, that required that, all email communications attempting to preserve an attorney-client privilege to include the caption "CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED" above the body of email messages. (*Id.*). Based on his experiences at IASIS, Frazier believed that the fact that Coyle had not required PCRs to have an attorney-client communication legend until 2004 indicated that Coyle had not considered those earlier documents to be privileged. (*Id.*).

///

///

///

///

///

14

**DISCUSSION**

**I.     Renewed Motion for In Camera Review of Physician Contract Reviews (#190)**[4]

Frazier requests that this Court consider his original "Motion for In Camera Review and a Determination that Relator may use Information in this Case" (Doc. #67) and consider that motion in conjunction with IASIS's renewed motion for sanctions. (*See* Renewed Mot. for In Camera Review (#190) at 1). IASIS does not oppose this request. (Resp. to Renewed Mot. for In Camera Review (#191) at 2).

In Frazier's original motion, he sought in camera review and a determination that the attorney-client privilege did not apply to the PCRs. (Mot. for In Camera Review (#67) at 6). Frazier argues that the PCRs are not privileged because the documents were created by an accountant acting within the scope of his own authority and that no legal advice was sought in its creation. (*Id.* at 16). He asserts that there is no showing that the communication was made solely for the purpose of requesting legal advice. (*Id.* at 17). He also argues that IASIS did not intend for the information in the PCRs to be kept confidential. (*Id.* at 21). He contends that none of the non-attorney recipients of the PCRs thought that the PCRs were privileged or any communication from Stephens was privileged. (*Id.*).

In response, IASIS argues that the PCRs are protected by the attorney-client privilege. (Opp'n to Mot. for In Camera Review (#83) at 10-11). It argues that the PCR Process, initiated in December 2001, was developed at the direction of the Legal Department and that the PCRs were prepared at the Legal Department's direction to aid the department in providing legal advice to the company regarding physician relationships. (*Id.* at 11). IASIS asserts that the Legal Department directed Stephens to gather and develop the PCRs so that the Legal Department could guide IASIS in the resolution of potential issues related to physician contracts. (*Id.* at 12). IASIS contends that whether an employee acts at the direction of counsel has nothing to do with the corporate reporting structure of the company. (*Id.*). It asserts that the PCRs did not involve an accounting function and bore no resemblance to an

---

[4] This motion was filed prior to this Court's dismissal of the TAC.

1   audit of the company's internal financial controls.  (*Id.* at 13).  It argues that, after the Internal

2   Audit Department completed its collection of information, the Legal Department used the

3   information to provide legal advice to the company.  (*Id.*).  It contends that senior management

4   viewed the PCRs as confidential.  (*Id.* at 15).

5       "The attorney-client privilege protects confidential disclosures made by a client to an

6   attorney in order to obtain legal advice, as well as an attorney's advice in response to such

7   disclosures."  *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992) (internal

8   citations omitted).  "The party asserting the attorney-client privilege has the burden of proving

9   that the privilege applies to a given set of documents or communications."  *Id.*

10      To meet this burden, a party must demonstrate that its documents adhere to the

11  essential elements of the attorney-client privilege which include: "(1) Where legal advice of any

12  kind is sought (2) from a professional legal adviser in his capacity as such, (3) the

13  communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at

14  his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8)

15  unless the protection be waived."  *Id.* at 1071 n.2.  Generally, to meet this burden, a party

16  submits a privilege log which identifies: "(a) the attorney and client involved, (b) the nature of

17  the document, (c) all persons or entities shown on the document to have received or sent the

18  document, (d) all persons or entities known to have been furnished the document or informed

19  of its substance, and (e) the date the document was generated, prepared, or dated."  *Id.* at

20  1071.   A party may also submit other evidence, such as affidavits, to demonstrate the

21  attorney-client privilege.  *See id.*

22      In this case, in support of the attorney-client privilege, IASIS has provided the Court with

23  the actual PCRs and declarations supporting their creation, purpose, and relevant recipients.

24  However, Frazier disputes these declarations.  Pursuant to the discussions at oral argument,

25  the Court finds that the PCRs are protected by the attorney-client privilege.  Although the

26  compliance department was involved with the creation of the PCRs, the PCRs were prepared

27  for the purpose of obtaining advice of counsel and not for the purpose of compliance review.

28  Coyle initiated the PCR process as a predicate to obtaining advice from counsel regarding

1  compliance with government rules and regulations governing reimbursement.  Even though

2  the format and audit procedures could later be used for compliance review and to interpret

3  government regulations, in accord with counsel's advice, the PCRs were initiated to frame the

4  solicitation of such advice.    Moreover, the PCRs were intended to be confidential

5  communications as demonstrated by the title of the documents and the body of the emails.

6  The Court grants in part the motion to review the PCRs in camera but denies the motion to use

7  the PCRs as moot (#190) in light of the Court's dismissal of the TAC.

8  **II.    Renewed Motion for Sanctions (#176); Motion for Attorneys' Fees and Non-Taxable Expenses (#226, 241); Motion to Establish Alternative Procedures Under Local Rule 54.2 (#242)**

9

10        IASIS filed its renewed motion for sanctions prior this Court's dismissal of the third TAC.

11  (*See generally* Renewed Mot. for Sanctions (Sealed) (#178)).  In that motion, IASIS sought

12  sanctions against Frazier in the form of dismissal of the case and Frazier's disqualification as

13  a relator based on Frazier's actions of converting IASIS's privileged documents for his own use

14  and for disclosing the documents to his attorneys.  (*Id.* at 16).  IASIS asked the Court to

15  dismiss the complaint under the Court's inherent authority to redress abusive litigation

16  practices.  (*Id.* at 18).  IASIS also argued that Frazier's attorneys' ("Qui Tam Counsel")

17  behavior in accepting, reviewing, and concealing IASIS's privileged materials perpetuated

18  Frazier's misuse of the documents and tainted the proceedings.  (*Id.* at 29).  IASIS argued that

19  Qui Tam Counsel's misconduct and cavalier behavior merited disqualification from

20  participation and dismissal of the case.  (*Id.*).

21        After the Court dismissed Frazier's TAC with prejudice, IASIS, along with David White

22  and Sandra McRee,[5] filed a motion for attorneys' fees and non-taxable expenses as a

23

24        [5]  In his TAC, Frazier added new defendants White and McRee and alleged the same claims against them as he did against IASIS.  (*See* Order (#223) at 15).  Frazier sought leave from the Court to add White and McRee to the complaint and relate back because they should have been aware of the alleged violations against IASIS or knew or should have known that they could have been subjected to personal liability. (*Id.* at 14-15).  The Court found that neither White nor McRee knew or should have known that the second amended complaint could have been a lawsuit filed against them because the allegations in that complaint had failed to identify the correct physicians and had failed to identify transactions in which they had been directly involved. (*Id.* at 15-16).  The Court denied the motion to relate back. (*Id.* at 16). White and McRee now seek attorneys' fees.

25

26

27

28

17

supplement to the renewed motion for sanctions.  (Mot. for Atty Fees (#226) at 2).  IASIS, White, and McRee estimate that they are entitled to $25 million of attorneys' fees and expenses.  (*Id.*).

In its memorandum in support of its motion for sanctions and motion for attorneys' fees, IASIS recognizes that the Court has already dismissed the case on the merits but  seeks the following sanctions: (1) dismissal of Frazier's complaint on independent grounds; (2) disqualification of Frazier from acting as (or otherwise assisting) a party adverse to IASIS; (3) disqualification of Qui Tam Counsel from representing (or otherwise assisting) Frazier or any other party adverse to IASIS; and (4) an order holding Frazier and Qui Tam Counsel jointly and severally liable for attorneys' fees and expenses that IASIS incurred in defending itself against a case that never should have been brought in the first place.  (Mem. for Sanctions & Atty Fees (#241) at 11).  IASIS also seeks an award of statutory attorneys' fees against Frazier, pursuant to 31 U.S.C. § 3730(d)(4), because Frazier's claims against IASIS, White, and McRee were either "clearly frivolous" or "clearly vexatious."  (*Id.*).  IASIS seeks attorneys' fees against Qui Tam Counsel personally, pursuant to 28 U.S.C. § 1927, because Qui Tam Counsel abused the judicial process.  (*Id.* at 17).

**A.      Renewed Motion for Sanctions (#176)**

A district court has inherent powers to impose sanctions for discovery abuses that may not be a technical violation of the discovery rules.  *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-67, 100 S.Ct. 2455, 2463-64, 65 L.Ed.2d 488 (1980)).  In order to dismiss under a court's inherent powers, a court must determine:  "(1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, [and] (4) the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case."  *Id.* at 380.  As optional considerations, where appropriate, a court may consider the prejudice to the party victim of the misconduct and the government interests at stake.  *Id.*

A court may dismiss under its inherent powers in "extreme circumstances" in response

18

to abusive litigation practices, and "to insure the orderly administration of justice and the integrity of the court's orders."  *Id.*  In order for a court to order default or dismissal as a sanction, the losing party's non-compliance "must be due to willfulness, fault, or bad faith."  *Id.*  "A finding of any of these circumstances can justify the sanction of dismissal."  *Id.*  "A district court may not sanction an attorney under its inherent powers if there is nothing in the local rules or norms of professional conduct 'which would have placed [the attorney] on reasonable notice' that his conduct was not in conformance with the court's requirements."  *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1132 (9th Cir. 2008).  Before dismissing an action, the court must "consider less drastic sanctions" and must have a "reasonable explanation of possible and meaningful alternatives."  *Halaco*, 843 F.2d at 381.

### i.    Sanctions against Frazier

As to Frazier, Defendant seeks dismissal of this case and Frazier's disqualification as a relator based on Frazier's alleged attorney-client relationship with IASIS, misappropriation of hundreds of pages of documents marked attorney-client privilege, and for using confidential information obtained during the course of representation.  (Renewed Mot. for Sanctions (Sealed) (#178) at 16, 18, 20, 25).

In response, Frazier admits he is an attorney, but disputes that he was an attorney for IASIS.  (Frazier Resp. to Renewed Mot. for Sanctions (#201) at 3-4).  He asserts that he did not "convert" any documents and instead made copies of his own documents.  (*Id.* at 11-13).

At oral argument, IASIS and Frazier informed the Court that they had reached a settlement.  The parties summarized the settlement in four parts.  First, Frazier will instruct his attorneys to immediately withdraw the pending appeal from the Ninth Circuit and withdraw from any further participation in this case as a relator on behalf of the United States.  Second, subject to the confirmation that the appeal has been withdrawn, IASIS will move to withdraw the pending motion for sanctions against Frazier.  Third, the settlement agreement calls for mutual releases from the parties which ensure that Frazier will never come back against IASIS as a relator or otherwise.  Fourth, the parties seek a 30-day adjournment to execute the settlement agreement because the agreement is based upon the withdraw of the appeal.

1    With the consent of both parties at oral argument, the Court ordered the settlement as

2    final as to those parties. The Court notes that, on December 12, 2011, the Ninth Circuit issued

3    an order dismissing the appeal. (Ninth Cir. Order (#280)). The Court orders the parties to file

4    a final form of the settlement with this Court within 15 days of this order. Accordingly, the

5    Court denies the Renewed Motion for Sanctions (#176) against Frazier as moot in light of the

6    settlement agreement.

7                    **ii.    Sanctions against Qui Tam Counsel**

8    As to Qui Tam Counsel, IASIS argues that their misconduct and cavalier behavior

9    merits disqualification from participation and dismissal of this case. (Renewed Mot. for

10   Sanctions (Sealed) (#178) at 29). Defendant asserts that Qui Tam Counsel had ethical duties

11   not to review, retain, disclose, or use the privileged material that they had received from

12   Frazier. (*Id.* at 30). Defendant argues that Qui Tam Counsel could not conduct their own

13   privilege review of the documents and could not unilaterally assess another party's claim of

14   privilege. (*Id.* at 31). Defendant contends that Qui Tam Counsel had a duty to notify IASIS

15   of the privileged materials and return them, or seek a ruling from the Court about those

16   materials. (*Id.* at 33). Defendant argues that, after Qui Tam Counsel encountered privileged

17   documents, they continued to review the documents to determine if a legitimate claim of

18   privilege applied. (*Id.* at 34). Defendant asserts that when Qui Tam Counsel were confronted

19   about the possession of privileged documents, they pretended not to know what documents

20   IASIS was talking about. (*Id.* at 35). Defendant argues that Qui Tam Counsel used the

21   privileged documents to draft the complaint. (*Id.*). Defendant asserts that the PCRs are

22   privileged and that Qui Tam Counsel admitted to using them to draft the complaint. (*Id.* at 36).

23   In response, Qui Tam Counsel argue that the PCRs are not privileged for three

24   reasons. (Resp. of Relator's Counsel to Renewed Mot. for Sanctions (#206) at 21). First, they

25   argue that IASIS fails to show that confidential communications were made with hospital

26   employees for purposes of obtaining legal advice. (*Id.*). Second, they assert that IASIS fails

27   to show that the hospital CEOs and CFOs who received the three PCRs kept them

28   confidential. (*Id.* at 23). Third, they contend that IASIS fails to establish that the PCRs were

communicated to an attorney or that an attorney had discussed them with the client.  (*Id.* at 24).  They assert that two of the PCRs did not include any attorneys on the communication.  (*Id.* at 25).  They argue that the one PCR that did include a copy to an attorney contained no evidence that the PCR was sent to the attorney for legal advice.  (*Id.*).  Qui Tam Counsel assert that when they reviewed the PCRs they reasonably believed that the PCRs were not privileged documents.  (*Id.*).  Qui Tam Counsel contend that they thought the PCRs were email communications between non-attorneys with attached audits prepared by an accountant.  (*Id.* at 25-26).

With respect to the documents in the sealed box, Qui Tam Counsel cite to the State Bar of Arizona's Ethics Opinion 01-04 regarding what to do if a client gives an attorney an adverse party's potentially privileged documents.  (*Id.* at 33).  Qui Tam Counsel assert that they did not disclose the possession of the documents until Frazier had consented and refrained from examining the potentially privileged documents except to determine the potential claim for privilege.  (*Id.* at 35).

The Arizona State Bar's Ethics Opinion 01-04 discusses "the ethical duty of a lawyer who receives from his or her client copies of . . documents" that belong to the adversary and appear, on their face, to be subject to the attorney-client privilege or to be otherwise confidential.  Ariz. Ethics Op. No. 01-04 (Mar. 2001) at 1.  The opinion noted that, in this particular case, no lawsuit had been filed, but an administrative charge had been filed with the appropriate state and federal agencies.  *Id.* The opinion states that a lawyer who receives such material from a third party is: "(i) to refrain from further examination of the material or from making use of it, (ii) to notify opposing counsel of its receipt, and (iii) either to abide by that counsel's instructions as to its disposition or to seek a ruling from a court as to whether it may be used."  *Id.* at 5.  When no litigation has been brought, and presumably cannot be brought, "the lawyer should refrain from reviewing or making use of the information in the documents and notify the ex-employer's counsel that they have come into the lawyer's possession."  *Id.* However, Arizona Ethics Rule 1.6 "requires client consent before the lawyer may notify the ex-employer or its attorney that the lawyer has received privileged or confidential material

belonging to the ex-employer." *Id.* "If the client refuses to consent to notification, . . . the lawyer still should refrain from examining the documents or making use of the information in them." *Id.*

In this case, the Arizona ethics opinion is not directly on point because the False Claims Act requires a relator to file the complaint in camera and under seal for at least 60 days and prohibits the relator from serving the defendant with the complaint until the court so orders. *See* 31 U.S.C. § 3730(b)(1)(2). Therefore, upon discovering that they had potentially privileged documents from IASIS, Qui Tam Counsel could not reveal the potential lawsuit to IASIS prior to the Court unsealing the complaint. As such, Qui Tam Counsel will not be sanctioned for failing to inform IASIS that they had potentially privileged documents before the Court unsealed the complaint.

However, Qui Tam Counsel were aware that they had potentially privileged documents in the Fall of 2004. (*See* Cohen Decl. (#93-4) at 2). When Qui Tam Counsel initiated a lawsuit in March of 2005, Qui Tam Counsel did not seek a ruling from this Court on what to do with IASIS's privileged documents. (*See* Docket Sheet Entry #1). In fact, Qui Tam Counsel never sought a ruling from this Court on IASIS's privileged documents before serving the unsealed complaint. IASIS, after reading the unsealed complaint in 2007, initiated contact with Qui Tam Counsel in an attempt to retrieve those documents back. (*See* Rennert Decl. (#93-2) at 3). As such, Qui Tam Counsel did breach an ethical duty to seek a ruling from the Court about the privileged documents and breached their duty to contact IASIS about the documents after the complaint was unsealed.

Additionally, after IASIS requested the documents from Qui Tam Counsel, they appeared to play "dumb" as to what privileged documents IASIS was talking about. (*See id.* at 11). Although Qui Tam Counsel were obligated to acquire Frazier's consent before returning the documents back to IASIS, Qui Tam Counsel should have told IASIS that or should have waited for Frazier's consent. Instead, Qui Tam Counsel feigned ignorance with respect to the Sealed Box of privileged documents in their offices.

Accordingly, Qui Tam Counsel did engage in misconduct by withholding IASIS's

documents and failing to seek either a court ruling while the case was sealed or failing to contact IASIS after the seal was lifted.  However, the circumstances in this case do not warrant dismissal.  The facts presented do not establish extraordinary circumstances of bad faith because Qui Tam Counsel kept the undisputed, privileged documents in a Sealed Box. Nevertheless, as discussed at oral argument, the Court sanctions Qui Tam Counsel to attorneys' fees and costs expended by IASIS in its attempt to get its privileged documents back from Qui Tam Counsel.  This includes the preparation of motions seeking such relief. The Court directs IASIS to submit a proposed listing of fees and costs within 15 days of the entry of this order.  Qui Tam Counsel may file objections within the time period provided by the local rules.  The Court will take these filings under submission and will not hold any further hearings on this matter.  IASIS is cautioned to submit fees and costs for an appropriate time period.  Qui Tam Counsel are also disqualified from assisting or representing Frazier or any other party adverse to IASIS.  The Court grants the Renewed Motion for Sanctions (#176) against Qui Tam Counsel.

### B.     Motion for Attorneys' Fees under 31 U.S.C. § 3730(d)(4) (#226, 241)

IASIS argues that Frazier's claims were clearly frivolous because they had no reasonable chance of success.  (Mem. for Sanctions & Atty Fees (#241) at 11).  IASIS argues that Frazier was ethically barred from suing IASIS as a whistle blower because Frazier had an attorney-client relationship with IASIS.  (*Id.* at 12).  IASIS argues that Frazier's medical necessity claim and false certification claim were frivolous because the claims were based on "bare allegations" and not on facts.  (*Id.* at 13-14).  IASIS also argues that Frazier's claims against White and McRee were frivolous because Frazier had no colorable basis for adding them as defendants six years after filing his initial qui tam complaint.  (*Id.* at 15).  IASIS asserts that Frazier's claims were "clearly vexatious" because  Frazier engaged in misconduct in pursuing the claims and was motivated to tarnish the reputations of IASIS, White, and McRee. (*Id.* at 16).

In response, Frazier asserts that there is no per se statutory prohibition on in-house counsel becoming a relator in a qui tam action.  (Frazier Resp. to Sanctions & Fees (#265) at

13).  Frazier responds that he was not counsel to the corporation.  (*Id.* at 14).  Frazier also asserts that, although the Court dismissed the TAC, the Court never found that the claims were frivolous.  (*Id.* at 15-16).  Frazier also asserts that there is no evidence to support the assertion that he brought the case to tarnish the reputation of IASIS or its employees.  (*Id.* at 17).

The Court denies as moot the motion for attorneys' fees under 31 U.S.C. § 3730(d)(4) (#226, 241) in light of the settlement agreement between IASIS and Frazier.  The Court also denies as moot the motion to establish an alternative procedure under Ariz. Loc. R. 54.2 (#242) in light of the settlement agreement between IASIS and Frazier.

### C.    Motion for Attorneys' Fees under 28 U.S.C. § 1927 (#226, 241)

IASIS argues that it is entitled to attorneys' fees pursuant to 28 U.S.C. § 1927 because Qui Tam Counsel abused the judicial process by secretly possessing IASIS's privileged documents for nearly seven years and disclosed a number of privileged documents to the DOJ. (Mem. for Sanctions & Atty Fees (#241) at 17-18).  IASIS asserts that it expended years and millions of dollars in attorneys' fees in order to protect its attorney-client privilege and attorney-work product.  (*Id.* at 18).

In response, Qui Tam Counsel argue that they did not act in bad faith.  (Qui Tam Opp'n to Sanctions & Fees (Sealed) (#269) at 54).  Qui Tam Counsel assert that they did not multiply the proceedings because they only filed a complaint.  (*Id.* at 55).

Pursuant to 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.  "Section 1927 sanctions require a bad faith finding." *W. Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1528 (9th Cir. 1990).  "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Id.* (quotations omitted).  Section 1927 cannot be applied to an initial pleading. *In re Keegan Mgmt. Co.*, 78 F.3d 431, 435 (9th Cir. 1996).  "The filing of a complaint may be sanctioned pursuant to Rule 11 or a court's inherent power, but

it may not be sanctioned pursuant to § 1927." *Id.*

In this case, § 1927 sanctions are not warranted against Qui Tam Counsel. First, this Court has not made a finding of bad faith against Qui Tam Counsel nor is there any evidence to establish that they knowingly raised a frivolous argument. Second, Qui Tam Counsel have only filed complaints or amended complaints in this case. As such, the Court denies the motion for §1927 sanctions. Accordingly, the Court denies the motion for attorneys' fees (#226, 241) against Qui Tam Counsel.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

25

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that the Renewed Motion for Sanctions Against Relator Jerre Frazier and His Counsel (#176) is GRANTED in part and DENIED in part. The Court denies as moot the Renewed Motion for Sanctions (#176) against Frazier in light of the settlement agreement between IASIS and Frazier. The Court orders the parties to file a final form of the settlement agreement within 15 days of the entry of this order. The Court grants the Renewed Motion for Sanctions (#176) against Qui Tam Counsel. The Court orders IASIS to submit a proposed listing of fees and costs within 15 days of the entry of this order.

IT IS FURTHER ORDERED that the Relator's Renewed Motion for In Camera Review of Physician Contract Reviews (#190) is GRANTED in part and DENIED in part. The Court grants in part the motion to review the PCRs in camera, but denies the motion to use the PCRs as moot in light of the Court's dismissal of the TAC.

IT IS FURTHER ORDERED that the Motion for Attorneys' Fees and Non-Taxable Expenses (#226, 241) is DENIED.

IT IS FURTHER ORDERED that the Motion to Establish Alternative Procedures Under Local Rule 54.2 (#242) is DENIED as moot.

Dated this 9th day of January, 2012.

United States District Judge

26